**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE MOORE on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-02504 |
| v. | ) ) | |
| CLUB EXPLORIA, LLC | ) ) | District Judge John Z. Lee |
| Defendant. | ) | Magistrate Judge Sunil R. Harjani |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS
AND STATEMENT OF ADDITIONAL MATERIAL FACTS
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff George Moore submits the following Response to

Defendant's Statement of Material Facts (Doc. 150) and a Statement of Additional Material Facts

in opposition to Defendant's Motion for Summary Judgment (Doc. 146).

**Response To Exploria's Statement of Material Facts**

*1.     Club Exploria is a vacation ownership company that owns and manages vacation properties, including the Summer Bay Resort ("Summer Bay"), in Orlando, Florida. Ex. 1, First Amended Class Action Complaint ("Am. Compl.") Dkt. No. 55, ¶ 2; Ex. 2, Rogers Tr. 10:18- 11:13.*

Response:  Admitted.

*2.     As part of its business, Club Exploria sold vacation packages for Summer Bay through various marketing channels, including telephone campaigns using leads developed by third parties. Ex. 1, Am. Compl. ¶¶ 2-3; Ex. 2, Rogers Tr. 12:4-12:7.*

Response:  Denied that the "leads" were developed exclusively by third parties. Exploria

reviewed and expressly approved of the "opt-in" language that it wanted the leads to agree to in a

communication with Spencer Green, including the language at diabeteshealth.info. Ex. 1, Rogers

Tr. 76:10 - 77:1; Ex. 2, CE-00148 (████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████).  And Exploria went through the

1

same review and approval process with Yodel. Ex. 1, Rogers Tr. 79:9-12 (███████████████

█████████████████████████████████████████████), 80:1-15; 105:21 -

106:1; Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608

(█████████████████████████████████████).

     Moreover, Exploria "developed" the "████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████

     Otherwise, admitted.

     *3.*     *Relevant here, Club Exploria contracted with GA Investments, LLC ("GAI") and Acquis, LLC ("Acquis") to generate Telephone Consumer Protection Act ("TCPA") compliant inbound call transfers "in accordance with federal, state, and local laws" marketing vacations at Summer Bay (the "Summer Bay Campaign"). Ex. 3, CE-00153 (GAI Insertion Order); Ex. 4, CE-00016 (Acquis Insertion Order); Ex. 2, Rogers Tr. 12:8-12:10; see also Ex. 1, Am. Compl. ¶ 4.*

     Response: Denied that Exploria contracted solely for "inbound call transfers." The contracts

expressly require Prospects DM (GAI's and Acquis's vendor) to make *outbound* calls conveying an

approved pre-recorded telemarketing script beginning with "Hello this is _____ a Trip Advisor

calling from the Helping Hands Association" and to then transfer the calls only after that pre-recorded

script was completed. Ex.6, CE-00154 ("████████████████████████████████

████████████████████████"); *id.* at CE-00155; Ex. 5, CE-0017 (same for Acquis); *id.* at

CE-00018; Ex. 1, Rogers Tr. 12:4-10 (admitting that Exploria hired vendors to place outbound

telemarketing calls on the Summer Bay Campaign).

     Also denied that Exploria contracted for TCPA compliant calls. █████████████████

████████████████████████████████████████████████████████████

███████; Ex. 5, CE-00016 (same for Acquis). Moreover, Exploria agreed to opt-in language that

violates the TCPA. Exploria reviewed and approved of the "opt-in language" that it understood would

appear on the various websites and understood and agreed that none of those websites would mention Exploria by name, but instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority." Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name): Ex. 2, CE-00148

(█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████).

Exploria went through the same review and approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1, Rogers Tr. 79:9-12 (████████████████████████████

██████████████████████████████████████████), 80:1-15; 105:21 -106:1; Ex. 3, CE-

04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (██████████████

████████████████████████████████████); Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria

never asked to put its name on the opt-in websites and confirming that none of the websites mentioned Exploria). Exploria admitted in its deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16; Ex. 8, diabeteshealth.info opt-in language at p. 2.

Further, Exploria understood and agreed that the calls were being made to people who had not consented. Exploria received numerous complaints that calls were made without consent, including several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1; Ex. 9, DC-0001; Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253 (conveying same complaint to Spencer Green), yet Exploria never once refused to pay Acquis for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

[REDACTED]

[REDACTED]

[REDACTED]

Ex. 14, CE-01594; Ex. 15, CE-02957. Exploria also knew its vendors were using the same alleged opt-in to make calls for multiple telemarketing campaigns on behalf of other entities. Ex. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate. Exploria understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis, Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5. Yet it made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 – 81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]." *Id.*

Otherwise, admitted.

4.      *Acquis then contracted with a company called Prospects DM, Inc. ("Prospects DM") to place TCPA-compliant calls in accordance with federal, state, and local laws in connection with the Summer Bay campaign. Ex. 4, CE-00016; Ex. 5, Connolly Decl. ¶ 4, Ex. B;Ex. 6, Connolly Tr. 99:22-100:1; Ex 1, Am. Compl. ¶ 4.*

Response: Denied that the contract called for TCPA compliant calls. The contract expressly require *prerecorded* telemarketing calls. Ex. 17, Connolly Decl. at Ex. B (ThirdParty_000104) (requiring outbound calls to use a "pre-recorded audio program"). Further, Acquis and Prospects DM both understood and agreed to "opt-in" language that violates the TCPA. [REDACTED]

[REDACTED]

█████████████████████████████████████████████████████████████ " Ex. 18, Connolly Tr. at 76:12 –

77:3, 79:3-19, 82:15 – 83:6; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in

language; Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17.

Further, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ Ex. 18, Connolly Tr. at 76:12 – 77:3. ███████████████████

██████████████████████████████████. Ex. 19, Grant. Tr. 69:2-5; Ex. 20, Wood Tr. 70:10 –

71:7.  Plaintiff's phone number was supposedly entered at www.diabeteshealth.info, yet the co-

owners diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit

stating that (i) it has no record of every selling any data to Yodel and (ii) it has never sold any data of

individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex.

21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 75, Affidavit of Jason Fine (PinPoint

Schools).

Otherwise, admitted.

*5.* ████████████████████████████████████████████████

█████████████ *Ex. 7, Grant Tr. 20:10-13, 23:10-12, 58:13-14.*

Response:  Denied in its entirety. ███████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

. Ex. 19, Grant. Tr. 146:12 – 147:18.

. Ex. 19, Grant. Tr. 209:1-15.

Ex. 19, Grant. Tr. 209:16-18.

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

6. . *Ex. 1, Am. Compl. ¶ 26; Ex. 7, Grant Tr. 63:16-22, 65:22-23; see also id. at 67:9-23* .

Response: Denied in its entirety.



Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

█████████████████████████████████████████████████████████. Ex. 19, Grant. Tr. 146:12 – 147:18. ████████████████████████████████████

███████████████████████████████. Ex. 19, Grant. Tr. 209:1-15. ████████████

████████████████████████████████████████████████

█████████. Ex. 19, Grant. Tr. 209:16-18.

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1

("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

Moreover, the calls were not transferred to Acquis. Prospects DM and Exploria interfaced their dialing system databases through a direct API connection which shared customer information with each call that was transferred. Ex. 18, Connolly Tr. 56:16-19, 62:1-25; Ex. 24, CE-05233; Ex. 25, CE-05246; Ex. 26, CE-05284; Ex. 1, Rogers Tr. 133:16 – 134:3; Ex. 27, CE-05249-50.

7. *Plaintiff claims that he received two telephone calls to (630) 699-XXXX (the "Subject Telephone Number") on September 14, 2018 and October 16, 2018. Ex. 1, Am. Compl, ¶ 26. Plaintiff testified that the calls he received referenced Club Exploria and its Summer Bay resort. Ex. 8, Moore Tr. 145:1-6. However, Plaintiff hung up before speaking to anyone from Club Exploria because he was not interested in what was being offered. Ex. 8, Moore Tr. 119:1-17.*

Response: Admitted.

8. *The Subject Telephone Number belonged to Mr. Moore's wife, Jennifer A. Moore, at the time these calls were received. Ex. 8, Moore Tr. 23:14-24:2, 25:2-25:9 (the phone number belonged to Ms. Moore from 2006-2020).*

Response: Denied. Plaintiff was the account holder, subscriber, and a regular user of the number at the time of the calls. Ex. 23, Moore Decl. at ¶ 3. Plaintiff answered the calls at issue in this case. *Id.* at ¶ 6. Plaintiff originally obtained the number 14 years ago and has paid for its use ever since. *Id.* at ¶ 3.

9. *Club Exploria did not initiate the calls to the Subject Telephone Number. Ex. 1, Am. Compl. ¶ 26 (Plaintiff received calls "from one of Defendant's vendors"), ¶ 29; Ex. 8, Moore Tr. 146:12-18.*

Response: Admitted that Club Exploria did not physically place the calls. Otherwise, denied. Club Exploria "initiated" the calls by, among other things, (i) *deciding to embark on a prerecorded telemarketing campaign* (Ex. 1, Rogers Tr. at 22:11 – 23:11, 31:19 – 33:10, 89:5-12, Ex. 28, CE-04992; (ii) *creating the telemarketing script that was used in the calls and revising it as the campaign progressed* (Ex. 1, Rogers Tr. at 33:3-6, 41:1-10, 55:3-14, 83:22 – 84:11; Ex.29, CE-05039-42 at CE-05039 (Exploria conveying initial draft to GAI); (iii) *dictating the demographics of who would*

be called (Ex. 1, Rogers Tr. 17:3-16, 32:18 – 33:6, 38:1-23; Ex. 6, CE-00154 (listing target states);
Ex. 5, CE-00017 (███████████████████████████████████████████████████████████
███████████████████████████████████████████████); (iv) *reviewing and
approving the content of the "opt-in language" that the persons called would agree to* (Ex. 1, Rogers
Tr., 76:10 – 77:23, 78:2-15, Ex. 2, (CE-00148)); (v) *hiring others to physically place the calls on its
behalf* (Ex. 1, Rogers Tr. 12:4-10 (admitting that Exploria hired vendors to place outbound
telemarketing calls on the Summer Bay Campaign); Ex. 30, CE-04916 (stating Exploria's
understanding that ████████████████████████████████████████████████████████
███████████████████ (vi) *dictating how and to where the calls were transferred* (Ex. 1, Rogers
Tr. 136:1-20, Ex. 31, CE-05303-04; Ex. 37, (Email from Acquis conveying Exploria's instructions
to Prospects DM)) (vii) *dictating the timing of the calls* (Ex. 1, Rogers Tr. 40:15-25 (Exploria
admitting it controlled hours in which calls could be made); Ex. 32 (Prospects DM asking during
which hours it was allowed to call); Ex. 33, CE-05282 (Exploria conveying schedule for calls to
Spencer Green and Dan Connolly and Dan Connolly accepting); and (viii) *dictating the volume of
the calls* (Ex.29, CE-05039-42 at CE-05039-40 (setting volume requirements); Ex. 18, Connolly Tr.
61:5 – 64:18, Ex. 34, Acquis-000002 (conveying volume requirements to Prospects DM).

     10.    *The Subject Telephone Number is also associated in the public record with another man, Donald Jorgensen. See ECF No. 121.*

     Response: Denied in its entirety. Plaintiff originally obtained the number fourteen years
ago and has paid for its use ever since. Ex. 23, Moore Decl. at ¶ 3. Plaintiff has no idea who
Donald Jorgensen is. *Id.* at ¶ 17.

     11.    *Club Exploria first contracted with GAI and then Acquis to generate inbound call transfers related to the Summer Bay Campaign. Ex. 9, Lizotte Tr. 66:3-11.*

     Response: Denied that Exploria contracted solely for "inbound call transfers." The contracts
expressly require Prospects DM (GAI's and Acquis's vendor) to make *outbound pre-recorded* calls



following an approved telemarketing script beginning with "Hello this is _____ a Trip Advisor

calling from the Helping Hands Association" and to then transfer the calls only after that pre-recorded

script was completed. Ex. 6, CE-00154 (" ████████████████████████████████████

████████████████████████████████ "); *id.* at CE-00155; Ex. 5, CE-00017 (same for Acquis); *id.*

at CE-00018; Ex. 1, Rogers Tr. 12:4-10 (admitting that Exploria hired vendors to place outbound

telemarketing calls on the Summer Bay Campaign).

Otherwise, admitted.

12.    *Club Exploria entered into two contracts with GAI in May 2018, both of which required all calls to be made in strict compliance with the TCPA and do-not-call regulations, meaning the consumer provided express consent to receive the marketing calls. Ex. 3, Ex. CE- 00153, Ex. 10, CE-00125 § 24 (GAI Marketing Agreement); Ex. 2, Rogers Tr. 15:4-15:10; Ex. 5, D.Connolly Decl. ¶ 8; Ex. 11, S. Green Decl. ¶¶ 3, 4 n.2. Club Exploria's Marketing Agreement withGAI also specifically provided that the two parties were independent contractors and did not have aprincipal-agent relationship.  Ex. 10, CE-00125 § 6.[1]*

Response:  Denied that Exploria contracted for TCPA compliant calls.  The contracts expressly

require *prerecorded* telemarketing calls.  Ex. 6, CE-00153 ( ████████████████████████████████

████████████████████ ).  Moreover, Exploria agreed to opt-in language that violates the TCPA.

Exploria reviewed and approved of the "opt-in language" that it understood would appear on the various

websites and understood and agreed that none of those websites would mention Exploria by name, but

---

[1] *[DEFENDANT'S ORIGINAL FOOTNOTE]:  A contract between GAI's affiliate, SPG Marketing, LLC, and Acquis provided that Prospects DM would act as the call center for the Summer Bay Campaign, and also provided that Prospects DM would make only TCPA compliant calls, where Prospects DM had express consent to call consumers. Ex. 11, Green Decl. ¶ 5, Ex. C. Prospects DM was responsible for obtaining consent for the calls it made pursuant to this agreement. Ex. 11, Green Decl. ¶ 3.*
RESPONSE:  Denied that the contract required TCPA compliant calls. ████████████████████████████████
████████████████████  Further, Acquis understood and agreed as part of its contract that the lead "opt-in" language would never mention Exploria, but would instead only authorize calls from the "Helping Hands Association" or a dba of Prospects DM, such as "Support First." Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6; Ex. 7, Lizotte Tr. 105:8 – 107:16; Ex. 8 (diabeteshealth.info opt-in language).  Further denied that Prospects DM was responsible for obtaining consent. Exploria reviewed and expressly approved of the "opt-in" language that it wanted the leads to agree to in a communication with Spencer Green, including the language at diabeteshealth.info. Ex. 1, Rogers Tr., 76:10 - 77:1; Ex. 2, CE-00148 ( ████████████████████████████████████████████████████████████████████ ").  Otherwise, admitted.

instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority," Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name), Ex. 2, CE-00148 (████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Exploria went through the same review and approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1, Rogers Tr. 79:9-12 (███████████████████████████████████████ ███████████████████████████████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (██████████████████████████████ ██████████████████); Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in websites and confirming that none of the websites mentioned Exploria). Exploria admitted in its deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria understood and agreed that the calls were being made to people who had not consented. Exploria received numerous complaints that calls were made without consent, including several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once refused to pay Acquis for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

[REDACTED]

Ex. 14, CE-01594; Ex. 15, CE-02957. Exploria also knew its vendors were using the same alleged opt-in to make calls for multiple telemarketing campaigns on behalf of other entities. EX. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate. Exploria understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis, Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5. Yet it made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 – 81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. [REDACTED]

[REDACTED]

Further denied that Club Exploria and GAI agreed that they did not have a principal-agent relationship. Club Exploria and GAI understood and agreed that GAI would act on Club Exploria's behalf and subject to Club Exploria's control. Ex. 1, Rogers Tr. 99:3-19 (admitting vendors were acting on Exploria's behalf). Throughout the campaign, Exploria had the right to control: (i) *who would be called* (Ex. 1, Rogers Tr. 17:3-16, 32:18 – 33:6, 38:1-23, 98:9 – 99:19, 102:15 – 104:18, 139:8-11, Ex. 9, DC-0001, Ex. 10, CE-01833; Ex. 6, CE-00154 (listing target states); Ex. 5, CE-00017 ([REDACTED]

[REDACTED]); Ex.29, CE-05039-42 at CE-05039); (ii) *the content of the "opt-in language" that the persons called would agree to* (Ex. 1, Rogers Tr., 76:10 – 77:23, 78:2-15, Ex. 2, (CE-00148)) (iii) *the content of the prerecorded script*

*conveyed in the calls* (Ex. 1, Rogers Tr. 33:3-6, 41:1-10, 55:3-14, 83:24 – 84:11; Ex. 19, Grant. Tr. 124:1 – 125:16, Ex. 36, Script Change Email; Ex.29, CE-05039-42 at CE-05039 (Exploria conveying initial draft to GAI)); (iv) *how and to where the calls were transferred* (Ex. 1, Rogers Tr. 136:1-20, Ex. 37, mail from Acquis conveying Exploria's instructions to Prospects DM ; Ex. 31, CE-05303-04); (v) *the timing of the calls* (Ex. 1, Rogers Tr. 40:15-25 (Exploria admitting it controlled hours in which calls could be made); Ex. 32, (Prospects DM asking during which hours it was allowed to call); Ex. 33, CE-05282 (Exploria conveying schedule for calls to Spencer Green and Dan Connolly and Dan Connolly accepting)); and (vi) *the volume of the calls* (Ex.29, CE-05039-42 at CE-05039-40 (setting volume requirements); Ex. 18, Connolly Tr. 61:5 – 64:18, Ex. 34, Acquis-000002 (conveying volume requirements to Prospects DM).

13. *On September 5, 2018, before the calls were placed to the Subject Telephone Number (Ex. 1, Am. Compl. ¶ 26), GAI informed Club Exploria that Acquis would be managing the Club Exploria account from that point forward, and that the switch from GAI to Acquis would not impact strict adherence to the TCPA. Ex. 11, Green Decl. ¶ 7; Ex. 12, CE-04798 (Sep. 5, 2018 Email from S. Green to G. McNamer).*

Response:  Denied that GAI's communication mentioned "strict adherence" to the TCPA. Ex. 84, CE-04798.  Otherwise admitted.

14. *Because Acquis was a new vendor, Club Exploria performed due diligence on the entity, including reviewing Acquis's corporate structure and corporate records to ensure they were current and active. Ex. 13, CE-00149 (July 18, 2019 email from S. Creus to J. Lizotte); Ex. 14, CE-0001 (Acquis Diligence Packet); Ex. 9, Lizotte Tr. 74:7-14. Club Exploria's compliance team reviewed Acquis to confirm it was a suitable vendor. Ex. 13, CE-00149. Acquis filled out a vetting packet required by Club Exploria and submitted its business registration records. Id.; Ex. 14 CE- 0001. Ultimately, Club Exploria's compliance team recommended entering into the contracts with Acquis but stated that Club Exploria would "need assurances that acquired leads have been properly scrubbed against National and State 'Do Not Call List'." Ex. 13, CE-00149. In addition, as a standard due diligence practice, Club Exploria searched for any public complaints against Acquis. Ex. 9, Lizotte Tr. 74:7-14.*

Response:  Denied that Club Exploria performed all "due diligence" into Acquis.  Exploria undertook no investigation whatsoever to ensure that Acquis could offer legitimate "lead" data of persons who actually visited one of the "opt-in" websites.  Ex. 1, Rogers Tr. at 75:17-25, 80:19 – 81:5; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4.

Otherwise, admitted.

15.     *In September 2018, Club Exploria and Acquis executed an insertion order (the "Acquis Agreement") for "TCPA compliant callback leads" with a "Live Date" of September 10, 2018. Ex. 4, CE-00016; Ex. 5, D. Connolly Decl. ¶ 5.*

Response: Denied that Exploria contracted for TCPA compliant calls. The ███████████ ██████████████████████████. Ex. 5, CE-00016 (requiring outbound calls to use a "pre-recorded audio program"). Moreover, Exploria agreed to opt-in language that violates the TCPA. Exploria reviewed and approved of the "opt-in language" that it understood would appear on the various websites and understood and agreed that none of those websites would mention Exploria by name, but instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority," Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name), Ex. 2, CE-00148 (███████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████). Exploria went through the same review and approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1, Rogers Tr. 79:9-12 (████████████████████████████████████ ██████████████████████████████████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (███████████████████████ ████████████████████); Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in websites and confirming that none of the websites mentioned Exploria). Exploria admitted in its deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria understood and agreed that the calls were being made to people who had not consented. Exploria received numerous complaints that calls were made without consent, including

several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24,

118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683,

Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for

a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13,

CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once refused to pay

Acquis for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3. ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ " Ex. 14, CE-01594; Ex. 15, CE-02957.  Exploria

also knew its vendors were using the same alleged opt-in to make calls for multiple telemarketing

campaigns on behalf of other entities. Ex. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate.  Exploria

understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis,

Prospects DM, or Yodel, but instead by unknown third parties.  Ex. 1, Rogers Tr. 71:14 – 73:5.  Yet it

made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came

from a reliable source, despite repeated complaints.  Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 –

81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Otherwise, admitted.

16.     *For a call to be billable under the Acquis Agreement, it had to be a call transfer*
*"where [Acquis] has received the consumer's permission to receive a phone call in accordance with*

*federal, state, and local laws." Ex. 4, CE-00016; Ex. 5, D. Connolly Decl. ¶ 5; Ex. 6, Connolly Tr.*
*100:2-100:24.*

Response: Admitted that only calls that resulted in a transfer after the prerecorded messages
were played were billable to Club Exploria. Denied that only TCPA compliant calls were billable
under the Agreement. Exploria paid for the calls even though it knew that none of the websites
referred to Exploria. Ex. 1, Rogers Tr. at 78:2-8 (Rogers testifying that none of the websites actually
mentioned Exploria by name); Ex. 7, Lizotte Tr. at 105:8 – 107:16 (Exploria admitting in its
deposition that the disclosure at diabeteshealth.info does not authorize telemarketing calls regarding
Exploria), Ex. 8, diabeteshealth.info opt-in language.

 Further, Exploria received numerous complaints that calls were made without consent,
including several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25,
106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-
CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited
calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex.
13, CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once refused to pay
Acquis for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

17. *Pursuant to the Acquis Agreement, "Acquis clearly understood that, in all events,*
*Club Exploria was contracting for TCPA compliant leads and only TCPA compliant leads." Ex. 4,*
*CE-00016; Ex. 5, D. Connolly Decl. ¶ 8.*

Response: Denied in its entirety. The contract expressly require *prerecorded* telemarketing
calls. Ex. 17, Connolly Decl. at Ex. B (ThirdParty_000104) (requiring outbound calls to use a "pre-
recorded audio program"). Further, Acquis understood and agreed as part of its contract that the lead
"opt-in" language would never mention Exploria but instead would authorize calls from the "Helping
Hands Association" and in some cases also a dba of Prospects DM, such as "Support First." Ex. 18,
Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8,
diabeteshealth.info opt-in language. Further, Acquis and Exploria understood and agreed that the "opt-

in" websites were not owned or operated by Exploria, GAI, Acquis, Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5; Ex. 18, Connolly Tr. at 76:12 – 77:3. Plaintiff's phone number was supposedly entered at www.diabeteshealth.info, yet the co-owners diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit stating that (i) it has no record of every selling any data to Yodel and (ii) it has never sold any data of individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 75, Affidavit of Jason Fine (PinPoint Schools).

Further, Exploria paid Acquis for calls even where the person called complained that they did not consent. Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035; Ex. 7, Lizotte Tr. 85:25 – 86:3.

18.  *"Club Exploria did not authorize Acquis or Prospects DM to make any calls on its behalf that were not compliant with the TCPA. To that end, Club Exploria required that all calls made pursuant to the [Acquis Agreement] be placed only when the appropriate consent under the TCPA had been obtained." Ex. 5, D. Connolly Decl. ¶ 10; see also Ex. 4, CE-00016; Ex. 7, Grant Tr. 175:15-176:6 (* ██████████████████████████████████████████ *.")*

Response: Denied in its entirety. ████████████████████████
██. Ex. 5, CE-00016 (██████████████████████████████████"). Moreover, Exploria agreed to opt-in language that violates the TCPA. Exploria reviewed and approved of the "opt-in language" that it understood would appear on the various websites and understood and agreed that none of those websites would mention Exploria by name, but instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority," Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name), Ex. 2, CE-00148 (███████████████████████████
████████████████████████████████████████████████████

████████████████████████████ ").  Exploria went through the same review and approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1, Rogers Tr. 79:9-12 (████████████████████████████████████████████████████████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (████████████████████████████████████████); Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in websites and confirming that none of the websites mentioned Exploria). Exploria admitted in its deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria understood and agreed that the calls were being made to people who had not consented.  Exploria received numerous complaints that calls were made without consent, including several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once refused to pay for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  Exploria also knew its vendors were using the same alleged opt-in to make calls for multiple telemarketing campaigns on behalf of other entities. EX. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate.  Exploria understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis,

Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5. Yet it made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 – 81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

Otherwise, admitted.

19.     _Club Exploria never communicated or acted in a way to contradict that understanding. Ex. 6, Connolly Tr. 101:5-101:17._

Response: Denied in its entirety. ████████████████████████████████

██████████████████████████████████████████████). Moreover, Exploria agreed to opt-in language that violates the TCPA. Exploria reviewed and approved of the "opt-in language" that it understood would appear on the various websites and understood and agreed that none of those websites would mention Exploria by name, but instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority," Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name), Ex. 2, CE-00148 (████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ Exploria went through the same review and approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1, Rogers Tr. 79:9-12 (███████████████████████████████████████████████████),

80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex.

4, CE-04608 (████████████████████████████████); Ex. 20, Wood

Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in websites and confirming

that none of the websites mentioned Exploria). Exploria admitted in its deposition that this "opt-in"

language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16,

Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria understood and agreed that the calls were being made to people who had not

consented.  Exploria received numerous complaints that calls were made without consent, including

several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6

– 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12,

CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I

never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253

(conveying same complaint to Spencer Green)), yet Exploria never once refused to pay for any such

call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 14, CE-01594; Ex. 15, CE-02957.  Exploria also knew its vendors were using the same alleged opt-

in to make calls for multiple telemarketing campaigns on behalf of other entities. EX. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate.  Exploria

understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis,

Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5.  Yet it

made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came

from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 –

81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. 

20.     *Acquis in turn contracted with Prospects DM to make calls as part of the Summer Bay Campaign. Ex. 1, Am. Compl. ¶ 4; Ex. 5, D. Connolly Decl. ¶ 4, Ex. B. Acquis's agreement with Prospects DM required TCPA-compliant leads and defined a billable call as a call transfer "where Prospects DM has received the consumer's permission to receive a phone call in accordance with federal, state, and local laws." Ex. 5, D. Connolly Decl. ¶ 4, Ex. B.*

Response:  Denied that Acquis's agreement with Prospects DM required TCPA-complaint

leads. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████.

Further, Acquis understood and agreed as part of its contract that the lead "opt-in" language would

never mention *Exploria* but would instead only authorize calls from the "Helping Hands

Association" such as "Support First." Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6;

Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

 Denied further that only calls made with the customer's permission in accordance with

federal, state, and local laws were billable under the contract.  Acquis paid Prospects DM for calls

even though it knew that the lead "opt-in" language never mentioned Exploria, and did so even

where the person called complained that they did not consent. Ex. 17, Connolly Decl. at ¶ 12;  Ex.

2, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex.

10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035; Ex. 7, Lizotte Tr. 85:25 – 86:3.

Otherwise, admitted.

21. ██████████████████████████████████████████
████████████████████████████████████████████████
███████████████ *Ex. 5, D. Connolly Decl. ¶ 9; Ex. 7, Grant Tr. 176:4-6, 179:15- 17, 179:22-*
*180:1, 202:16-20.*

Response: Denied in its entirety. Exploria reviewed and approved of the "opt-in language"

that it understood would appear on the various websites and understood and agreed that none of those

websites would mention Exploria by name, but instead would only purport to authorize calls from the

"Helping Hands Association" or "Senior Care Authority." Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers

reviewed language at diabeteshealth.info before campaign began and thought "helping hands

association" would be sufficient), , Ex. 2, CE-00148 (████████████████████████████

████████████████████████████████████████████████

████████████████████████████") . Exploria went through the same review and

approval process for the opt-in language with Yodel. Ex. 1, Rogers Tr. 79:9-12 (████████████

█████████████████████████████████████████), 80:1-15; 105:21 -106:1,

Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (████████

████████████████████████████); Ex. 20, Wood Tr. 39:8-18 (testifying

that Exploria never asked to put its name on the opt-in websites and confirming that none of the

websites mentioned Exploria).

22. *Club Exploria understood that GAI and Acquis were its independent contractors,*
*not its agents; and that Prospects DM was an independent contractor of GAI and Acquis. Ex. 15,*
*CE-00020 § 6 (Acquis Marketing Agreement) ("The Parties specifically agree that their relationship*
*shall be that of two independent contractors and not that of an employer and employee or principal and*
*agent."); Ex. 10, CE-00125 § 6; Ex. 9, Lizotte Tr. 79:18-80:10, 113:19-114:7.*

Response: Denied in its entirety. Club Exploria, GAI, Acquis, and Prospects DM

understood and agreed as part of their contracts that GAI, Acquis, and Prospects DM would act on

Club Exploria's behalf and subject to Club Exploria's control. Ex. 1, Rogers Tr. 99:3-19 (admitting

vendors were acting on Exploria's behalf). Throughout the campaign, Exploria had the right to

control: (i) *who would be called* (Ex. 1, Rogers Tr. 17:3-16, 32:18 – 33:6, 38:1-23, 98:9 – 99:19,

102:15 – 104:18, 139:8-11, Ex. 9, DC-0001, Ex. 10, CE-01833; Ex. 6, CE-00154 (listing target

states); Ex. 5, CE-00017 (█████████████████████████████████████████████

███████████████████████████████████████████████████████; Ex.29, CE-

05039-42 at CE-05039); (ii) *the content of the "opt-in language" that the persons called would agree*

*to* (Ex. 1, Rogers Tr., 76:10 – 77:23, 78:2-15, EX. 2, (CE-00148)) (iii) *the content of the prerecorded*

*script conveyed in the calls* (Ex. 1, Rogers Tr. 33:3-6, 41:1-10, 55:3-14, 83:24 – 84:11; Ex. 19, Grant.

Tr. 124:1 – 125:16, Ex. 36, Script Change Email; Ex.29, CE-05039-42 at CE-05039 (Exploria

conveying initial draft to GAI)); (iv) *how and to where the calls were transferred* (Ex. 1, Rogers Tr.

136:1-20, Ex. 37, Email from Acquis conveying Exploria's instructions to Prospects DM; Ex. 31, CE-

05303-04); (v) *the timing of the calls* (Ex. 1, Rogers Tr. 40:15-25 (Exploria admitting it controlled

hours in which calls could be made); Ex. 32, (Prospects DM asking during which hours it was

allowed to call); Ex. 33, CE-05282 (Exploria conveying schedule for calls to Spencer Green and Dan

Connolly and Dan Connolly accepting)); and (vi) *the volume of the calls* (Ex.29, CE-05039-42 at

CE-05039-40 (setting volume requirements); Ex. 18, Connolly Tr. 61:5 – 64:18, Ex. 34, Acquis-

000002 (conveying volume requirements to Prospects DM).

      23.    *Club Exploria believed that Prospects DM was placing calls as part of the Summer Bay*
*Campaign (Ex. 4, CE-00016) and did not know that Prospects DM had engaged another third party,*
*Tele-Skills, to place the calls. Ex. 2, Rogers Tr. 12:4-17; Ex. 9, Lizotte Tr. 52:12-20.*

      Response: ███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████ . █████████████████

██████████████████████████████████████████████

████████████████████ ███████████████████████

██████████████████████████████████████████████



Further, ██████████████████████████████████████████████. Ex. 19,

Grant. Tr. 146:12 – 147:18. ████████████████████████████

████████████████████████████████████████. Ex. 19, Grant. Tr. 209:1-15. ████████

████████████████████████████████████████████████████████

████████. Ex. 19, Grant. Tr. 209:16-18.

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this

case.  Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and

obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1

("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects

made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

24.     _In a separate call campaign running contemporaneously with the GAI/Acquis_
_campaign, Club Exploria contracted with Yodel Technologies, LLC ("Yodel") to generate inbound_
_calls related to Summer Bay and other properties. Ex. 1, Am. Compl. ¶ 4; Ex. 17, CE-00176 (Yodel_
_Agreement); Ex. 2, Rogers Tr. 12:4-12._

Response: Denied that Exploria's contract with Yodel merely required Yodel to generate inbound calls. Exploria and Yodel agreed as part of their contract that Yodel would make outbound calls utilizing a prerecorded telemarketing script and then transfer the calls to Exploria only after that prerecorded script was completed. Ex. 20, Wood Tr. 14:24 –17:9, Ex. 39, CE-00176 – CE-00186, Ex. 40, Insertion Orders; Ex. 1, Rogers Tr. 28:9 – 31:3, Ex. 41, CE-01598 – CE-01599.

Denied further that the calls placed by Yodel contemporaneously with the Prospects DM calls were a "separate call campaign." It was the same campaign. A ███████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████. Ex. 20, Wood Tr. 13:20 – 14:5, 22:19-24, 27:20 – 28:8; Ex. 19, Grant. Tr. 70:11 – 71:4, 74:7-14, 75:22 – 76:12; Infra at Exploria SOMFs ¶¶ 31 & 37. ██████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████. Ex. 20, Wood Tr. 38:9 – 39:18, 40:3-8, 44:9-21; Ex. 1, Rogers Tr. at 76:19 - 77:23, 78:2-8, Ex. 2, CE-00148 ; Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6, Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language. Exploria's "standard operating procedure" with complaints about the calls was to ask both Yodel and GAI/Acquis to investigate the complaint because they were calling at the same time with essentially the same script. Ex. 1, Rogers Tr. 49:7-23.

██████████████████████████████████████████████████████████████████████ ████████████████████████████████ (Ex. 19, Grant. Tr. 62:3-13, 112:15 – 113:1, 116:6 – 117:4; Ex. 20, Wood Tr. 14:24 – 15:5, 46:5 – 47:10), (ii) *promoted the same Summer Bay property in Orlando* (Ex. 1, Rogers Tr. 11:11 – 12:2, 24:11-24, 29:19 – 30:1, 41:1-10, 48:6 – 50:6); (iii) *imposed the same qualification requirements for the promotion* (Ex. 1, Rogers Tr. 106:25 – 107:10); (iv) *conveyed essentially the same script which stated the caller was a "Trip Advisor" from*

*"the Helping Hands Association," offering a 3 night stay in "magical Orlando,"* (Ex. 1, Rogers Tr. at 28:9 – 31:3, 51:12-18, 53:1 – 54:16, 56:6 – 57:20, 93:4 – 94:15, 95:9 – 96:4, 118:6 - 119:13, Ex. 41, CE-01598 – CE-01599, Ex. 42, CE-03073 – CE-03075, Ex. 43, CE-03410 – CE-03411, Ex. 44, CE-01605 – CE-01607, Ex. 45, CE-03057 – CE-03062, Ex. 11, CE-04682; Ex. 6, CE-00155; Ex. 5, CE-0018, Ex. 17, Connolly Decl. at Ex. B (ThirdParty_000104); Ex. 20, Wood Tr. 98:11 – 99:1); and (v) were *transferred to the same Exploria call center* once the prerecorded script completed (Ex. 1, Rogers Tr. 27:1-16).

Further, ███████████████████████████████████████████████████████████████████████████████████████████████. Ex. 47, Grant Declaration (Royal Seas) at ¶¶ 4, 6; Ex. 20, Wood Tr. 81:10-17, 82:21 - 84:9, 87:22 – 90:17; Ex. 19, Grant. Tr. 69:11-71:9, 72:13 – 73:10, 75:11-14, 82:6-21, 86:7 – 87:3, 116:17-23, 139:15 – 140:17, 140:20 – 144:10. The owner of Acquis believes that Josh Grant, the owner of Prospects DM, is also an owner of Yodel and that Yodel "may be controlled by Josh." Ex. 18, Connolly Tr. 86:12-22.

25.     *However, Plaintiff was never called by Yodel. Ex. 16, Wood Tr. 120:23-122:1.*[2]

Response: Admitted that Yodel did not physically place the call, but otherwise denied.   The prerecorded script stated that the caller was the Helping Hands Association, which is Yodel's DBA. Ex. 20, Wood Tr. 35:21-24, 37:22-24. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████.
Ex. 47, Grant Declaration (Royal Seas) at ¶¶ 4, 6; Ex. 20, Wood Tr. 81:10-17, 82:21 - 84:9, 87:22 – 90:17; Ex. 19, Grant. Tr. 69:11-71:9, 72:13 – 73:10, 75:11-14, 82:6-21, 86:7 – 87:3, 116:17-23, 139:15 – 140:17, 140:20 – 144:10. The owner of Acquis believes that Josh Grant, the owner of

---

[2] [DEFENDANT'S ORIGINAL FOOTNOTE]: <u>Because Yodel is not responsible for the calls to Plaintiff, Club Exploria's relationship with Yodel is not relevant to determining whether Club Exploria can be held vicariously liable for the calls at issue.</u>
RESPONSE: Plaintiff objects to this statement as impermissible legal argument.  In any event, the assertion is denied. Exploria's relationship with Yodel is relevant given that Exploria itself asserts numerous statements of material fact concerning its relationship with Yodel.  It is also relevant for the reasons set forth in Plaintiff's memorandum of law.

Prospects DM, is also an owner of Yodel and that Yodel "may be controlled by Josh." Ex. 18, Connolly Tr. 86:12-22.

Moreover, ██████████████████████████████████████████████████████████████

██████" Ex. 19, Grant. Tr. 70:11 – 71:4, 74:7-14; Infra at Exploria SOMFs ¶¶ 31 & 37.

26.     _Consistent with its longstanding vendor practices, Club Exploria's contract with Yodel required Yodel to provide services "in full compliance with all applicable laws and regulations, including without limitation, the Telephone Consumer Protection Act and the National Do Not Call registry." Ex. 17, CE-00176; Ex. 16, Wood Tr. 15:10-22._

Response:  Denied in its entirety.  The contract required prerecorded telemarketing calls. Ex. 20, Wood Tr. 14:24 –17:9, Ex. 39, CE-00176 – CE-00186, Ex. 40, Insertion Orders; Ex. 1, Rogers Tr. 28:9 – 31:3, Ex. 41, CE-01598 – CE-01599.

Further, Exploria and Yodel understood and agreed as part of their contract that the lead "opt-in" language would never mention _Exploria_ but would instead authorize calls from the "Helping Hands Association." Ex. 48, CE-04201 – CE-04203,  Ex. 20, Wood Tr. 38:3 – 39:18, 40:3-8, 44:9-21; Ex. 1, Rogers Tr. 71:14 -73:15, 76:19 – 78:8; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Moreover, **Exploria** received numerous complaints regarding Yodel's calls, including that they were being made in violation of the law, yet Exploria never refused to pay Yodel for any such call. Ex. 1, Rogers Tr. 58:12 – 59:6; Ex. 49, CE-01533-34; Ex. 50, CE-01828; Ex. 52, CE-02227; Ex. 54, CE-02556; Ex. 55, CE-02665; Ex. 56, CE-02789 (reference to a lawsuit that was filed); Ex. 57, CE-03112; Ex. 58, CE-03162; Ex. 59, CE-03746; Ex. 60, CE-04624; Ex. 61, CE-04631-32; Ex. 62, CE-04661 – CE-04662; Ex. 63, CE-04664-65; Ex. 64, CE-01704-05 ("████████████████████████████ ████████████████████████████████████████████████████████████"); Ex. 65, CE-04696; Ex. 66, CE-04998 – CE-05004; Ex. 7, Lizotte Tr. 45:14-19.

Furthermore, Exploria knew that the calls were being made without consent.  Exploria was aware that Yodel's calls on the Summer Bay campaign resulted in the recipient's Caller ID showing

"scam likely" when the phone rang, but it continued with the calls anyway. Ex. 1, Rogers Tr. at 114:8 – 115:23. 

27. *Accordingly, Yodel understood that it had no authority to initiate calls that were not TCPA compliant on behalf of Club Exploria. Ex. 16, Wood Tr. 122:14-123:18.*

Response:  Denied in its entirety. Exploria and Yodel understood and agreed as part of their contract that the lead "opt-in" language would never mention *Exploria* but would instead authorize calls from the "Helping Hands Association." Ex. 48, CE-04201 – CE-04203,  Ex. 20, Wood Tr. 38:3 – 39:18, 40:3-8, 44:9-21; Ex. 1, Rogers Tr. 71:14 -73:15, 76:19 – 78:8; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Moreover, Exploria received numerous complaints regarding Yodel's calls, including that they were being made in violation of the law, yet Exploria never refused to pay Yodel for any such call. Ex. 1, Rogers Tr. 58:12 – 59:6; Ex. 49, CE-01533-34; Ex. 50, CE-01828; Ex. 52, CE-02227; Ex. 54, CE-02556; Ex. 55, CE-02665; Ex. 56, CE-02789 (reference to a lawsuit that was filed); Ex. 57, CE-03112; Ex. 58, CE-03162; Ex. 59, CE-03746; Ex. 60, CE-04624; Ex. 61, CE-04631-32; Ex. 62, CE-04661 – CE-04662; Ex. 63, CE-04664-65; Ex. 64, CE-01704-05 ("████████████████████ █████████████████████████████████████"); Ex. 65, CE-04696; Ex. 66, CE-04998 – CE-05004; Ex. 7, Lizotte Tr. 45:14-19.

Furthermore, Exploria knew that the calls were being made without consent.  Exploria was aware that Yodel's calls on the Summer Bay campaign resulted in the recipient's Caller ID showing "scam likely" when the phone rang, but it continued with the calls anyway. Ex. 1, Rogers Tr. at 114:8

– 115:23. 

28. ___The agreement with Yodel further specified that Yodel was an independent contractor, and not an agent of Club Exploria. Ex. 17, CE-00176 ¶ 15(a); Ex. 16, Wood Tr. 15:10-22; see also Ex. 9, Lizotte Tr. 96:9-10, 113:19-114:7 (Club Exploria understood that Yodel was an independent contractor).___

Response: Denied in its entirety. Club Exploria and Yodel understood and agreed as part of their contract that Yodel would act on Club Exploria's behalf and subject to Club Exploria's control. Ex. 1, Rogers Tr. 99:3-19; Ex. 20, Wood Tr. 13:10-13, 56:5-7. Throughout the campaign, Exploria had the right to control (i) *the content of the prerecorded script* (Ex. 1, Rogers Tr. 83:22 – 84:11, 92:14 – 98:7, 107:13 – 108:18, 137:5 – 138:1, Ex. 67, CE-01602, Ex. 44, CE-01605 – CE-01607, Ex. 45, CE-03057 – CE-03062; (ii) *who would be called* (Ex. 1, Rogers Tr. 98:13 – 100:8, 78:19 – 79:23, Ex. 65, CE-04696; Ex. 70, CE-01600 – CE-01601), (iii) *the volume of the calls* (Ex. 1, Rogers Tr. 59:10 – 60:9, 99:21 – 102:11, Ex. 71, CE-04653, Ex. 70, CE-01600 – CE-01601, Ex. 72, CE-01610 – CE-01613, and (iv) *the time of the calls* (Ex. 1, Rogers Tr. 99:21 – 102:11, , Ex. 70, CE-01600 – CE-01601, Ex. 72, CE-01610 – CE-01613.

29. *Ex. 6, Connolly Tr. 45:1-45:5, 60:7-60:21; Ex. 7, Grant Tr. 68:13-21.*

---

[3] [DEFENDANT'S ORIGINAL FOOTNOTE]: Because the calls to Plaintiff were made by Tele-Skills, which was engaged by Prospects DM, which in turn was engaged by Acquis, this section focuses on Acquis, Prospects DM, and Tele-Skills. Club Exploria's relationship with GAI ended prior to the calls to Plaintiff.
RESPONSE: Denied that the calls to Plaintiff were made by Tele-Skills and denied that Tele-skills was engaged by Prospects DM. See Responses to SOMFs 5 and 23. Also denied that Exploria's relationship with GAI ended prior to the calls to Plaintiff. Exploria communicated with Spencer Green of GAI about the campaign after the calls to Plaintiff. Ex. 1, Rogers Tr. at 106:4-24, Ex. 10, CE-01833.

Response:  Admitted that ██████████████████████████████████████████ ████s, but denied that any of those consumers "opted in and provided consent to be called" on the Summer Bay campaign.  To begin, Exploria has not established that any of the persons whose contact information ██████████████████████ actually visited one of the opt-in websites, █████████ █████████████████████████████████████████████ (Exploria, GAI, Acquis, Yodel, and Prospects DM). Ex. 1, Rogers Tr. 72:1 - 75:8; Ex. 20, Wood Tr. 70:10 – 71:7; Ex. 19, Grant. Tr. 69:2-5; Ex. 18, Connolly Tr. 60:7-21.  There is good reason to doubt that any of the called parties actually did visit one of the websites.  One of the websites owners responded to Exploria's subpoena in this case by telling Exploria that "the leads that are being attributed to us by you clearly are not our leads and are fraudulent leads with fake IP addresses and possibly fake mailing addresses." Ex. 73, PermissionDIRECT email at pp. 1, 3.  The "lead" data that resulted in the call to Plaintiff is also fake.  Exploria contends that Prospects DM purchased the following lead bearing Plaintiff's phone number from Yodel:

> Name: Donald Jorgensen
> Phone: 630-699-████
> Address:
> ██████████
> Oswego, IL 60543
> Email ██████████████████
> URL: diabeteshealth.info
> Signup date/time: 02/20/2017 @ 02:03:54
> IP: 63.250.187.177

See infra, SOMF 41, 43.  Yet the co-owners of diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit stating that (i) it has no record of every selling any data to Yodel and (ii) it has never sold any data of individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 7, Lizotte Tr. 108:8 – 110:13, Ex. 74, diabeteshealth.info Terms and Conditions at p. 1; Ex. 75, Affidavit of Jason Fine (PinPoint Schools); see also Ex. 76, Exploria Answer to Interrogatory 2.

Moreover, the internet service provider for the ip address 63.250.187.177, BT America's Inc. (BT), has confirmed that it never assigned that ip address to any user and it was therefore "spoofed outside BT". Ex. 77, BT Email to Michael Grill at pp. 2-4.   Furthermore, Plaintiff has owned the telephone number for fourteen years and has no idea who Donald Jorgensen is. See Ex. 23, Moore Decl. at ¶¶ 3, 16-17.

Second, even assuming that these consumers actually visited one of the "opt-in" websites, it is undisputed that the website opt-in language never mentioned Exploria and instead only purported to authorize calls from the "Helping Hands Association" and ███████████████████████ ████████████████████████████████████████████" Ex. 7, Lizotte Tr. at 105:8 – 107:16 (Exploria admitting in its deposition that the disclosure at diabeteshealth.info does not authorize telemarketing calls regarding Exploria), Ex. 8, diabeteshealth.info opt-in language.  ; Ex. 20, Wood Tr. 38:3 – 39:18, 40:3-8, 44:9-21; Ex. 1, Rogers Tr. 71:14 -73:15, 76:19 – 78:8, 78:2-8, Ex. 2, CE-00148 ; Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6, Ex. 19, Grant, Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 48, CE-04201 – CE-04203.

Further, ████████████████████████████████████ ████████████████████████████████████. Ex. 19, Grant. Tr. 75:11-15.

30.    ████████████████████████████████. *Ex. 7,* *Grant Tr. 68:13-21, 69:17-22.* ██████████████████ *Id.*

Response:  Denied that Data Providers own websites or have relationships with website owners. ████████████████████████████████████████. Ex. 19, Grant. Tr. 69:2-5; Ex. 20, Wood Tr. 70:10 – 71:7.  Moreover, data providers such as Yodel often have no relationship with the website owners but instead purchase the lead data from an intermediary brokerage. Ex. 20, Wood Tr. 103:5 – 108:6.

Further, denied that any visitor to one of these websites consented to calls from or concerning Exploria. It is undisputed that the website opt-in language never mentioned Exploria and instead only purported to authorize calls from the "Helping Hands Association" and in some cases a ███████ ████████████████████████████████████████████████████ Ex. 7, Lizotte Tr. at 105:8 – 107:16 (Exploria admitting in its deposition that the disclosure at diabeteshealth.info does not authorize telemarketing calls regarding Exploria), Ex. 8, diabeteshealth.info opt-in language; Ex. 20, Wood Tr. 38:3 – 39:18, 40:3-8, 44:9-21; Ex. 1, Rogers Tr. 71:14 -73:15, 76:19 – 78:8, 78:2-8, Ex. 2, CE-00148 ; Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6, Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 48, CE-04201 – CE-04203. The co-owners diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit stating that (i) it has no record of every selling any data to Yodel and (ii) it has never sold any data of individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 75, Affidavit of Jason Fine (PinPoint Schools).

Further, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 19, Grant. Tr. 75:11-15.

31. ████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████████████ *. 7,*
*Grant Tr. 70:11-23, 74:10-14.*

Response: Denied that that the "opt-in data" was acquired through websites. Exploria has not established that any of the persons ████████████████████████████████████ actually visited one of the opt-in websites, ███████████████████████████████ ████████████████████████████████████████████████████ Ex. 1, Rogers Tr. 72:1

- 75:8; Ex. 20, Wood Tr. 70:10 – 71:7; Ex. 19, Grant. Tr. 69:2-5; Ex. 18, Connolly Tr. 60:7-21. There is good reason to doubt that any of the called parties actually did visit one of the websites. One of the websites owners responded to Exploria's subpoena in this case by telling Exploria that "the leads that are being attributed to us by you clearly are not our leads and are fraudulent leads with fake IP addresses and possibly fake mailing addresses." Ex. 73, PermissionDIRECT email at pp. 1, 3. The "lead" data that resulted in the call to Plaintiff is also fake. Exploria contends that Prospects DM purchased the following lead bearing Plaintiff's phone number from Yodel:

> Name: Donald Jorgensen
> Phone: 630-699-█████
> Address:
> ████████████
> Oswego, IL 60543
> Email ███████████████████
> URL: diabeteshealth.info
> Signup date/time: 02/20/2017 @ 02:03:54
> IP: 63.250.187.177

See infra, SOMF 41, 43. Yet the co-owners of diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit stating that (i) it has no record of ever selling any data to Yodel and (ii) it has never sold any data of individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 75, Affidavit of Jason Fine (PinPoint Schools); see also Ex. 76, Exploria Answer to Interrogatory 2. Moreover, the internet service provider for the ip address 63.250.187.177, BT America's Inc. (BT), has confirmed that it never assigned that ip address to any user and it was therefore "spoofed outside BT". Ex. 77, BT Email to Michael Grill at pp. 2-4. Furthermore, Plaintiff has owned the telephone number for fourteen years and has no idea who Donald Jorgensen is. See Ex. 23, Moore Decl. at ¶¶ 16-17.

Also denied that the inclusion of a Prospects DM's DBA in the "opt-in" language is sufficient for the "prior express written consent" required by the TCPA. *See* Plaintiff's Memorandum of law.

Otherwise, admitted.

32. 

*id. at 185:15-19.*

Response: Denied in its entirety. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 7,

Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. Ex. 19, Grant. Tr. 75:11-15.

33. ████████████████████████████████████████

Response: ████████████████████████████████████

---

[4] *DEFENDANT'S ORIGINAL FOOTNOTE: Jornaya and TrustedForm are two lead certification programs that help verify and document consent by recording consumers filling out online lead forms, among other things. See, e.g., Connolly Tr. 46:9-19.*

RESPONSE: Denied that Jornaya and TrustedForm record "consumers," as opposed to bots, click farms, or affiliate marketers filling out online lead forms with stolen consumer information. *See* Ex. 20, Wood Tr. 74:7-25, 110:23 – 113:1; *see also* FRAUDULENT WEB TRAFFIC CONTINUES TO PLAGUE ADVERTISERS, OTHER BUSINESSES, https://www.wsj.com/articles/fraudulent-web-traffic-continues-to-plague-advertisers-other-businesses-1522234801; BOT FORM FILLS ARE DESTROYING LEAD GENERATION INDUSTRY. WHAT CAN BE DONE?, https://performinsiders.com/2019/03/bot-form-fills-are-destroying-lead-generation-industry-what-can-be-done/ ("Deceitful affiliates will maximize leads by using bots, malware, or an even more sophisticated method – human fraud farms engaged in filling out forms with real people's information.")

█████████████████████████████████████████████████████████████

████████████████████████████

    ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████

Otherwise, admitted.

34. █████████████████████████████████████████████
███████████████████████████████████████████████████████████████

*Ex. 7, Grant Tr. 161:20-162:24, 166:14-167:18.*

Response: ███████████████████████████████████████████

████████████████████████████████████████████████████████

█████" Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17, 161:20 -

162:24, 166:14 - 167:18; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in

language.

Also denied the "opt-in" language is sufficient for the "prior express written consent"

required by the TCPA. *See Plaintiff's Memorandum of law.*

Otherwise, Admitted.

35. ███████████████████████████████████████████
██████████████████████████████████*. Ex. 7, Grant Tr. 160:11-161:2.*

    ████████████████████████████████████████████████

█████████████████████████

Otherwise, admitted.

36. █████████████████████████*Ex. 7, Grant Tr. 149:19-23; Ex. 16, Wood Tr. 114:14-21. Landfall is a*
*digital marketing agent that owns and operates multiple websites to generate leads for its customers,*

*including Prospects DM.[5] See Ex. 18, Brody Decl. ¶¶ 8, 11. The data that Yodel purchased from Landfall, included data associated with a Landfall website at www.diabeteshealth.info. Ex. 16, Wood Tr. 119:20-24.*

Response:  Denied that the owner of www.diabeteshealth.info is Landfall Data, LLC. www.diabeteshealth.info, is jointly owned by Landfall 2, Inc and PinPoint Schools. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 76, Exploria Answer to Interrogatory 2; Ex. 7, Lizotte Tr. 108:8 – 110:13, Ex. 74, diabeteshealth.info Terms and Conditions at p. 1; Ex. 75, Affidavit of Jason Fine – PinPoint Schools.

Further denied that Yodel ever obtained data from any Landfall entity. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 7, Lizotte Tr. 108:8 – 110:13, Ex. 75, Affidavit of Jason Fine – PinPoint Schools.

37. ███████████████████████████████████████████ *Ex. 7, Grant Tr. 200:4-7.*

Response:  Denied in its entirety.  See Response to SOMF 29.  Further, one of Prospects DM's clients, Royal Seas Cruises, Inc. was sued in 2017 for violations of the TCPA based on calls that Prospects DM made to leads that supposedly originated at diabeteshealth.info, the same website from which the Jorgensen lead supposedly originated. Ex. 47, Grant Declaration (Royal Seas) at ¶ 28. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. Ex. 19, Grant. Tr. 75:11-15.

38. ████████████████████████████████████████.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[5] [DEFENDANT'S ORIGINAL FOOTNOTE]: Kevin Brody, Landfall's chief executive officer, gave sworn testimony in a deposition and provided a sworn declaration in another case regarding Landfall and www.diabeteshealth.info. *DeForest v. Royal Seas*, 17-cv-00986 (S.D. Cal.), ECF No. 159-8.
RESPONSE:  Admitted.

████████████████████████████████████████████████
████████████████████████████

Response:  Admitted.

39.  ████████████████████████████████████████

████       *If the consumer met certain criteria and expressed interest in Club Exploria's vacation packages, the consumer would be live transferred to a Club Exploria agent. Ex. 9, Lizotte Tr. 81:12-81:19.*

Response:  Denied that ████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

█ ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████  Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr.

108:4-6; 11-16.

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████.

19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language. Further, one of Prospects DM's clients, Royal Seas Cruises, Inc. was sued in 2017 for violations of the TCPA based on calls that Prospects DM made to leads that supposedly originated at diabeteshealth.info, the same website from which the Jorgensen lead supposedly originated. Ex. 47, Grant Declaration (Royal Seas) at ¶ 28.

Otherwise, admitted.

40.     *Other than the complaint from Plaintiff, neither Club Exploria nor Acquis nor Prospects DM received any complaints from consumers who were called as part of the Summer Bay Campaign and stated that they did not consent to be called.[6] Ex. 2, Rogers Tr. 69:21-70:3; Ex. 5, D.*

---

[6] [DEFENDANT'S ORIGINAL FOOTNOTE]: Club Exploria did receive calls from consumers asking to be put on Club Exploria's "Do-Not-Call" List, but no other complaints that a consumer had not consented to be called. Ex. 2, Rogers Tr. 74:2-74:5.

*Connolly Decl. ¶ 12; Ex. 6, Connolly Tr. 103:16-104:20; Ex. 7, Grant Tr. 201:17-202:2.*

Response:  Denied in its entirety.  Ex. 17, Connolly Decl. at ¶ 12 (stating that three other individuals made TCPA complaints and two of them were *mistaken* because they *had* provided consent); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything");  Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001 (person threatening legal action because on Do-Not-Call list), Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA").

Further, Exploria received numerous complaints from persons called on the Summer Bay Campaign by Yodel, which utilized the same data as Prospects DM. Ex. 1, Rogers Tr. 58:12 – 59:6; Ex. 49, CE-01533-34; Ex. 50, CE-01828; Ex. 52, CE-02227; Ex. 54, CE-02556; Ex. 55, CE-02665; Ex. 56, CE-02789 (reference to a lawsuit that was filed); Ex. 57, CE-03112; Ex. 58, CE-03162; Ex. 59, CE-03746; Ex. 60, CE-04624; Ex. 61, CE-04631-32; Ex. 62, CE-04661 – CE-04662; Ex. 63, CE-04664-65; Ex. 64, CE-01704-05 ("███████████████████████████████████████████████ ████████████████████████████████████████"); Ex. 65, CE-04696; Ex. 66, CE-04998 – CE-05004; Ex. 7, Lizotte Tr. 45:14-19.

Exploria was sued on July 20, 2018 for calls placed on the Summer Bay Campaign by Yodel. *Mallard v. Club Exploria, LLC,* 9:18-cv-80958-RLR (S.D. Fla.).  Exploria was sued again in April 2019 for calls placed on the Summer Bay Campaign by Yodel. Ex. 1, Rogers Tr., 81:9-19, Ex. 66, CE-04998 – CE-05004.

41.   █████████████████████████████████████████████████ ██████████████████████████████████████ *Ex. 7, Grant Tr. 168:1-169:7.* ████████████████████████████████████████████████

RESPONSE:  Admitted that Exploria received numerous requests to be on the do-not-call list, but denied that such requests do not indicate a lack of consent. Denied further that Exploria received "no other complaints that a consumer had not consented to be called. Ex. 17, Connolly Decl. at ¶ 12 (stating that three other individuals made TCPA complaints and two of them were mistaken because they had provided consent); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything");  Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1; Ex. 9, (DC-0001) (threatening legal action because on Do not call list); Ex. 10, (CE-01833); Ex. 11; (CE-04682-CE-04683); Ex. 12, (CE-05035 "complaint of calls violating TCPA").

█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

Response: Admitted.

42. *Prospects DM did [sic] recall receiving any complaint stemming from its prior calls to the Subject Telephone Number. Ex. 7, Grant Tr. 171:8-16.*

Response: Admitted.

43. ███████████████████████████████████████████████
███████████████████████████████████████████████████ *Ex. 7, Grant Tr. 168:7-171:7, Ex. 20.*
████████████████████████████████████████

████████████████████████. *Id.; see also Ex. 21, Redacted Consent Record Provided by Qatalyst, Inc. in Response to Club Exploria Subpoena.*

Response: Denied that Yodel could believe that data purporting to originate at diabeteshealth.info reflected "consent" under the TCPA. Yodel understood that the "opt-in" language would never mention Exploria but would instead purport to authorize calls from the "Helping Hands Association." Ex. 48, CE-04201 – CE-04203, Ex. 20, Wood Tr. 38:3 – 39:18, 40:3-8, 44:9-21; Ex. 7, Lizotte Tr. at 105:8 – 107:16 (Exploria admitting in its deposition that the disclosure at diabeteshealth.info does not authorize telemarketing calls regarding Exploria), Ex. 8, diabeteshealth.info opt-in language.

Also denied that the "opt-in data" for the Jorgensen lead is accurate, legitimate, or otherwise reflects a genuine website submission. Here is the data:

> Name: Donald Jorgensen
> Phone: 630-699-3200
> Address:
> 415 Lennox Dr
> Oswego, IL 60543
> Email: djorgensen@worldnet.att.net
> URL: diabeteshealth.info
> Signup date/time: 02/20/2017 @ 02:03:54
> IP: 63.250.187.177

Yet the co-owners of diabeteshealth.info, Landfall 2, Inc. and PinPoint Schools, have each submitted an affidavit stating that (i) it has no record of every selling any data to Yodel and (ii) it has never

sold any data of individuals that authorized pre-recorded calls promoting the goods or services of Exploria. See Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 7, Lizotte Tr. 108:8 – 110:13, Ex. 74, diabeteshealth.info Terms and Conditions at p. 1; Ex. 75, Affidavit of Jason Fine – PinPoint Schools; see also Ex. 76, Exploria Answer to Interrogatory 2.  Moreover, the internet service provider for the ip address 63.250.187.177, BT America's Inc. (BT), has confirmed that it never assigned that ip address to any user and it was therefore "spoofed outside BT". Ex. 77, BT Email to Michael Grill at pp. 2-4.   Furthermore, Plaintiff has owned the telephone number for fourteen years and has no idea who Donald Jorgensen is. Ex. 23, Moore Decl. at ¶¶ 3, 16-17.

44.     *Club Exploria contracted for TCPA-compliant calls only. See supra ¶¶ 12, 18, 21, 26.) As a standard practice, if Club Exploria received a complaint from a consumer saying that he or she did not consent to be called, it investigated that complaint. Ex. 9, Lizotte Tr. 58:1-58:3. Club Exploria's practice was to investigate every single complaint from a consumer. Id. at 58:1-3. Upon receiving a complaint, Club Exploria's procedure was to review the record for the call in its systems, and then to ask the call vendor to find the record of consent and provide it to Club Exploria. Ex. 2, Rogers Tr. 49:7-11. Additionally, Club Exploria would put the telephone number on its internal "Do Not Call" list so that the consumer would not be called again. Ex. 2, Rogers Tr. 112:25-113:10; Ex. 6, Connolly Tr. 111:15-111:19.*

Response:  Denied that Exploria contracted only for TCPA compliant calls.  ██████████

██████████████████████████████████████████████████████████████████████

██████████; Ex. 5, CE-00016 (same for Acquis); Ex. 20, Wood Tr. 14:24 –17:9, Ex. 39, CE-00176 – CE-00186, Ex. 40, Insertion Orders; Ex. 1, Rogers Tr. 28:9 – 31:3, Ex. 41, CE-01598 – CE-01599.  Moreover, Exploria agreed to opt-in language that violates the TCPA.  Exploria reviewed and approved of the "opt-in language" that it understood would appear on the various websites and understood and agreed that none of those websites would mention Exploria by name, but instead would only purport to authorize calls from the "Helping Hands Association" or "Senior Care Authority,"  Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name), Ex. 2, CE-00148 (██████████████████████ DM

██████████████████████████████████████████████████████████

██████████████████████████████████ ").  Exploria went through the same review and

approval process for the opt-in language with Yodel, who provided the leads on the campaign. Ex. 1,

Rogers Tr. 79:9-12 (██████████████████████████████████████████████

███████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language

provided by Yodel); Ex. 4, CE-04608 (█████████████████████████████

████████); Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in

websites and confirming that none of the websites mentioned Exploria). Exploria admitted in its

deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7,

Lizotte Tr. at 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria understood and agreed that the calls were being made to people who had not

consented.  Exploria received numerous complaints that calls were made without consent, including

several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6

– 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12,

CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I

never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253

(conveying same complaint to Spencer Green)), yet Exploria never once refused to pay Acquis for any

such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.  Exploria also received numerous complaints that Yodel's

calls were made in violation of the law, yet Exploria never refused to pay Yodel for any such call. Ex. 1,

Rogers Tr. 58:12 – 59:6; Ex. 49, CE-01533-34; Ex. 50, CE-01828; Ex. 52, CE-02227; Ex. 54, CE-

02556; Ex. 55, CE-02665; Ex. 56, CE-02789 (reference to a lawsuit that was filed); Ex. 57, CE-03112;

Ex. 58, CE-03162; Ex. 59, CE-03746; Ex. 60, CE-04624; Ex. 61, CE-04631-32; Ex. 62, CE-04661 –

CE-04662; Ex. 63, CE-04664-65; Ex. 64, CE-01704-05 ("██████████████████████████

██████████████████████████████████████████████ "); Ex. 65, CE-

04696; Ex. 66, CE-04998 – CE-05004; Ex. 7, Lizotte Tr. 45:14-19. 

Ex. 14, CE-01594; Ex. 15, CE-02957.

Exploria also knew its vendors were using the same alleged opt-in to make calls for multiple telemarketing campaigns on behalf of other entities. EX. 35, CE-03687.

Further, Exploria understood and agreed that the "opt-in" data was likely illegitimate. Exploria understood and agreed that the "opt-in" websites were not owned or operated by Exploria, GAI, Acquis, Prospects DM, or Yodel, but instead by unknown third parties. Ex. 1, Rogers Tr. 71:14 – 73:5. Yet it made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 – 81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4.

Also denied that Exploria investigated any complaints other than asking its vendor for a copy of the purported "opt-in" data. It made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source, despite repeated complaints. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 80:19 – 81:5, 129:14 – 131:19; ; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4. Furthermore, Exploria knew that the calls were being made without consent. Exploria was aware that Yodel's calls on the Summer Bay campaign resulted in the recipient's Caller ID showing "scam likely" when the phone rang, but it continued with the calls anyway. Ex. 1, Rogers Tr. at 114:8

43

– 115:23. 

Also denied that Exploria's internal do-not-call procedures were applicable to the Summer Bay Campaign. Exploria did not provide a copy of its procedures to any of its vendors. Ex. 1, Rogers Tr. 137:1 – 138:5, 138:15-139:11. Exploria's only do-not-call policy with the respect to the Summer Bay campaign was to pass along do-not-call requests it received to Yodel, GAI, and Acquis and then to expect them to stop calling. *Id.*

45.     *Club Exploria also had a detailed Do Not Call policy in effect. Ex. 19, CE-00130; see also Ex. 2, Rogers Tr. 137:9-11. The Policy provided that, when requested, Club Exploria would place a consumer's number on its Do Not Call List, within three business days, and keep the number on the list for at least 10 years. Ex. 19, CE-00130 (Do Not Call Policy). Additionally, Club Exploria's Do Not Call policy provided that if a consumer notified Club Exploria that he or she received a telephone call after having made a request to be placed on the Do Not Call list, Club Exploria would have a manager or supervisor investigate and personally confirm that the telephone number is included on the Do Not Call list. Id. The policy also requires Club Exploria's compliance officer to review the policy semi-annually. Id*

Response: Denied that Exploria's internal do-not-call procedures were applicable to the Summer Bay Campaign. Exploria did not provide a copy of its procedures to any of its vendors. Ex. 1, Rogers Tr. 137:1 – 138:5, 138:15-139:11. Exploria's only do-not-call policy with the respect to the Summer Bay campaign was to pass along do-not-call requests it received to Yodel, GAI, and Acquis and then to expect them to stop calling. Id.

46.     *Club Exploria also provided TCPA compliance training to its employees, including on consent requirements and do not call rules. Ex. 20, CE-00157 (Training Outline); Ex. 2, Rogers Tr. 44:17-20.*

Denied that that this TCPA compliance training was applicable to the Summer Bay

Campaign. Exploria did not provide the training documents to any of its vendors. Ex. 1, Rogers Tr. 139:13 – 140:5. Further, Exploria's training document states the caller should "Ensure prior express written consent forms comply with FCC specific rules," but Exploria did not do so with respect to the Summer Bay Campaign since the "opt-in" language it reviewed and approved never mentioned Exploria. Ex. 79, CE-00174.

47. ██████████████████████████████████████████
███████████████████████████████████████████████
█████████████ *Ex. 7, Grant Tr. 185:3-14; see also Ex. 6, Connolly Tr. 111:15-112:4.*

Response: Admitted.

48. ████████████████████████████ *Ex. 5, D. Connolly Decl. ¶ 11; Ex. 6, Connolly Tr. 102:20-103:3; Ex. 7, Grant Tr. 190:5-7.* ██████████████████████████ *Ex. 6, Connolly Tr. 103:5-103:12; Ex. 7, Grant Tr. 190:8-11.*

Response: Denied in its entirety. Prospects DM and Exploria interfaced their dialing system databases through a direct API connection which shared customer information with each call that was transferred. Ex. 18, Connolly Tr. 56:16-19, 62:1-25; Ex. 24, CE-05233; Ex. 25, CE-05246; Ex. 26, CE-05284; Ex. 1, Rogers Tr. 133:16 – 134:3; Ex. 27, CE-05249-50. Further, Exploria allowed Prospects DM to record Exploria's complete conversations with the prospective customers that occurred after transfer, including the exchange of customer credit card information. Ex. 26, CE-05284.

49. *Club Exploria did not have direct contact with Prospects DM. Ex. 2, Rogers Tr. 39:8-10; Ex. 9, Lizotte Tr. 21:19-23.* ████████████ *Ex. 7, Grant Tr. 25:8-15, 102:4-7* ████████ *); id. at 184:4-14. Additionally, Club Exploria did not have any contact with Tele-Skills or know that Tele-Skills was involved in the Summer Bay Campaign. Ex. 2, Rogers Tr. 12:4-20.*

Response: Denied that Exploria had no direct contact or business relationship Prospects DM. Exploria had several direct communications with Josh Grant of Prospects DM via both email and

telephone. Ex. 24, CE-05233; Ex. 25, CE-05246; Ex. 26, CE-05284. Further, Exploria had a direct API connection with Prospects DM, shared customer information with Prospects DM, and allowed Prospects DM to record Exploria's conversations with its customers.  Ex. 18, Connolly Tr. 56:16-19, 62:1-25; Ex. 26, CE-05284; Ex. 1, Rogers Tr. 133:16 – 134:3; Ex. 27, CE-05249-50.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

50.   *Club Exploria did not control which lead providers Prospects DM used to generate TCPA-compliant leads for the Summer Bay Campaign. Ex. 6, Connolly Tr. 106:24-107:1; Ex. 9, Lizotte Tr. 14:2-14:9; 97:22-97:7.* ████████████████████████████████████ *Ex. 7, Grant Tr.189:17-190:4.*

Response: Denied that Exploria did not have the right to control which lead providers or lead data that Prospects DM could use on the campaign. Exploria had the right to review and approve the content of the "opt-in language" that it would accept for leads and thereby controlled which lead providers could be used for the campaign. Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed and approving language at diabeteshealth.info before campaign began), Ex. 2, CE-00148. And Exploria went through the same review and approval process with Yodel. Ex. 1, Rogers Tr. 79:9-12 (████████ ███████████████████████████████████████████████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (████████████████████████████████████).

Further, Yodel invited Exploria to approve or disapprove the use of new lead providers in the middle of the campaign. Ex. 80, CE-01639.

Otherwise, admitted.

51. *Club Exploria has no role in owning or running the websites used by Data Providers, determining the content of those sites, or maintaining the contact or consent information generated by those sites. Ex. 2, Rogers Tr. 72:10-72:12; Ex. 9, Lizotte Tr. 94:3-16. Club Exploria did not even know who Prospects DM's third party Data Providers were. Ex. 2, Rogers Tr. 72:6- 15 ("Q. Did Club Exploria ever do any investigation into the data providers, the people that sold the data to Yodel or ACQUIS or GAI . . . . A. No. We didn't contract with those people. We contracted with Yodel and ACQUIS and GAI to deliver express written consent-compliant calls").*

Response: Denied that Exploria did not have the ability to control the "opt-in" language that appeared on the websites. Exploria had the right to review and approve the content of the "opt-in language" that it would accept for leads. Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed and approving language at diabeteshealth.info before campaign began), Ex. 2, CE-00148. Exploria went through the same review and approval process for the opt-in language with Yodel. Ex. 1, Rogers Tr. 79:9-12 (████████████████████████████████████████████

██████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (████████████████████████████████████████).

Otherwise, admitted.

52. ████████████████████████████████████████████████
████████████████████████████████████████████████████ *Ex. 6, Connolly Tr. 106:14-106:19; Ex. 9, Lizotte Tr. 14:2-14:9; 97:22-97:7; Ex. 7, Grant Tr. 192:18- 20 (Club Exploria did not mandate any specific number of calls that had to be made), 195:1-7.*

Response: Denied in its entirety. Exploria *did control when* Prospects DM made calls. Ex. 1, Rogers Tr. 40:15-25 (Exploria admitting it controlled hours in which calls could be made); Ex. 32, (Prospects DM asking during which hours it was allowed to call); Ex. 33, CE-05282 (Exploria conveying schedule for calls to Spencer Green and Dan Connolly and Dan Connolly accepting). Further, Exploria *did set quotas for the number of calls* to be made. (Ex.29, CE-05039-42 at CE-05039-40 (setting volume requirements); Ex. 18, Connolly Tr. 61:5 – 64:18, Ex. 34, Acquis-000002 (conveying volume requirements to Prospects DM). Further, Exploria *did tell Prospects DM who to call*. Ex. 1, Rogers Tr., 17:3-16, 32:18 – 33:6, 38:1-23, 98:9 – 99:19, 102:15 – 104:18, 139:8-11, Ex.

9, DC-0001, Ex. 10, CE-01833; Ex.29, CE-05039-42 at CE-05039); Ex. 6, CE-00154 (listing target

states); Ex. 5, CE-00017 (██████████████████████████████████████████

██████████████████████████████████████████████████████);

53.     _Further, Club Exploria did not receive data regarding the number of outbound calls_
_that were placed. Ex. 2, Rogers Tr. 61:6-12._

Response:  Denied in its entirety. Exploria received data for each transferred call directly

into its dialing system database via a direct API connection which shared customer information with

each call that was transferred. Ex. 18, Connolly Tr. 56:16-19, 62:1-25; Ex. 24, CE-05233; Ex. 25,

CE-05246; Ex. 26, CE-05284; Ex. 1, Rogers Tr. 133:16 – 134:3; Ex. 27, CE-05249-50.

54.     ██████████████████████████████████████████████

██████████████████████████ _Ex. 6, Connolly Tr. 105:10-105:18;_
_106:8-106:13; Ex. 7, Grant Tr. 194:3-15._

Response:  Denied in its entirety. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████ Moreover, Acquis, the one employee operation who

worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my

understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM

"was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr.

108:4-6; 11-16.

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████

     Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this

case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and

obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1

("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects

made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

     Also denied that Exploria did not control the timing of the calls. Exploria *did control when*

Prospects DM made calls. Ex. 1, Rogers Tr. 40:15-25 (Exploria admitting it controlled hours in which

calls could be made); Ex. 32, (Prospects DM asking during which hours it was allowed to call); Ex. 33,

CE-05282 (Exploria conveying schedule for calls to Spencer Green and Dan Connolly and Dan

Connolly accepting). Because the script required directly after completion of the prerecorded

soundboard process, Prospects DM could not place the calls outside of the hours in which Exploria was

open and willing to accept transfers. See Ex. 4, CE-0019 (show transfer at end of script); Ex. 17,

Connolly Decl. at Ex. B (ThirdParty_000104) (same).

55.     *Club Exploria did not determine which call center was used to make the calls as part of the Summer Bay Campaign. Ex. 6, Connolly Tr. 108:7-108:10; Ex. 2, Rogers Tr. 12:4-20.*

Response:  Denied in its entirety. ████████████████████████████████████

████████████████. Ex. 6, CE-00154; Ex. 5, CE-00017

56.     *Club Exploria  never instructed Acquis  or Prospects DM on the equipment  to use to place calls for the Summer Bay Campaign. Ex. 6, Connolly Tr.  107:8-107:17.* ██████████████
████████████████████████ *Ex. 7, Grant Tr. 23:10-12.*

Response:  Denied in its entirety. ████████████████████████████████████

████████████. Ex. 6, CE-00153; Ex. 5, CE-00016.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

57. ████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████

Response: ██████████████████████████████████████████

███████ Further admitted that if a consumer missed a call and called back the number on the caller ID he or she would have reached Prospect DM's system. Otherwise, denied.

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

Second, denied that any person calling back after missing a call would have been transferred to Acquis. Prospects DM's API connection for the transfers was directly with Exploria, not with Acquis. Ex. 18, Connolly Tr. 56:16-19, 62:1-25; Ex. 24, CE-05233; Ex. 25, CE-05246; Ex. 26, CE-05284; Ex. 1, Rogers Tr. 133:16 – 134:3; Ex. 27, CE-05249-50. That is why Exploria had to communicate directly with Prospects DM rather than with Acquis to resolve issues with the transfer process. Ex. 24, CE-

05233; Ex. 25, CE-05246; Ex. 26, CE-05284. Further, Acquis simply played a "middleman" role where it "introduces companies to each other and then try to make a little money in the middle". Ex. 18, Connolly Tr. 40:19-21. Acquis does not have any employees other than Mr. Connolly to staff a call center. Ex. 18, Connolly Tr. 38:24-25.

58. ██████████████████████████████████████████████████████████
████████████████████████████████████████████ *x. 6, Connolly Tr. 66:1- 66:13; Ex. 7, Grant Tr. 188:10-22. If the call center employee chose to use the recorded audio prompts, he or she would select a certain button on his or her computer, which would deliver the chosen message, in real time. Ex. 6, Connolly Tr. 66:1-66:13.*

Response: █████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████.

Ex. 22.2. Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training"

the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.



Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1 ("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

Also denied that any call center agent "had the option of speaking directly to the consumer." ██████████████████████████████████████████ Ex. 6, CE-00153; Ex. 5, CE-00016. ██████████████████████████████████ Ex. 19, Grant. Tr. 116:6 – 117:4 ████████████████████████████████████████████ ████████████████), Ex. 34, Acquis-000002 (Acquis requesting Prospects DM to record the script into a .wav file), Ex. 81, Prospects DM emailing the completed .wav file to Acquis. Furthermore, Exploria has not identified a single call made on the Summer Bay campaign in which the prerecorded script was not used.

59. 



*Ex. 7, Grant Tr. 193:19-194:2.*

Response: ████████████████████████████████████



Moreover, Acquis, the one employee operation who worked with Prospects DM on the Summer Bay Campaign as the "middle man", testified "my understanding is the calls were made from call centers owned by Prospects DM" and that Prospects DM "was responsible for hiring" and "training" the employees who made the calls. Ex. 18, Connolly Tr. 108:4-6; 11-16.

Further, Defendant has repeatedly admitted that Prospects DM placed the calls at issue in this case. Doc. 113 at ¶ 5 ("Prospects DM both placed calls at issue in this case received by Plaintiff and obtained the relevant contact information from other sources before placing those calls."); Doc. 91 at p.1

("Prospects made the phone calls at issue . . ."); Doc. 88 at p.1 ("Club Exploria contends that Prospects made the calls at issue"); Doc. 94 at p. 1 ("Prospects DM made the phone calls at issue to Mr. Moore.").

Denied further that Exploria did not provide any training for the Summer Bay Campaign. Exploria set forth requirements for (i) *who would be called* (Ex. 1, Rogers Tr. 17:3-16, 32:18 – 33:6, 38:1-23, 98:9 – 99:19, 102:15 – 104:18, 139:8-11, Ex. 9, DC-0001, Ex. 10, CE-01833; Ex. 6, CE-00154 (listing target states); Ex. 5, CE-00017 (same); Ex.29, CE-05039-42 at CE-05039); (ii) *the content of the "opt-in language" that the persons called would agree to* (Ex. 1, Rogers Tr., 76:10 – 77:23, 78:2-15, Ex. 2, CE-00148 ) (iii) *the content of the prerecorded script conveyed in the calls* (Ex. 1, Rogers Tr. 33:3-6, 41:1-10, 55:3-14, 83:24 – 84:11; Ex. 19, Grant. Tr. 124:1 – 125:16, Ex. 36, Script Change Email; Ex.29, CE-05039-42 at CE-05039 (Exploria conveying initial draft to GAI)); (iv) *how and to where the calls were transferred* (Ex. 1, Rogers Tr. 136:1-20, Ex. 37, Email from Acquis conveying Exploria's instructions to Prospects DM; Ex. 31, CE-05303-04); (v) *the timing of the calls* (Ex. 1, Rogers Tr. 40:15-25 (Exploria admitting it controlled hours in which calls could be made); Ex. 32, (Prospects DM asking during which hours it was allowed to call); Ex. 33, CE-05282 (Exploria conveying schedule for calls to Spencer Green and Dan Connolly and Dan Connolly accepting)); and (vi) *the volume of the calls* (Ex.29, CE-05039-42 at CE-05039-40 (setting volume requirements); Ex. 18, Connolly Tr. 61:5 – 64:18, Ex. 34, Acquis-000002 (conveying volume requirements to Prospects DM).

60. ████████████████████████████████████ *Ex. 6, Connolly Tr. 67:4-67:14, 83:8-83:11; Ex. 7, Grant Tr. 96:15-21. Club Exploria then had the right to approve or make changes to the script. Ex. 9, Lizotte Tr. 49:9-49:25.*

Response: Admitted that Exploria had the right to approve or make changes to the script, but denied that Acquis drafted the script initially. Exploria's vice president of marketing testified that Exploria itself initially drafted the body of the script when Exploria was planning the campaign with GAI. Ex. 1, Rogers Tr. 55:3-14; 33:3-6; see also Ex.29, CE-05039-42 at CE-05039

(Exploria conveying initial draft to GAI). Further, the owners of Acquis stated that the script came from Exploria. Ex. 42, CE-03073.

61.    *Prospects DM selected the voice talent for the Summer Bay Campaign, and Club Exploria was not involved in that decision in any way. Ex. 6, Connolly Tr. 109:1-109:6.*

Response:  Admitted.

62.    ███████████████████████████████████████████████
███████████████████ *Ex. 6, Connolly Tr. 109:24-111:3; Ex. 7, Grant Tr. 200:8-20, 201:5-16.*

Response:  Denied that Exploria never stated that Acquis or Prospects DM was its agent to the call recipients.  Exploria stated that the caller was Exploria's "marketing partner" in the prerecorded script that Exploria created, which was then conveyed to the called parties, including Plaintiff. Ex. 5, CE-00018; Ex. 23, Moore Decl. at ¶¶ 5-8, and ex. A-B thereto (recordings).  Further, Exploria indicated that the caller was its agent by accepted transfers of the calls directly from Prospects DM and then continuing with the sales pitch that Prospects DM started. Ex. 1, Rogers Tr. 27:1-16; 65:16 – 66:14, Ex. 82, CE-01573.

63.    ███████████████████████████████████████████████
█████████ *x. 7, Grant Tr. 202:3-10;  Ex. 6, Connolly  Tr.  104:21-105:6.*
███████████████████ *Ex. 7, Grant Tr. 202:11-15;  Ex. 6, Connolly Tr. 101:19-24.*

Response:  Denied in its entirety.  ██████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████ Ex. 1, Rogers Tr. 71:14 -73:15, 76:19 – 78:8, 78:2-8, Ex. 2, CE-00148 ;  Ex. 18, Connolly Tr. at 76:12 – 77:3, 79:3-19, 82:15 – 83:6, Ex. 19, Grant. Tr. 70:11 – 71:4, 85:17 – 87:6, 88:18-22, 139:15 - 140:17; Ex. 48, CE-04201 – CE-04203; Ex. 7, Lizotte Tr. 105:8 – 107:16, Ex. 8, diabeteshealth.info opt-in language.

Further, Exploria reviewed and expressly approved of the "opt-in" language in a communication with Spencer Green, including the language at diabeteshealth.info. Ex. 1, Rogers Tr., 76:10 - 77:1; Ex. 2, CE-00148 (█████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████"). And Exploria went through the same review and approval process with Yodel. Ex. 1, Rogers Tr. 79:9-12 (██████████████████████████████ ██████████████████████████████████████), 80:1-15; 105:21 -106:1, Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel);, Ex. 4, CE-04608 (████ ███████████████████████████████████).

Further, Exploria received numerous complaints that calls were made without consent, including several that came before the calls to Mr. Moore, (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-050035; Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once refused to pay for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.



64.      *Club Exploria ceased its GAI/Acquis call campaign after Plaintiff called to complain. See Ex. 6, Connolly Tr. 58:20-59:2 (the campaign stopped running when Moore contacted Club Exploria).*

Response: Admitted that Exploria ended the campaign at a point in time after Plaintiff complained (the campaign is not ongoing), but denied that it had anything to do with Plaintiff's complaint. Exploria testified that it decided to end the campaign because it wasn't making enough sales. Ex. 1, Rogers Tr. 123:17 – 125:11. Dan Connolly's testimony confirmed that the campaign ended due to sales volume, not because of Plaintiff's complaint. Ex. 18, Connolly Tr. 90:18-23. Further, Exploria thought that Yodel placed the call when it received Plaintiff's complaint, yet continued to place calls on the campaign despite admitting that Yodel was "too dirty" when reviewing Plaintiff's complaint. Ex. 1, Rogers Tr. 118:6 - 120:22, Ex. 11, CE-04682 – CE-04683.

65. ███████████████████████████████████████████
████████████ *Ex. 7, Grant Tr. 44:9-45:3, 193:4-9; Ex. 6, Connolly Tr. 37:3-7 (testifying that Connolly is and has always been the sole owner of Acquis).*

Response: Admitted.


### Plaintiff's Statement of Additional Material Facts

1.  In March 2018, Exploria hired Yodel to make outbound telephone calls utilizing a soundboard AKA avatar system that conveys a prerecorded telemarketing script, and then transfers the calls to Exploria after the prerecorded script is completed. Ex. 20, Wood Tr. 14:24 –17:9, Ex. 39, CE-00176-86, Ex. 40, Insertion Orders.

2.  The prerecorded script conveyed in Yodel's calls stated the caller was a "Trip Advisor" from "the Helping Hands Association," and offers a 3 night stay in "magical Orlando" at Exploria's Summer Bay Resort. Ex. 41, CE-01598-99; Ex. 44, CE-01605-07; Ex. 83, CE-03239-40. The script further conveyed that in order to qualify for the offer, the called party would need to be over the age of 25, have a major credit card, and a household income of at least $65k per year. *Id.*

3.  At the time of the calls, Exploria had only one property in Orlando, FL – the Summer Bay Resort. Ex. 1, Rogers Tr. 11:11-13.

4.    In May 2018, Exploria also hired GA Investments, LLC ("GAI") to make outbound telephone calls utilizing a soundboard AKA avatar system that conveys a prerecorded telemarketing script, and then transfers the calls to Exploria after the prerecorded script is completed. Ex. 6, CE-00153-56; Ex. 28, CE-04992;

5.    Exploria gave GAI the script to convey in the calls. Ex. 29, CE-05039; Ex. 1, Rogers Tr. 55:3-14; 33:3-6; Ex. 42, CE-03073.

6.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████    *Id.*

7.    When Exploria was preparing its call center agents to receive transfers of the GAI calls, it informed them that ███████████████████████████████████████████████
████████████████" Ex. 29, CE-05039.

8.    Exploria's "standard operating procedure" with complaints about the calls was to ask both Yodel and GAI to investigate the complaint because they were using the same script. Ex. 1, Rogers Tr. 49:7-23.

9.    In May 2018, the same time that it entered into its contract with Exploria, GAI appointed Acquis, LLC ("Acquis") to perform all of GAI's responsibilities in the Exploria contract and entered into a contract with Acquis that contains essentially identical terms as GAI's contract with Exploria. Ex. 17, Dan Connolly Decl. at ¶ 3; Id. at ex. A (GAI and Acquis Contract).

10.    Exploria was aware that GAI was contracting with Acquis to perform the work and, to formalize the arrangement, Exploria entered into its own contract with Acquis at the same time (May

of 2018), which contains identical terms as its contract with GAI. Ex. 85, (CE-00020-24).

11.     In September 2018, GAI informed Exploria that it was backing out of the arrangement and that going forward, Exploria's account would be managed solely by Acquis. Ex. 84, CE-04798.

12.     Accordingly, Exploria entered in to a new Insertion Order with Acquis in September 2018 to continue the campaign. Ex. 5, CE-00016-19.

13.     Spencer Green was the main point of contact with Exploria both while the campaign was managed by GAI and while it was managed by Acquis. Ex. 18, Connolly Tr. 55:4 – 57:5.

14.     Exploria's written agreements with both Acquis and GAI gave Exploria sole authority over the content of the prerecorded script and ████████████████████████████
████████████████████████████████████████" Ex. 5, at CE-00016; Ex. 6, at CE-000153.

15.     ████████████████████████████████████████
████████████████████ ████████████████████████████
████████████████████████████████████████
████████. Ex. 5, at CE-00017; Ex. 6, at CE-000154.

16.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████." Ex. 85, CE-00020-24 at ¶¶ 4-5; Ex. 86, CE-00125-29 at ¶¶ 4-5.

17.     ████████████████████████████████████████
████████████████████████████████████████. Ex. 85, CE-00020-24 at ¶¶ 11-12; Ex. 86, CE-00125-29 at ¶¶ 11-12.

18.     In ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████ . Ex. 5 at CE-00016-19; Ex. 17, at pp.1-4.

19.     ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ [.]"Ex. 5, CE-00017; Ex. 6, at CE-000154. ███████████████████████████████████

███████ . Ex. 5, CE-00016; Ex. 6, at CE-000153. Moreover, Spencer Green confirmed this arrangement with Exploria via email dated May 21, 2018, where he confirmed that Prospects DM would be both placing the calls and obtaining the lead data from third parties, and Exploria replied with approval. Ex. 2, CE-00148

20.     Prospects DM created the soundboard recording that was conveyed in the calls it placed on the Summer Bay Campaign and conveyed it to Acquis as a .wav file for Exploria's review. Ex. 34, Acquis-000002; Ex. 81, Prospects DM emailing the completed .wav file to Acquis.

21.     Exploria's vice president of marketing testified that Exploria expected all of its telemarketing vendors to comply with Exploria's instructions on the campaign even "in the middle of the campaign. Ex. 1, Rogers Tr. at 84:9-11, 98:13 – 99:19, 100:23 – 101:1, 139:8-11.

22.     Exploria's vice president of marketing testified that the only reason Exploria had fewer communications with GAI/Acquis than it did with Yodel is because "the volume of calls negotiated or contracted for was much, much, much less." Ex. 1, Rogers Tr. 45:25 – 46:10.

23.     Exploria understood and agreed with that Exploria's vendors did not control the "opt-in" websites, but would instead purchase the phone numbers from third-party data brokers. Ex. 1, Rogers Tr. 71:14 – 73:5; Ex. 7, Lizotte Tr. 95:16 – 99:12, Ex. 16, CE-04710 – CE-04711.

24.     Exploria made no effort whatsoever to determine whether the any of the "opt-in" data was legitimate or came from a reliable source. Ex. 1, Rogers Tr. at 72:1 – 75:8, 75:17-25, 129:14

– 131:19; Ex. 7, Lizotte Tr. 92:22 – 95:13, 99:16 – 105:4.  It didn't investigate who sold the data to its vendors, it didn't investigate who owned or operated the "opt-in" websites, it didn't investigate whether those websites maintained any fraud prevention measures, and it didn't investigate whether the "opt-in" data might have simply been fabricated.  Ex. 1, Rogers Tr. at 72:1 – 75:8, 80:19 – 81:5.

25.　　Exploria understood and agreed that the opt-in disclosure on those websites would never mention Exploria, but would instead purport to authorize calls from "the Helping Hands Association" or "Senior Care Authority" without explaining who they are or disclosing any connection to Exploria. Ex. 1, Rogers Tr., 76:10 – 77:23 (Rogers reviewed language at diabeteshealth.info before campaign began and thought "helping hands association" would be sufficient), 78:2-8 (admitting that none of the websites actually mention Exploria by name): Ex. 2, CE-00148  (████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  Ex. 20, Wood Tr. 39:8-18 (testifying that Exploria never asked to put its name on the opt-in websites and confirming that none of the websites mentioned Exploria).

26.　　Exploria understood and agreed that Exploria's vendors would use the same alleged "opt-in" to call those phone numbers on other telemarketing campaigns that had nothing to do with Exploria. Ex. 35, CE-03687-==88==.

27.　　Exploria reviewed and expressly approved of the opt-in language that would be used on the websites on numerous occasions, including the very website at which it claims Plaintiff's phone number was entered. Ex. 1, Rogers Tr., 76:10 – 77:23;  Ex. 1, Rogers Tr. 79:9-12 (███████

████████████████████████████████████████████████████████), 80:1-15; 105:21 -106:1; Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (██████████████████████████████████████████).

28.　　Before beginning the campaign, Exploria reviewed the "opt-in" language at

www.diabeteshealth.info and expressly approved of it, saying "Oh good- this is what we needed to see . . . we should be good to go soon." Ex. 2, CE-00148.

29.     The "opt-in" language makes no mention of Exploria but does purport to authorize calls from "the Helping Hands Association" or "Senior Care Authority." Ex. 8, www.diabeteshealth.info opt-in language at p. 2.   It does not explain what those entities are or that they have any connection to Exploria. *Ibid.*

30.     Exploria admitted in its deposition that this "opt-in" language does not authorize telemarketing calls regarding Exploria. Ex. 7, Lizotte Tr. at 105:8 – 107:16. The owners of www.diabeteshealth.info agree that the language does not authorize telemarketing calls regarding Exploria. Ex. 21, Affidavit of Jason Fine (Landfall 2, Inc.) at ¶¶ 3-6; Ex. 75, Affidavit of Jason Fine – PinPoint Schools.

31.     Yodel claims that "Helping Hands Association" is a d/b/a that Yodel uses to identify itself in its soundboard calls and for no other purpose. Ex. 20, Wood Tr. at 37:25 – 38:8.

32.     Exploria's understanding at the time of the campaign was that Helping Hands Association was "a charity." Ex. 1, Rogers Tr. 52:1-20.

33.     ███████████████████████████████████████████████████
████████████████████████████████████████████████████████ Ex. 19, Grant Tr. at 86:7 – 88:8.

34.     Exploria received numerous complaints that calls made by Prospects DM were made without consent, including several that came before the calls to Mr. Moore (Ex. 1, Rogers Tr. at 102:15 – 104:25, 106:4-24, 118:6 – 120:20, 126:13 – 129:1, Ex. 9, DC-0001, Ex. 10, CE-01833, Ex. 11, CE-04682-CE-04683, Ex. 12, CE-05035 ("complaint of calls violating TCPA"); Ex. 78, CE-04334 ("unsolicited calls for a product I never asked for . . . I NEVER clicked on any website or filled out anything"); Ex. 13, CE-05253 (conveying same complaint to Spencer Green)), yet Exploria never once

refused to pay for any such call. Ex. 7, Lizotte Tr. 85:25 – 86:3.

35.      Exploria also received numerous complaints that Yodel's calls were made in violation of the law, yet Exploria never refused to pay Yodel for any such call. Ex. 1, Rogers Tr. 58:12 – 59:6; Ex. 49, CE-01533-34; Ex. 50, CE-01828; Ex. 52, CE-02227; Ex. 54, CE-02556; Ex. 55, CE-02665; Ex. 56, CE-02789 (reference to a lawsuit that was filed); Ex. 57, CE-03112; Ex. 58, CE-03162; Ex. 59, CE-03746; Ex. 60, CE-04624; Ex. 61, CE-04631-32; Ex. 62, CE-04661 – CE-04662; Ex. 63, CE-04664-65; Ex. 64, CE-01704-05 ("



"); Ex. 65, CE-04696; Ex. 66, CE-04998 – CE-05004; Ex. 7, Lizotte Tr. 45:14-19.

36.

. *Ibid.*

37.

." Ibid.  Yet Exploria did not terminate the relationship and continued to allow Yodel to make calls on the Summer Bay campaign for another year. Ex. 2, Rogers Tr. 120:8 – 121:4.

Respectfully submitted,

PLAINTIFF, individually and
on behalf of others similarly situated,

By:
**KEOGH LAW, LTD.**

*/s/ Timothy J. Sostrin*
 Keith J. Keogh
Timothy J. Sostrin
KEOGH LAW, LTD.
Firm No. 30942
55 West Monroe Street, Suite 3390
Chicago, Illinois 60603
Telephone: (312) 726-1092
keith@keoghlaw.com
tsostrin@keoghlaw.com

and

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

***Attorneys for Plaintiff and the
Putative Class***