--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., Petitioner

v.

MCKESSON CORPORATION, et al.

No. 23-1226
|
Argued January 21, 2025
|
Decided June 20, 2025

**Synopsis**
**Background:** Chiropractic clinic brought putative class action against advertiser under Telephone Consumer Protection Act of 1991 (TCPA), alleging advertiser sent unsolicited advertisements via "telephone facsimile machines" without including opt-out notice. The United States District Court for the Northern District of California, Haywood S. Gilliam, Jr., J., 332 F.R.D. 589, granted clinic's motion for class certification. Subsequently, the District Court, Gilliam, J., 2021 WL 1056812, granted summary judgment to advertiser on claims involving online fax services, finding that under Hobbs Act, Federal Communications Commission's (FCC) recent order interpreting term "telephone facsimile machine" in TCPA to exclude online fax services was binding. The District Court, Gilliam, J., 2021 WL 4818945, decertified class, then, 2022 WL 1239346, entered judgment in favor of clinic on its individual claims involving traditional fax machine. On appeal, the United States Court of Appeals for the Ninth Circuit, 2023 WL 7015279, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kavanaugh, held that:

absent express statutory preclusion of judicial review, a district court in an enforcement proceeding is not bound by an agency's pre-enforcement statutory interpretation but must determine the meaning of the statute itself, and

Hobbs Act did not preclude district court from disagreeing with FCC's statutory interpretation.

Reversed and remanded.

Chief Justice Roberts and Justices Thomas, Alito, Gorsuch, and Barrett joined.

Justice Kagan filed dissenting opinion, in which Justices Sotomayor and Jackson joined.

**Procedural Posture(s):** On Appeal; Petition for Writ of Certiorari; Motion for Summary Judgment.

*Syllabus* [*]

**\*1** The Telephone Consumer Protection Act (TCPA) protects businesses and consumers from intrusive telemarketing by prohibiting unsolicited fax advertisements to "telephone facsimile machines" absent an opt-out notice informing recipients that they can choose not to receive future faxes. 47 U.S.C. § 227. The Act provides a private right of action with statutory minimum damages of $500 per violation.

McKesson Corporation, a healthcare company, sent unsolicited fax advertisements through a subsidiary in 2009 and 2010 to medical practices, including McLaughlin Chiropractic Associates. McLaughlin sued McKesson in the U. S. District Court for the Northern District of California in 2014 for damages and an injunction, alleging TCPA violations for faxing unsolicited advertisements without the required opt-out notices. McLaughlin also sought to represent a class of fax recipients who received the advertisements either on traditional fax machines or through online fax services. The District Court certified the class without distinguishing between those two methods of receipt.

While McLaughlin's lawsuit was pending, a company petitioned the Federal Communications Commission for a declaratory ruling about whether the TCPA applies to faxes received through online fax services. Months after class certification, the FCC issued the *Amerifactors* order, interpreting "telephone facsimile machine" in the TCPA to exclude online fax services. Following Ninth Circuit precedent that FCC final orders are reviewable exclusively in the courts of appeals under the Hobbs Act, the District Court deemed the *Amerifactors* order binding and granted summary judgment to McKesson on claims involving online fax services. The court then decertified the class, leaving McLaughlin with claims for only 12 faxes received on a traditional machine and damages of $6,000. The Ninth Circuit affirmed.

*Held*: The Hobbs Act does not bind district courts in civil enforcement proceedings to an agency's interpretation of a statute. District courts must independently determine the law's meaning under ordinary principles of statutory interpretation while affording appropriate respect to the agency's interpretation. Pp. —— – ——.

(a) Pre-enforcement review statutes fall into three categories. First, statutes like the Clean Water Act, CERCLA, and the Clean Air Act expressly preclude judicial review in enforcement proceedings. Second, statutes like the Toxic Substances Control Act expressly authorize or contemplate review in both pre-enforcement and enforcement proceedings. Third, statutes like the Hobbs Act are silent about judicial review in enforcement proceedings. For this third category, fundamental principles of administrative law establish the proper default rule: In enforcement proceedings, district courts must independently determine whether an agency's statutory interpretation is correct, rather than being bound by the agency's interpretation. This presumption of judicial review is codified in Administrative Procedure Act, which provides that agency action is subject to judicial review in enforcement proceedings except where there is prior, adequate, and exclusive opportunity for review. 5 U.S.C. § 703. The availability of pre-enforcement review does not ordinarily preclude judicial review in enforcement proceedings. Pp. —— – ——.

*2 (b) Unlike statutes that expressly preclude judicial review in enforcement proceedings, the Hobbs Act does not override the default rule. The Hobbs Act's grant of "exclusive jurisdiction" to courts of appeals to "determine the validity" of agency orders refers to entering declaratory judgments in pre-enforcement proceedings. 28 U.S.C. § 2342. When a district court disagrees with an agency's statutory interpretation in an enforcement proceeding, it determines the defendant's liability under the correct interpretation of the statute but does not issue a declaratory judgment "determining the validity" of the agency order. The phrase "determine the validity" should be read consistently with the other listed forms of relief—"enjoin," "set aside," and "suspend"—all of which are forms of relief rather than descriptions of decisional processes. Section 2349 of the Hobbs Act confirms this interpretation by referring to a "judgment determining the validity," establishing that "determine the validity" refers to declaratory relief. Pp. —— – ——.

(c) The Emergency Price Control Act precedent in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, does not control because that Act contained two key provisions working in tandem: "exclusive jurisdiction to determine the validity" (similar to the Hobbs Act) and an express prohibition stating that no other court "shall have jurisdiction or power to *consider the validity*" of covered regulations (not included in the Hobbs Act). 56 Stat. 33 (emphasis added). When Congress enacted the Hobbs Act in 1950, six years after *Yakus*, it chose not to include the second provision that would have clearly precluded judicial review in enforcement proceedings. Other Hobbs Act cases like *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203, and *FCC v. ITT World Communications, Inc.*, 466

U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480, involved estoppel and preclusion principles where parties lost before the agency and then sought to relitigate the same issues, which did not occur here. Pp. ―― – ――.

(d) Policy concerns about potential disagreement between courts do not override statutory text and traditional administrative law principles. Circuit splits followed by Supreme Court review are common and do not justify denying judicial review in enforcement proceedings. The alternative of petitioning agencies for new rulemakings or declaratory orders provides largely illusory review that cannot substitute for meaningful judicial review, as agencies retain discretion to decline petitions and any judicial review of denied petitions would be subject to deferential standards. Blindsiding all potentially affected parties by requiring them to bring pre-enforcement challenges within 60 days or lose their right to contest an agency's interpretation in a later enforcement proceeding would be impractical and unfair. The Court sees no good rationale for reading the Hobbs Act to require the District Court to afford absolute deference to the agency. Pp. ―― – ――.

Reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined. KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

Case below, 2023 WL 7015279

**Attorneys and Law Firms**

Matthew W.H. Wessler, Washington, DC, for Petitioner.

Joseph R. Palmore, Washington, DC, for Respondents

Matthew Guarnieri for the United States, as amicus curiae, supporting respondents.

Glenn L. Hara, Anderson + Wanca, Rolling Meadows, IL, Matthew W.H. Wessler, Counsel of Record, Jonathan E. Taylor, Gregory A. Beck, Gupta Wessler LLP, Washington, DC, for Petitioner.

Aileen M. McGrath, Tiffany Cheung, Bonnie Lau, Zach ZhenHe Tan, Morrison & Foerster LLP, San Francisco, CA, Alexandra Avvocato, Morrison & Foerster LLP, New York, NY, Deanne E. Maynard, Counsel of Record, Morrison & Foerster LLP, Washington, DC, Diana L. Kim, Morrison & Foerster LLP, Palo Alto, CA, for Respondents.

**Opinion**

Justice KAVANAUGH delivered the opinion of the Court.

In civil enforcement proceedings under the Telephone Consumer Protection Act, are district courts bound by the Federal Communications Commission's interpretation of the Act? The answer is no.

I

This case involves an FCC order that interprets the Telephone Consumer Protection Act of 1991, or TCPA. The TCPA protects businesses and consumers from intrusive telemarketing communications. Among other restrictions, the TCPA prohibits a business from sending an "unsolicited advertisement" by fax to a "telephone facsimile machine" absent an opt-out notice informing recipients that they can choose not to receive future faxes. 105 Stat. 2395, as amended, 47 U.S.C. §§ 227(b)(1)(C), (2)(D).

The TCPA provides a private right of action. § 227(b)(3). Private parties may sue the sender of an unlawful fax—an unsolicited fax that lacks an opt-out notice—for damages or injunctive relief in federal or state court. *Ibid*.; 28 U.S.C. § 1331; see *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 372, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). For monetary damages, the TCPA sets a floor of $500 for each unlawful fax. 47 U.S.C. § 227(b)(3)(B). A court may order treble damages if it finds a violation willful or knowing. § 227(b)(3).

**\*3** A combination of factors—namely, the private right of action, the statutory minimum damages for each violation, the number of violations that a business can quickly rack up when sending mass fax advertisements, and the class-action device—has spawned substantial TCPA litigation over unwanted faxes. Plaintiffs have sought significant damages against businesses that sent fax advertisements without opt-out notices.

McKesson Corporation is, among other things, a healthcare company. In 2009 and 2010, in an effort to promote McKesson's products, a McKesson subsidiary sent unsolicited fax advertisements to various medical practices. McLaughlin Chiropractic Associates received some of those faxes. In 2014, McLaughlin sued McKesson in the U. S. District Court for the Northern District of California. McLaughlin alleged that McKesson violated the TCPA by faxing unsolicited advertisements without the opt-out notice that the statute requires.

McLaughlin requested damages and an injunction, and it also sought to represent a class of other recipients of McKesson's faxes. Some recipients (including McLaughlin) received the faxes on a traditional fax machine—the standalone device dedicated to receiving and printing faxes. But others received the faxes through online fax services, either by email or through an online portal.

The District Court certified a class of fax recipients, drawing no distinction between faxes received on traditional fax machines and faxes received through online fax services.

As McLaughlin's lawsuit progressed, another company with no connection to the litigation petitioned the FCC for a declaratory ruling about whether the TCPA applies to faxes received through online fax services. Months after the District Court certified the class in McLaughlin's suit, the FCC issued an order—known as the *Amerifactors* order—interpreting the term "telephone facsimile machine" in the TCPA. *In re Amerifactors Financial Group, LLC*, 34 FCC Rcd. 11950 (2019) (declaratory ruling). The FCC ruled that "an online fax service is not a 'telephone facsimile machine.'" *Id*., at 11953, ¶11. Under that interpretation, the TCPA would not prohibit faxes received through online fax services.

As the parties here recognized, if the FCC's *Amerifactors* order were binding on the District Court, it would undermine McLaughlin's class-action lawsuit because McLaughlin defined the class to include plaintiffs who received unsolicited faxes through online fax services.

After receiving briefing on the issue, the District Court deemed the *Amerifactors* order "a final, binding order" that dictated the court's interpretation of the TCPA. *True Health Chiropractic, Inc.* v. *McKesson Corp.*, No. 13–cv–2219 (ND Cal., Dec. 24, 2020), App. to Pet. for Cert. 38a. In line with Ninth Circuit precedent, the court reasoned that it lacked the authority "to question the validity of FCC final orders" such as the *Amerifactors* order. App. to Pet. for Cert. 37a. Under the judicial review provisions of the Hobbs Act, according to the District Court, those FCC orders are " 'subject to the exclusive review of the court of appeals' " in pre-enforcement suits. *Id*., at 36a (quoting *Wilson v. A. H. Belo Corp.*, 87 F.3d 393, 398 (CA9 1996)).

After the District Court determined that the *Amerifactors* order was binding, the court granted summary judgment to McKesson and against McLaughlin on the claims involving faxes received through online fax services. The District Court then decertified the class. That left McLaughlin with winnowed-down claims based on 12 unsolicited faxes that McLaughlin received on a traditional fax machine. So McLaughlin obtained a damages award of only $6,000.

**\*4** On appeal, the U. S. Court of Appeals for the Ninth Circuit affirmed, agreeing that the District Court was "bound" by the *Amerifactors* order. *True Health Chiropractic, Inc.* v. *McKesson Corp.*, No. 22–15710 etc. (Oct. 25, 2023), App. to Pet. for Cert. 6a–7a.

This Court granted certiorari to decide whether the Hobbs Act required the District Court to follow the FCC's legal interpretation of the TCPA. 603 U. S. ——, 145 S.Ct. 116, ——L.Ed.2d —— (2024). The Court previously considered that question but ultimately did not decide it in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 139 S.Ct. 2051, 204 L.Ed.2d 433 (2019).

II

In 1950, Congress passed and President Truman signed the Administrative Orders Review Act, commonly known as the Hobbs Act. 64 Stat. 1129. The Hobbs Act provides for pre-enforcement judicial review of FCC orders. To obtain pre-enforcement review, a party must file a petition in a federal court of appeals within 60 days of the FCC order.

In McKesson's view, which is supported here by the United States as *amicus curiae*, the Hobbs Act's provision for pre-enforcement review in the courts of appeals bars district courts in enforcement proceedings from disagreeing with an agency's interpretation of a statute. According to McKesson and the Government, the District Court in this case was absolutely bound by the FCC's interpretation of the TCPA.

We disagree. The Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct. Here, therefore, the District Court should interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

A

The Hobbs Act provides in relevant part: "The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... all final orders of the Federal Communication[s] Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). Under the Hobbs Act, when the FCC issues certain orders, any "party aggrieved" has 60 days to file a petition in a court of appeals seeking review of the order and declaratory or injunctive relief against the enforcement of the order. §§ 2342, 2344, 2349. If more than one petition for review is filed within that 60-day period, the petitions are then consolidated in a single court of appeals. § 2112(a). The Hobbs Act also governs review of certain actions of the Department of Agriculture, Department of Transportation, Federal Maritime Commission, Nuclear Regulatory Commission, Surface Transportation Board, and Department of Housing and Urban Development. See §§ 2342(2)–(7).

Pre-enforcement review under the Hobbs Act allows regulated and affected parties to obtain greater clarity about their legal rights and obligations—rather than taking their chances and hoping to prevail in later enforcement proceedings. The Hobbs Act requires parties who want to challenge the legality of agency rules or orders in a pre-enforcement proceeding to do so both promptly and in a court of appeals. That pre-enforcement review process avoids the delays and uncertainty that otherwise could ensue from multiple pre-enforcement suits filed across time in multiple district courts and from subsequent appeals in the courts of appeals.

**\*5** Suppose, however, that no one files a pre-enforcement suit challenging an agency rule or order. Or suppose that a court of appeals upholds the agency's statutory interpretation in a pre-enforcement challenge. Either way, a critical follow-on question is whether the Hobbs Act bars different parties in subsequent enforcement proceedings from arguing—and district courts from concluding—that the agency incorrectly interpreted the statute. The answer is no. [1]

To understand why, we first must distinguish the three categories of statutes that authorize pre-enforcement review of agency rules and orders.

Statutes in the first category authorize pre-enforcement judicial review and expressly *preclude* judicial review in subsequent enforcement proceedings. Examples include the Clean Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), and the Clean Air Act. The Clean Water Act provides for pre-enforcement review of certain agency actions in a court of appeals and generally requires parties to seek review within 120 days. See 33 U.S.C. § 1369(b)(1). Importantly, the Act also states that those agency actions "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." § 1369(b)(2). CERCLA likewise allows parties to seek pre-enforcement review of any covered regulation in the D. C. Circuit within 90 days. See 42 U.S.C. § 9613(a). Like the Clean Water Act, CERCLA specifies that those regulations "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." *Ibid*. Similarly, the Clean Air Act generally authorizes parties to file pre-enforcement petitions for review in the appropriate court of appeals within 60 days. See § 7607(b)(1). The Clean Air Act, too, states that those agency actions "shall not be subject to judicial review in civil or criminal proceedings for enforcement." § 7607(b)(2).

The second category lies at the opposite pole—it consists of pre-enforcement judicial review statutes that also expressly *authorize* (or at least expressly contemplate) judicial review in subsequent enforcement proceedings. For instance, the Toxic Substances Control Act states that courts of appeals "shall have exclusive jurisdiction of any action to obtain judicial review (*other than in an enforcement proceeding*)." 15 U.S.C. §§ 2618(a)(1)(A), (a)(1)(B) (emphasis added). A similar provision authorizes review of certain Federal Trade Commission rules. § 57a(e)(5)(B). Those statutes recognize judicial review in pre-enforcement suits and enforcement proceedings alike.

Statutes in the third category fall between the first two categories. Those statutes provide for pre-enforcement review but are silent on the question of whether a party may contest the agency's legal interpretation in subsequent enforcement proceedings. The Hobbs Act is one example. Others include statutes that authorize review of certain Securities and Exchange Commission and Department of Labor rules and orders. See §§ 77i(a), 80a–42(a), 80b–13(a); 29 U.S.C. § 655(f ).

 *6  That third category raises the key question here: What is the default rule for pre-enforcement review statutes that neither expressly preclude nor expressly authorize judicial review in subsequent enforcement proceedings? As relevant here, is the proper default rule in enforcement proceedings (i) to preclude district courts from reviewing an agency's statutory interpretation or (ii) to allow district courts to review an agency's statutory interpretation? [2]

Fundamental principles of administrative law establish the proper default rule: In an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct. District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation. See *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024). [3]

That is the proper default rule for a variety of reasons. To begin, this Court has long recognized a " 'basic presumption of judicial review' " of agency action. *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 586 U.S. 9, 22, 139 S.Ct. 361, 202 L.Ed.2d 269 (2018) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). As a general matter, "unless there is persuasive reason to believe" that Congress intended to preclude judicial review, this Court will not preclude review. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (quotation marks omitted); see *Bouarfa v. Mayorkas*, 604 U.S. 6, 19, 145 S.Ct. 24, 220 L.Ed.2d 245 (2024); *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 273, 136 S.Ct. 2131, 195 L.Ed.2d 423 (2016).

In this enforcement-proceeding context, that presumption is codified in the Administrative Procedure Act, 5 U.S.C. § 703. Section 703 provides: "Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, *agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement*." (Emphasis

added.) Therefore, § 703 itself articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute. Indeed, in 1947, the year after the APA was enacted, the Attorney General's Manual on the Administrative Procedure Act explained that in "many situations," "an appropriate method of attacking the validity of agency action is to set up the alleged invalidity as a defense in a civil or criminal enforcement proceeding." Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 99 (1947).

**\*7** Consistent with the background presumption of judicial review and § 703, this Court's precedents have held that a party usually may seek judicial review of an agency's rule or order in an enforcement proceeding. Courts presume that "parties may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them." *Corner Post, Inc. v. Board of Governors*, 603 U.S. 799, 823, 144 S.Ct. 2440, 219 L.Ed.2d 1139 (2024) (quotation marks omitted). [4]

To be sure, in 1967, this Court's decision in *Abbott Laboratories* v. *Gardner* revolutionized administrative law by more regularly allowing pre-enforcement challenges to agency rules and orders under the APA, at least absent statutory preclusion of such pre-enforcement review. 387 U.S. at 139–141, 87 S.Ct. 1507. But *Abbott Laboratories* did not purport to eliminate judicial review in enforcement proceedings. Indeed, eliminating such review would have thwarted a key aim of the *Abbott Laboratories* decision, which was to *expand* the opportunities for judicial review by allowing challenges to agency action in either pre-enforcement suits or enforcement proceedings. See *id.*, at 140–141, 87 S.Ct. 1507.

In short, the background presumption of judicial review, the text of § 703 of the APA, and the tradition and precedents allowing parties in enforcement proceedings to contest an agency's interpretation combine to establish a clear default rule: In enforcement proceedings, district courts independently determine whether an agency's interpretation of a statute is correct.

To be clear, the default rule is only a default, meaning that it applies only absent congressional indication otherwise. When Congress wants to preclude judicial review in enforcement proceedings, it can easily say so. The Clean Water Act, CERCLA, and the Clean Air Act all expressly preclude judicial review in enforcement proceedings. But absent such congressional preclusion, judicial review should be available.

The default rule also avoids unnecessary litigation and unfairness. It would be impractical—and an enormous waste of resources—to demand that every potentially affected party bring or join pre-enforcement Hobbs Act challenges against every agency rule or order that might possibly affect them at some point in the future. As Justice Powell spelled out in a similar context, it "is totally unrealistic to assume that more than a fraction of the persons and entities affected by a regulation—especially small contractors scattered across the country—would have knowledge of its promulgation or familiarity with or access to the Federal Register." *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 290, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (concurring opinion).

**\*8** On some occasions, moreover, the entities in an enforcement proceeding may not have existed when the relevant agency rule or order was first issued. Or at that time, they may have had no reason to suspect that they could be ensnared in future enforcement proceedings involving that agency action.

Requiring all those potentially affected parties to somehow predict the future and bring a pre-enforcement challenge within 60 days or otherwise lose their right to challenge an agency's interpretation of a statute down the road in an enforcement proceeding would be highly unusual—and would rightly strike many affected parties as grossly unfair. That no doubt explains why Congress rarely enacts such statutes. [5]

All of those considerations taken together lead to a very straightforward principle: When Congress wants to bar a district court in an enforcement proceeding from reviewing an agency's interpretation of a statute, Congress can and must say so. We do not presume that Congress *silently* intended to preclude judicial review in enforcement proceedings. Rather, the default rule is that district courts in enforcement proceedings may conclude that an agency's interpretation of a statute is incorrect.

B

Unlike the Clean Water Act, CERCLA, and the Clean Air Act, the Hobbs Act does not expressly preclude review in enforcement proceedings. So the default rule applies, meaning that judicial review of the FCC's statutory interpretation is available in this enforcement proceeding unless the Hobbs Act provides otherwise. McKesson and the Government advance several arguments that the Hobbs Act should be interpreted to preclude judicial review of an agency's interpretation in an enforcement proceeding. None is persuasive.

*First*, McKesson and the Government say that the text of the Hobbs Act overrides the default rule. They point to the language in the Hobbs Act stating that the court of appeals in a pre-enforcement challenge possesses "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity" of the agency order. 28 U.S.C. § 2342. They seize on the language "exclusive jurisdiction ... to determine the validity." They argue that if the district court in an enforcement proceeding could disagree with an agency's statutory interpretation, the district court would in essence "determine the validity" of the order —thereby contravening the Hobbs Act's grant of exclusive jurisdiction to the court of appeals to do so in a pre-enforcement suit.

 **\*9**  That argument is mistaken. In this context, a court of appeals determines the validity of the agency order by entering a declaratory judgment that declares the order valid or invalid. Critically, if a district court in an enforcement proceeding disagrees with the agency's interpretation of a statute, the district court does not issue such a declaratory judgment. Rather, the district court simply determines the liability of the defendant under the correct interpretation of the statute. In other words, when exercising judicial review in an enforcement proceeding, a district court may consider the validity of the agency order, but the court does not "determine the validity" of that order in the sense of entering a declaratory judgment, which is how that phrase is used in § 2342. Therefore, district court review does not conflict with the Hobbs Act.

Notably, moreover, the statutory phrase "determine the validity" is preceded by the terms "enjoin," "set aside," and "suspend." Here, McKesson claims that "determine the validity" goes beyond a form of relief (that is, beyond a declaratory judgment) and extends to "a court's decisional process in evaluating an order's merits." Brief for Respondents 9. But the *noscitur a sociis* canon counsels against reading the term "determine the validity" to be different in kind and broader than the other three terms, which are all forms of relief. See, *e.g.*, *Fischer v. United States*, 603 U.S. 480, 487–488, 144 S.Ct. 2176, 219 L.Ed.2d 911 (2024); *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–635, 132 S.Ct. 2034, 182 L.Ed.2d 955 (2012).

In addition, a variation of the phrase "determine the validity" appears in another provision of the Hobbs Act, § 2349. That provision states that the court of appeals in a pre-enforcement proceeding "has exclusive jurisdiction" to enter "a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency." § 2349(a).

The phrase "judgment determining the validity" in § 2349 further confirms that the phrase "determine the validity" in § 2342 refers to a declaratory judgment. The two provisions work in tandem, not at odds, and they have a consistent meaning. The main point of § 2342 is to identify the relevant courts that may hear pre-enforcement challenges—namely, the courts of appeals— and to list the agency actions that the Hobbs Act covers. Section 2349 specifies in more procedural detail that a court of appeals exercises jurisdiction upon "the filing and service of a petition," and it authorizes the court of appeals to enter a judgment upon review of "the petition, evidence, and proceedings set forth" in the administrative record. *Ibid*. So the language in § 2349 further supports our conclusion about the meaning of § 2342: In an enforcement proceeding, a district court is not bound by an agency's statutory interpretation. [6]

As the dissent notes, the Hobbs Act provides "exclusive jurisdiction" to the courts of appeals. § 2342. But the question is: "exclusive jurisdiction" to do what? Under the Hobbs Act, the courts of appeals have exclusive jurisdiction to hear pre-enforcement challenges, meaning that district courts may not entertain those pre-enforcement suits. That language does not bar district courts in enforcement proceedings from independently interpreting the meaning of the statute at issue.

In short, the Hobbs Act does not bar McLaughlin from arguing in the district court enforcement proceeding that the FCC's interpretation of the TCPA is incorrect. The Hobbs Act dictates how, when, and in what court a party can challenge a new agency order before enforcement. The Act does not purport to address, much less preclude, district court review in enforcement proceedings. So the District Court in this enforcement proceeding can decide what the statute means under ordinary principles of statutory interpretation, affording appropriate respect to the FCC's interpretation. By doing so, the District Court will not "determine the validity" of the FCC's *Amerifactors* order and thus will not contravene the Hobbs Act.

**\*10** One additional note: Even if the text of the Hobbs Act were ambiguous as to whether it precludes judicial review of an agency interpretation in enforcement proceedings, ambiguity does not suffice to deprive a party of that judicial review. See, *e.g.*, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229, 140 S.Ct. 1062, 206 L.Ed.2d 271 (2020); *Cuozzo Speed Technologies*, 579 U.S. at 273, 136 S.Ct. 2131. To deny a party like McLaughlin the opportunity to contest the agency's interpretation in an enforcement proceeding, Congress must clearly preclude such review. The Hobbs Act does not do so.

*Second*, McKesson and the Government turn to precedent and say that one of this Court's cases—*Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944)—already construed a statute similar to the Hobbs Act to bar judicial review in enforcement proceedings. That argument, too, is misplaced.

In *Yakus*, the Court considered pre-enforcement suits authorized by the Emergency Price Control Act of 1942. The question was whether the Act's authorization of pre-enforcement suits for adjudicating the validity of World War II pricing regulations and orders precluded judicial review in subsequent enforcement proceedings. See *id.*, at 418, 64 S.Ct. 660.

The Emergency Price Control Act contained two key sentences governing judicial review. The first sentence said that a specially created federal court possessed "exclusive jurisdiction to *determine the validity* of any regulation or order" covered by the Act. 56 Stat. 33 (emphasis added). That first sentence is similar to § 2342 of the Hobbs Act. The second sentence said: "Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to *consider the validity* of any such regulation, order, or price schedule." *Ibid.* (emphasis added). That second sentence is *not* replicated in the Hobbs Act, but is similar to the preclusion-of-review provisions in the Clean Water Act, CERCLA, and the Clean Air Act.

According to the Court in *Yakus*, the first sentence of the Emergency Price Control Act, which gave a specific court the exclusive jurisdiction to determine the validity of certain regulations, "*coupled with the provision*" that explicitly provided that no other court had jurisdiction to "consider" the validity of those same regulations, deprived the District Court in the later enforcement proceeding of authority to consider the legality of the relevant price regulation. 321 U.S. at 429–430, 64 S.Ct. 660 (emphasis added).

By using the phrase "coupled with," the *Yakus* Court reasoned that those two sentences of the Emergency Price Control Act *together* barred district court review. The first sentence alone did not suffice. Importantly, moreover, *Yakus* did not treat the second sentence of the Emergency Price Control Act—which barred all other courts from even considering the validity of the regulations—as redundant or a restatement of the first. On the contrary, the Court recognized that the two provisions achieved separate objectives. The first sentence afforded a particular court "exclusive" jurisdiction "to determine the validity" of a pricing regulation in a pre-enforcement challenge. *Id.*, at 443, 64 S.Ct. 660. The second sentence, in turn, foreclosed "any further or other consideration of the validity of a regulation" in enforcement proceedings. *Ibid.* The word "exclusive" in the first sentence did not itself bar any subsequent review in enforcement proceedings. If it had, then the second sentence of the Emergency Price Control Act—barring any other consideration of the validity of the regulations—would have been unnecessary. Yet the Act included the second sentence and, importantly, the *Yakus* Court then expressly relied on that second sentence in deciding that review was precluded in subsequent enforcement proceedings.

**\*11** In 1950, six years after *Yakus*, Congress enacted the Hobbs Act. According to McKesson and the Government, Congress replicated relevant provisions of the Emergency Price Control Act in the Hobbs Act. Not so. In enacting § 2342 of the Hobbs Act, Congress incorporated language resembling the first sentence of the Emergency Price Control Act that granted the courts

of appeals exclusive jurisdiction to entertain pre-enforcement challenges to determine the validity of agency rules and orders. But Congress did not carry forward the second sentence of the Emergency Price Control Act, which provided that no other court had jurisdiction even to "consider the validity" of those same agency rules and orders. In the Hobbs Act, in other words, Congress did not include the language from the Emergency Price Control Act that, as interpreted in *Yakus*, would have expressly communicated Congress's decision to preclude district courts from considering the validity of certain rules and orders.

In relying on *Yakus*, McKesson and the Government also disregard a critical contextual difference between the Emergency Price Control Act and the Hobbs Act. Congress designed the Emergency Price Control Act for the wartime context, where the need for quick and definitive judicial rulings was at its zenith. By contrast, the Hobbs Act is an omnibus administrative review statute that covers a variety of agency rules and orders, without an exigency of that kind.

Because the Emergency Price Control Act differs in important textual and contextual ways from the Hobbs Act, *Yakus* does not control here.

McKesson and the Government also rely on two Hobbs Act cases, *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970), and *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984). But those cases likewise do not advance their cause. In *Port of Boston*, two private parties had been opposed to one another in an agency's adjudicative proceeding. 400 U.S. at 65–66, 91 S.Ct. 203. Then, the losing party in the adjudicative proceeding intervened in an ongoing District Court suit against the other party, seeking to relitigate the agency's decision. *Id.*, at 64–67, 91 S.Ct. 203. *ITT World* similarly involved a party who lost before the agency and then turned around and sued the agency in District Court. 466 U.S. at 465–466, 468, 104 S.Ct. 1936. In both cases, this Court held that the Hobbs Act barred the suit. See *Port of Boston*, 400 U.S. at 72, 91 S.Ct. 203; *ITT World*, 466 U.S. at 468, 104 S.Ct. 1936. Those decisions mean only that a form of estoppel or preclusion applies when two parties are opposed in an agency's adjudicative proceeding—and the losing party then seeks to upset the result of that adjudicative proceeding in an ordinary district court suit rather than in the court of appeals venue provided by statute. See also n. 3, *supra*. The litigation between McLaughlin and McKesson at issue in this case does not implicate those concerns about "collateral redetermination of the same issue" involving the same parties "in a different and inappropriate forum." *Port of Boston*, 400 U.S. at 72, 91 S.Ct. 203.

To be sure, as McKesson and the Government note, one paragraph near the end of the *Port of Boston* opinion could be read more broadly than simply relying on estoppel or preclusion principles. See *ibid*. But that paragraph was styled as alternative reasoning and, if read broadly, would be inconsistent with fundamental principles of administrative law and judicial review that this Court has emphasized in the years since. So we decline to adopt that broader reading and instead confine *Port of Boston* to the estoppel and preclusion principles that formed the primary basis for the decision. [7]

 ***12** *Third*, McKesson and the Government argue that practical problems could ensue if the Hobbs Act did not bar judicial review of agency legal interpretations in enforcement proceedings.

They raise concern about the potential disagreement and inefficiency that could crop up if courts in enforcement proceedings independently interpret statutes instead of following an agency's interpretation. That policy-laden argument does not overcome the text of the statute and traditional administrative law principles. Moreover, the argument is unpersuasive even on its own terms. If an agency order is upheld in a pre-enforcement challenge by a court of appeals, it is true that a different court of appeals (upon review of a district court's decision) might disagree with the agency's interpretation in an appeal from a subsequent enforcement proceeding. But that inter-circuit disagreement would simply create a circuit split on the interpretation of the law and likely trigger review in this Court. Circuit splits followed by this Court's review are commonplace. There is no reason to think that Congress wanted to short-circuit that ordinary system of judicial review for the multiplicity of agency rules and orders encompassed by the Hobbs Act.

The Government separately suggests that judicial review is not necessary in any event because an affected party who did not bring a pre-enforcement challenge can always petition the agency for a new rulemaking or declaratory order. That is a largely

empty promise. To begin, if the Government actually supports judicial review after the initial 60-day Hobbs Act period, it makes little sense to squeeze review into that convoluted route rather than recognizing judicial review in enforcement proceedings. More fundamentally, judicial review may not always be available under that route, or it may take many years for the agency to act on a petition for a new rulemaking or declaratory order. And even if judicial review of a denied petition is available, "the ability to petition" an agency for a new rulemaking or declaratory order is not "a sufficient substitute for *de novo* judicial review of its lawfulness" because the "agency's discretionary decision to decline to take new action would be subject only to deferential judicial review." *Corner Post,* 603 U.S. at 825, n. 9, 144 S.Ct. 2440 (quotation marks omitted). In short, the Government's suggestion of an alternative path of judicial review is largely illusory in practice and does not supply a basis for denying judicial review in district court enforcement proceedings.

The dissent expresses concern about how our decision will affect the incentives of regulated parties. See *post*, at ——, ——– ——. Invoking plutonium shippers and nuclear reactor operators, the dissent says that regulated parties like those will be emboldened to violate agency rules and orders, all because those regulated parties may challenge the validity of agency rules and orders in subsequent enforcement proceedings. But the APA itself makes judicial review available in both pre-enforcement proceedings and enforcement proceedings, so our decision today does not create some unusual procedure. See *Abbott Laboratories*, 387 U.S. at 140–141, 87 S.Ct. 1507. Indeed, as is true under the APA, many regulated parties will prefer to challenge a rule or order in a pre-enforcement proceeding—that is, *before* running the risk of ruinous liability in an enforcement proceeding. Avoiding exposure to liability in an enforcement proceeding is a core purpose of pre-enforcement review. See *id.,* at 153–154, 87 S.Ct. 1507. We do not think that the availability of judicial review in district court enforcement proceedings will create the negative incentives that the dissent is concerned about.

**\*13** As it has done with the Clean Water Act, CERCLA, and the Clean Air Act, Congress can choose to expressly preclude judicial review in enforcement proceedings (subject to constitutional constraints). But we should not lightly conclude that Congress wants to simultaneously deny judicial review in enforcement proceedings whenever it grants particular courts "exclusive jurisdiction" over pre-enforcement challenges. That would blindside parties who would not necessarily have anticipated that they should have filed a pre-enforcement challenge, insulate agencies from circuit splits, and thereby render this Court's review of significant agency rules and orders less likely. Such an interpretation would read far too much into a few oblique words in the Hobbs Act.

To the extent we consider real-world effects, moreover, they cut against McKesson and the Government. As McKesson and the Government see things, when the initial window for pre-enforcement review closes, no one can argue in court that the agency's interpretation of a statute is incorrect—no matter how wrong the agency's interpretation might be. In other words, their argument would require the District Court to afford *absolute deference* to the agency. We see no good rationale for reading the Hobbs Act to embody such an absolute-deference rule.

* * *

The District Court is not bound by the FCC's interpretation of the TCPA. The District Court should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

McKesson separately contends that we should affirm anyway because, in its view, the FCC's interpretation of the TCPA is correct. Consistent with our usual practice, we leave that issue for remand. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KAGAN, with whom Justice SOTOMAYOR and Justice JACKSON join, dissenting.

Imagine the Nuclear Regulatory Commission (NRC) issues a rule to ensure the safe handling of nuclear material—for example, by prohibiting the shipment of (radioactive) plutonium by air. See 10 C.F.R. § 71.88 (2024). And imagine, too, that a regulated party thinks the rule exceeds the NRC's statutory authority. Must the party challenge the rule right away—before putting plutonium on a plane—by bringing its arguments to a court of appeals? Or can the party send plutonium through the skies without regard to the rule, and contest its validity only when (really, if) the NRC initiates an enforcement action?

Today, the Court picks the second option: ship first, litigate later. The Hobbs Act provides for prompt pre-enforcement judicial review of much agency action, including most of the NRC's rules and orders. See 28 U.S.C. § 2342(4). But as the majority sees things, the Act "does not preclude district courts" from declaring a rule or order invalid years after it issued, at the behest of a party who declined to seek judicial review in the first instance. *Ante*, at ——. So a regulated party, as in my plutonium example, can violate an agency's rule, wait for the agency to discover the offense and bring an enforcement action, and only then challenge the rule as going beyond statutory authority. And the same is true in private litigation (as here), for either a plaintiff or a defendant. If, for example, a defendant raises an agency's rule or order in a civil suit (as McKesson did to defeat McLaughlin's class action), the plaintiff can always respond by challenging the agency action's validity. And that is so, in both the administrative and the private contexts, even if appellate courts have previously approved the agency rule or order, so long as those judicial decisions are not somehow binding (which they often will not be).

**\*14** But the Court's conclusion is wrong, as a matter of ordinary statutory interpretation. The text of the Hobbs Act makes clear that litigants who have declined to seek pre-enforcement judicial review may not contest the statutory validity of agency action in later district-court enforcement proceedings. And this Court's prior decisions have said just that. Today's majority evades the Hobbs Act's most natural meaning by relying on a novel "default rule," which demands that Congress use a certain form of words—really, that Congress create statutory redundancy—to preclude parties from bringing down-the-road challenges to agency action. That rule has no foundation in our law; it emerges fully formed today from the majority's head. And it prevents the Hobbs Act from functioning as Congress wanted—by allowing regulated parties to end-run the Act's pre-enforcement judicial review scheme, and thereby undermine the stability and efficacy of administrative programs.

I

Under the Hobbs Act, the federal courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" specified agency rules and orders. § 2342. The question here is whether the Act—despite vesting that "exclusive jurisdiction" in the courts of appeals—still allows a litigant to attack the validity of a covered agency action in a district-court enforcement proceeding. Or otherwise asked: May a party in a district-court suit challenge a covered agency action, many years after the action issued and underwent judicial review, as part of his claim or defense?

The Hobbs Act's text provides the answer. By its terms, the Hobbs Act gives courts of appeals exclusive authority to "determine the validity" of specified agency actions. "Exclusive," of course, means courts of appeals alone, not district courts. And there lies the problem for a party challenging agency action in a district court, not a court of appeals. When he objects to an order because it misconstrues a statute, he asks the district court to "determine the [order's] validity." The court, to address the claim, has to settle or decide ("determine") whether the challenged agency action is lawful ("valid"). See, *e.g.*, Black's Law Dictionary 536, 1719 (4th ed. 1951) (defining "determine" to mean "settle" or "decide," and "validity" to mean "[l]egal sufficiency"); see also *id*., at 1719 (defining "valid" to mean "legally sufficient" or "authorized by law"). So the party's request is for the district court to do exactly what the Hobbs Act says it cannot. This case could be Exhibit A. McLaughlin wants a district court to disregard the Federal Communications Commission's (FCC's) *Amerifactors* order, 34 FCC Rcd. 11950 (2019), on the ground that it conflicts with the Telephone Consumer Protection Act. See *ante,* at —— – ——. But to do that, the district court would need to decide (or "determine") that *Amerifactors* is legally wrong (or "invalid"). And the Hobbs Act reserves such determinations for the federal courts of appeals. As the statute says, their jurisdiction is "exclusive."[1]

**\*15** The majority's contrary reading of "determine the validity" has nothing to recommend it. In the majority's view, a court determines the validity of an agency order only when it "enter[s] a declaratory judgment" holding the order valid or invalid. See *ante,* at ––––. And because (the majority continues) a district court in an enforcement proceeding does not enter a declaratory judgment, its ruling on validity does not collide with the Hobbs Act. But why read "determine the validity" to mean "*issue a declaratory judgment* determining the validity"? By adding words to the phrase—usually considered bad practice in statutory interpretation—the majority narrows its meaning. See, *e.g.*, Lomax v. Ortiz-Marquez, 590 U. S. 595, 600, 140 S.Ct. 1721, 207 L.Ed.2d 132 (2020) ("[T]his Court may not narrow a provision's reach by inserting words Congress chose to omit"). As Congress drafted the phrase, it refers to any method of, or mechanism for, determining an order's validity; as the majority reads the phrase, it reduces to only one. Had Congress meant to refer to only that one, it had a perfectly easy way to do so—just insert language, along the lines of the italics above, mentioning declaratory judgments. Congress of course knows how to do that when it wants to. See, *e.g.*, 5 U.S.C. § 703 (referring to "actions for declaratory judgments"). It did not want to here. It gave exclusive jurisdiction to the courts of appeals to "determine the validity of " specified agency orders and rules—by whatever means, not just by entering declaratory judgments. [2]

History and precedent confirm that view. At the time Congress drafted the Hobbs Act, this Court had held that two statutes like it applied whenever a litigant's claim or defense called agency action into question. See Venner v. Michigan Central R. Co., 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Congress enacted the Hobbs Act against the backdrop of those decisions, presumably intending to replicate their results. See, *e.g.,* Parker Drilling Management Services, Ltd. v. Newton, 587 U.S. 601, 612, 139 S.Ct. 1881, 204 L.Ed.2d 165 (2019) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law' "). And this Court has previously read the Hobbs Act as doing exactly that—as preventing later, collateral attacks on agency orders that could have been challenged at the time they issued.

Begin with *Venner*, which involved a Hobbs Act predecessor called the Urgent Deficiencies Act. The case arose from an Interstate Commerce Commission (ICC) order permitting a railroad to participate in a joint venture with two others. See 271 U.S. at 128–129, 46 S.Ct. 444. A minority shareholder of the railroad sued to enjoin the venture, arguing that the ICC had no statutory authority to approve it. But we decided the District Court lacked jurisdiction. The suit, we explained, "assail[ed] the validity" of an ICC order by asking that the railroad "be enjoined from doing what the order specifically authorize[d]." *Id*., at 130, 46 S.Ct. 444. And such an attack on an agency order's validity had to be brought in the court, and according to the procedures, the Urgent Deficiencies Act directed. See *ibid.*; see also Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 381–382, 42 S.Ct. 349, 66 L.Ed. 671 (1922) (similarly dismissing a civil suit because it was "in effect" an attack on an agency rule). So *Venner* precluded, under an earlier Hobbs-Act-type statute, just what today's majority allows: a collateral attack on agency action brought as a claim or defense in a later civil suit. If the majority were to apply the *Venner* rule today, it would hold that McLaughlin could not "assail the validity" of the FCC's *Amerifactors* order except in the way the Hobbs Act specifies. [3]

**\*16** And *Venner* is no one-off: *Yakus* understood another Hobbs Act precursor—the jurisdictional provision of the Emergency Price Control Act of 1942 (EPCA)—in the identical way. That Act created an agency to issue regulations and orders involving wartime prices. Relevant here, it also gave a special court "exclusive jurisdiction to determine the validity" of those orders, and barred other courts from "consider[ing]" their "validity." See 321 U.S. at 429, 64 S.Ct. 660 (quoting § 204(d), 56 Stat. 33). The Court understood that language—some ending up verbatim in the Hobbs Act—to preclude a district court from ruling on the "validity" of the agency's orders in a later enforcement proceeding (including, as there, a criminal prosecution for violating the Act). 321 U.S. at 430, 64 S.Ct.. 660. That holding follows straightforwardly from *Venner*—and likewise points to a different result today.

The majority thinks *Yakus* is different because the EPCA included a surfeit of exclusivity language. See *ante,* at –––– – ––––. In one sentence (as in the Hobbs Act), the statute made clear that the special court had "exclusive jurisdiction" to "determine the validity" of the agency's orders; in the next, the law provided that no other court had jurisdiction to consider such an order's validity. See 321 U.S. at 429, 64 S.Ct. 660. Because the *Yakus* Court noted both, the majority argues, it must have thought the first sentence insufficient alone. See *ante*, at ––––. But the majority's conclusion hardly follows from its observation. Sure, the

*Yakus* Court mentioned both sentences, because both were there. (I would have too.) But if only the first were there, would the Court have reached a different conclusion? No, because the second sentence is just the negative of the first: If Court X has "exclusive jurisdiction" over a matter (here, "determining the validity" of agency action), Courts Y and Z have no authority over that matter—just by dint of what "exclusive" means. And indeed, in a later case involving the EPCA (decided just two years before Congress enacted the Hobbs Act), we relied only on the language in the first sentence to hold that the special court's "exclusive jurisdiction" to "determin[e an order's] validity" precluded a district court from entertaining a collateral attack on the order. See *Woods v. Hills*, 334 U.S. 210, 213–214, 68 S.Ct. 992, 92 L.Ed. 1322 (1948). The second sentence, we recognized then, was just the opposite side of the coin, not worth mentioning. Or, to switch to a more common statutory interpretation metaphor, the second sentence was the "lamentably common" suspenders on top of the already sufficient belt. A. Scalia & B. Garner, Reading Law 177 (2012).

It is thus not surprising that when this Court previously encountered the Hobbs Act, it reached the same result—once again foreclosing a district court's "collateral redetermination" of the validity of an agency order. *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 72, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). And make no mistake: That is *Port of Boston*'s holding, however much the majority tries to veil it. See *ante,* at –––– – ––––. The case got its start when the Federal Maritime Commission (FMC) issued an order in a ratemaking proceeding authorizing a port operator to impose certain fees on shipowners using the port. Later, a shipowner intervened in an ongoing district-court suit to collect the fees, and sought to argue that the FMC order allowing them was in error. This Court held that the Hobbs Act barred consideration of that issue. The Act, we explained, was "explicit" in giving the courts of appeals "exclusive jurisdiction" to "determine the validity" of the FMC's orders. 400 U.S. at 69, 91 S.Ct.. 203. And that meant the district court could not entertain a "collateral attack" on what the FMC had done. *Id*., at 71, 91 S.Ct. 203. In the last part of the opinion, the Court responded to the shipowner's contention that such an attack was "justif[ied]" because it had not participated in the FMC's ratemaking. The Court began by noting—in the single paragraph the majority pretends is the crux of the decision—that the shipowner really had taken part through an agent. See *ibid.* And then the hammer came down: The shipowner's participation—or lack thereof—simply did not matter. See *id.*, at 72, 91 S.Ct. 203. Even if the shipowner had not taken part in the ratemaking, "it had every opportunity" to do so and "then to seek timely review in the Court of Appeals." *Ibid.* As long as that was true, the shipowner was stuck. Echoing its earlier holding about the Act's "explicit" command, the Court again made clear: The shipowner "cannot force collateral redetermination" of the FMC's decision "in a different and inappropriate forum." *Ibid.*

 *17  So the majority today is wrong as a matter of text: The Hobbs Act gives the courts of appeals exclusive jurisdiction to determine the validity of agency action, meaning that district courts have no jurisdiction to do so. The majority today is wrong as a matter of history: Congress knew about that judicial review regime when it enacted the Hobbs Act, and would have expected the language it used (cribbed as it was from the EPCA) to produce the same result. And the majority today is wrong as a matter of precedent: This Court has held that the Hobbs Act, like its precursors, sets up a single judicial review mechanism for agency rules and orders, and prevents later collateral attacks on them in other courts. Small wonder, then, that every court of appeals to address the question before us has rejected the position the majority takes.[4] There is simply nothing in the law to support today's result.

II

How, then, does the majority justify its position? All of the work is done through the creation of a so-called "default rule." *Ante,* at ––––. According to the majority, Congress's decision to give the courts of appeals "exclusive" jurisdiction to "determine the validity" of agency action is not enough to prevent district courts in later proceedings from doing the same thing. That is because, the majority says, Congress did not "expressly preclude" those district-court determinations. *Ibid.* And what Congress did not "expressly preclude," we should understand it to have permitted. The idea is closely related to the majority's view of *Yakus.* See *supra,* at –––– – ––––; *ante,* at –––– – ––––. Recall that the EPCA's first sentence gave exclusive jurisdiction to the special appellate court to review an agency action's "validity," and its second sentence affirmed that other courts had no jurisdiction over the identical matters. See 414 U.S. at 429. The majority insists on Congress always taking that double-barreled, belt-and-

suspenders approach. Where Congress has not, courts cannot ask, as a matter of ordinary statutory interpretation, whether an exclusivity provision alone expresses Congress's intent to have court-of-appeals review be, well, exclusive. Congress always has to add a second, "we mean it too" sentence.

But why? The majority offers only two reasons—the presumption of judicial review of agency action and the APA. See *ante,* at —— – ——. Neither provides support for the majority's novel default rule.

The presumption of judicial review of agency action is indeed "basic," *ante,* at ——, but it does not stretch as wide as the majority claims. The principal case the majority cites puts it this way: We presume that "Congress did not mean to prohibit *all* judicial review" of an agency's decision. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 672, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); emphasis added); see *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, n. 8, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994). "All" is a small word, but it means something. The presumption does not operate when Congress, rather than eliminating judicial review, has channeled it in one direction or another. So, for example, this Court has approved many congressional schemes lodging pre-enforcement review of agency action in the courts of appeals alone, even though parties may wish to proceed, in the ordinary way, first to district court. See *id.*, at 207–208, 218, 114 S.Ct. 771; *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 185–186, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023). "Because court of appeals review is available," we have explained, those schemes "do[ ] not implicate" the presumption favoring judicial review of agency action. *Thunder Basin*, 510 U.S. at 207, n. 8, 114 S.Ct. 771.[5] Similarly here. The Hobbs Act simply favors a centralized way of providing judicial review of covered actions—at a particular time, in a particular court. And as noted earlier, it does not apply when a person lacks an adequate opportunity to avail himself of that mechanism; in that event, he can obtain judicial review in a later proceeding. See *supra,* at ——, n. 1. So the Hobbs Act does not implicate the presumption in favor of judicial review.

*18  Neither does the APA support the majority's default rule. The majority relies on Section 703, which it presents as follows:

"Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, *agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement*." *Ante,* at —— (emphasis supplied by majority).

But what if we instead present Section 703 like this:

"*Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law*, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."

The point, of course, is that under Section 703 the majority's preferred kind of judicial review is subject to an exception: Congress may replace it with a "prior, adequate, and exclusive opportunity for judicial review." To me, that phrase reads like a description of the Hobbs Act. I imagine to the majority it does not (though, if not the Hobbs Act, what?). But on neither view can one find in Section 703 the demand for an interpretive fist on the scales, of the sort the majority devises. To the contrary, a court treats Section 703 respectfully when it addresses straight up the issue that the prefatory clause makes decisive: Does some statute provide for a "prior, adequate, and exclusive opportunity for judicial review"?

The Attorney General's Manual on the Administrative Procedure Act, which the majority also cites, in fact endorses that straight-up (not pre-jiggered) interpretive approach. The majority quotes the following from the Manual: "[I]n many situations" "an appropriate method of attacking the validity of agency action is to set up the alleged invalidity as a defense in a civil or criminal enforcement proceeding." *Ante,* at ——; Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 99 (1947). True enough. But the Manual also makes clear that sometimes that will not be an appropriate method—because Congress has decided otherwise. A statute, the Manual explains, may "expressly provide for an exclusive method of judicial review which precludes challenge of agency action in enforcement proceedings." *Ibid.*, and n. 13 (citing the EPCA). Or, the Manual continues, "a court may conclude from the statutory context that such was the legislative intention." *Ibid.* So the directive the Manual gives is to do ordinary statutory interpretation—not to avoid it, as the majority does. "In brief," the Manual summarizes, "courts must

determine in each case" whether Congress "intended to preclude or to permit judicial review of agency action in enforcement proceedings." *Id.*, at 100–101. Quite right—someone should tell the majority.

Finally, note what the majority does not have to support its interpretive method—any on-point precedent. No *Venner* or *Yakus* or *Port of Boston*. See *supra,* at —— – ——. No *Lambert* or *Woods*. See *supra,* at ——, ——. There is a lone quotation from *Corner Post, Inc. v. Board of Governors*, 603 U.S. 799, 817, 144 S.Ct. 2440, 219 L.Ed.2d 1139 (2024). See *ante,* at ——. But that statement merely notes the general rule that a person can attack a regulation in enforcement proceedings; it does not say anything about how to determine whether a statute like the Hobbs Act provides an exception to that rule. On that question, as shown above, all the Court's precedent goes against the majority's view.

III

**\*19** The majority's misreading of the Hobbs Act prevents the statute from serving its intended function. Today's holding undermines the certainty and finality Congress sought in designing a mechanism for judicial review; it subjects all administrative schemes, and the many businesses and individuals relying on them, to the ever-present risk of disruption. On a more technical —but still quite important—level, the holding allows parties to put agency action in jeopardy without suing, or even notifying, the Government. And the holding makes more likely that regulated parties will put off submitting to lawful agency action, including in areas where Congress would have most valued sure and immediate compliance. In all, the majority's misreading frustrates the point of the Act, which is to prevent collateral attacks, possibly years down the line, on even the most settled administrative frameworks.

First and foremost, the majority's position guts Congress's scheme—centered on a 60-day time limit—for ensuring quick resolution of challenges to agency action, and repose after that. See *Corner Post,* 603 U.S. at 817, 144 S.Ct. 2440 (describing the Hobbs Act's time limit as a "repose provisio[n]"). Under the Act, a single circuit court is to resolve all challenges to a covered action's validity that are brought within 60 days. See §§ 2344, 2112(a). On the 61st day, a challenge is untimely. The idea is to rule on the legal disputes at the beginning, often with the full range of stakeholders present. Once the court of appeals resolves the challenges—up or down, valid or invalid—the rules of the road are set. Regulated parties know what they have to comply with, and also what they can rely on. Except that the majority's decision today blows all that up. The finality and certainty of the Hobbs Act system will largely evaporate under the constant pressure of later enforcement actions. Any party at any time in the future—*ad infinitum*, so to speak—will now be able to disrupt even the most solid-seeming regulatory regimes. Those who complied with the old rules (for example, who took advantage of the FCC's safe harbor for certain faxes) may become in a moment exposed to liability. No one will know what they can rely on. And so the majority today subverts Congress's object. A strict 60-day time limit, meant to give stability to the administrative sphere, now becomes a forever-provision, putting everything always up for grabs.

The majority's holding also will deprive the Government of the opportunity to defend agency action. Under the Hobbs Act, a person challenging an agency order must sue the United States and serve its petition on both the agency and the Attorney General. § 2344. Those requirements have an obvious purpose: They enable the Government to protect its interests by standing up for the order under attack. See *Port of Boston*, 400 U.S. at 70, 91 S.Ct. 203; cf. 28 U.S.C. § 2403(a) (similarly requiring notice and an opportunity to intervene for the United States in any action challenging a statute's constitutionality). But under the majority's regime, a district court may declare an order invalid in a private suit (or a suit involving a State) that the Government has no role in—maybe does not even know about. Here, for example, McLaughlin's challenge to the *Amerifactors* order arose in a class action not involving the Government. After today—and contra the Hobbs Act—a court could sustain such a challenge without the FCC having so much as a chance to object.

Finally, I return to where I started, with a party—let's say again, a plutonium shipper—who would prefer to ignore an agency order and contest it later (if the Government brings an enforcement action). The Hobbs Act, read rightly, checks that kind of conduct, by providing for a definitive ruling on the order's legality soon after it issues. And it is not hard to see why

Congress favored that approach. Among the agency actions covered are rules governing the NRC's licensees—like plutonium shippers or nuclear reactor operators. See 42 U.S.C. § 2239. And similarly, orders issued by the Secretary of Transportation to address railway safety emergencies. 49 U.S.C. §§ 20104(a), 20114(c). In other words, agency actions that (assuming they clear judicial review) Congress would have wanted regulated parties to comply with *now*. But the majority decides today that prompt compliance is really just an option. The plutonium shipper can disobey an agency order, knowing that, even in the face of a court of appeals decision upholding it, he can later seek a different result. The majority responds: No worries, because many or most regulated parties will prefer pre-enforcement review anyway. See *ante,* at —— – ——. And that is right—many or most will. But Congress was entitled to decide that even a few parties out of compliance with an NRC order (until a later enforcement proceeding) were a few too many—so that parties should not be given that choice. In allowing parties to end-run early judicial review, the majority thus flouts the Hobbs Act's design.

* * *

**\*20** The Hobbs Act gives the courts of appeals "exclusive jurisdiction" to "determine the validity" of covered agency action. Those words mean what they say, or anyway should. They mean that, because the appellate courts' jurisdiction is exclusive, district courts have no power to make the determination anew. Once an agency action has gone through the Act's judicial review scheme, the question of the action's validity is over. Because the majority today rejects that straightforward reading and thereby subverts the Act's operation, I respectfully dissent.

**All Citations**

606 U.S. ----, --- S.Ct. ----, 2025 WL 1716136

---

**Footnotes**

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1  We use the term "enforcement proceedings" in this opinion as shorthand for what the Administrative Procedure Act calls "civil or criminal proceedings for judicial enforcement." 5 U.S.C. § 703. As we use the term here, it includes both (i) enforcement actions brought by the Government and (ii) civil suits brought by private parties alleging a defendant's violation of a statute, regulation, or order.

2  Judicial review in enforcement proceedings of course may also include review of whether the rule or order was arbitrary and capricious under the APA or otherwise was unlawful. Because this case involves interpretation of a statute, we focus here on that scenario.

3  To be clear, if a party challenges an agency action in a pre-enforcement suit in a court of appeals and loses, that specific party may be barred by ordinary estoppel or preclusion principles from relitigating the same question in a future enforcement proceeding. See *Abbott Laboratories v. Gardner*, 387 U.S. 136, 154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Moreover, if the district court in the enforcement proceeding sits in the same circuit as the court of appeals that decided a pre-enforcement suit, the district court may be bound under principles of vertical *stare decisis* to adhere to the court of appeals holding. Neither of those scenarios is present here because neither McLaughlin nor any other party brought a pre-enforcement suit regarding the *Amerifactors* order.

4   The dissent, relying on *Thunder Basin Coal Co.* v. *Reich*, objects that the presumption of judicial review does not apply unless a statute would preclude *all* judicial review. *Post*, at ——— (citing 510 U.S. 200, 207, n. 8, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994)). That objection is misplaced for two reasons. *First*, the presumption of judicial review applies to "statutes that may limit *or* preclude review." *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 273, 136 S.Ct. 2131, 195 L.Ed.2d 423 (2016) (emphasis added). The presumption can apply with varying degrees of strength. Compare *Thunder Basin*, 510 U.S. at 207, n. 8, 114 S.Ct. 771 (not applying "the strong presumption that Congress did not mean to prohibit all judicial review" because "court of appeals review is available" (quotation marks omitted)), with *id.*, at 207, 216, 114 S.Ct. 771 (nonetheless applying a presumption of judicial review and determining that it was overcome by "fairly discernible" intent (quotation marks omitted)); see also *Elgin v. Department of Treasury*, 567 U.S. 1, 9–10, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012). *Second*, this case raises a different issue than *Thunder Basin*. This case concerns the availability of judicial review in enforcement proceedings, and as we have explained, the relevant presumption for purposes of judicial review in enforcement proceedings is codified in § 703 of the APA.

5   Indeed, the unfairness that would otherwise ensue could potentially rise to the level of a constitutional due process problem. Barring defendants in enforcement actions from raising arguments about the legality of agency rules or orders enforced against them raises significant questions under the Due Process Clause—especially for parties that did not exist or had no good or reasonably foreseeable reason to sue when the agency rule or order was first issued. In *Adamo Wrecking Co.* v. *United States*, Justice Powell warned that the preclusion-of-review provision of the Clean Air Act raised constitutional issues that "merited serious consideration." 434 U.S. 275, 289, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (concurring opinion). The D. C. Circuit likewise has cautioned that provisions of that sort raise a "substantial due process question." *Chrysler Corp. v. EPA*, 600 F.2d 904, 913 (1979). We avoid those due process concerns in Hobbs Act cases by adhering to the default rule of allowing judicial review of agency legal interpretations in enforcement proceedings.

6   The dissent says that we have erred in our analysis of the Hobbs Act's text by "adding words"—specifically, by reading the phrase "determine the validity" in the Hobbs Act to mean "*issue a declaratory judgment* determining the validity." *Post*, at ———. We are not adding words; we are simply interpreting the phrases "judgment determining the validity" and "determine the validity" in this statute to refer to a declaratory judgment.

7   On a related tack, McKesson and the Government point to century-old precedents interpreting the Urgent Deficiencies Act of 1913, a predecessor to the Hobbs Act. 38 Stat. 208; see *Venner v. Michigan Central R. Co.*, 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926); *Lambert Run Coal Co. v. Baltimore & Ohio R. Co.*, 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922). In those cases, the plaintiffs sued private defendants and challenged agency decisions that had specifically authorized those defendants to engage in the disputed conduct—by granting what in essence was a license or waiver to the defendants. In the District Courts, the plaintiffs sought injunctions that would negate the agency's license or waiver and prevent the defendants "from doing what the order specifically authorizes." *Venner*, 271 U.S. at 130, 46 S.Ct. 444; see *Lambert*, 258 U.S. at 379–382, 42 S.Ct. 349. This Court held that the proper avenue for that kind of challenge was pre-enforcement review in the court designated by the Urgent Deficiencies Act. In the Court's view, the plaintiffs' requested relief was "equivalent to asking that the order be adjudged invalid and set aside." *Venner*, 271 U.S. at 130, 46 S.Ct. 444; see *Lambert*, 258 U.S. at 381–382, 42 S.Ct. 349. Those cases therefore do not shed light on the broader issue in this case—namely, the general availability of judicial review in enforcement proceedings.

1   One exception bears mention: Under § 703 of the Administrative Procedure Act (APA), a litigant may challenge agency action in a district court when he lacked an "adequate ... opportunity" to obtain pre-enforcement review of the action in a court of appeals by way of the Hobbs Act. See 5 U.S.C. § 703 ("Except to the extent that prior, *adequate*, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement" (emphasis added)). So if a specific litigant did not have a practical way to seek pre-enforcement review under the Hobbs Act—as, for example, a new business would not—then that litigant can use an enforcement proceeding to challenge an agency action. Contra, *ante,* at ———. But that benefit does not extend to a party that has intentionally or negligently forgone Hobbs Act review. That kind of party had, but passed up, an "adequate

opportunity." And there is no dispute here that McLaughlin is such a party: It knew about, but decided not to participate in, consideration of the *Amerifactors* order. See Pet. for Cert. 20.

2   The *noscitur a sociis* canon does not come to the majority's aid. According to the majority, the phrase preceding "to determine the validity"—"to enjoin, set aside, suspend"—refers to awarding "forms of relief." *Ante,* at ——. And because a declaratory judgment is also a form of relief, the majority claims that the general language of the "validity" phrase should be narrowed to that particular. See *ibid.* But there are at least three things wrong with that idea. First, there is just not enough ambiguity in the words "determine the validity" to resort to the highly nuanced and often unreliable *noscitur* canon. See, *e.g., United States v. Stevens,* 559 U.S. 460, 474, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). Second, a careful reader will note that Congress did not, as the majority does, run the two phrases together as one. Congress's language goes: A court of appeals has exclusive jurisdiction "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of " an agency order. § 2342. The addition of the second "to" in that provision marks the "validity" phrase as slightly different from what precedes it, thus making use of the canon still more inappropriate. And third, the majority's argument fails even on its own terms, because a court awards relief as much when it dismisses a suit based on an order's invalidity as when it issues a declaratory judgment announcing the invalidity. Nothing in the Hobbs Act suggests that Congress saw a difference in those alternative ways of providing relief from an illegal order.

3   The majority's response, relegated to a footnote, is hard to make out. It appears to limit the *Venner* holding to cases where the agency has issued a party-specific order—there, a "license or waiver"—which a later legal action seeks to undo. See *ante,* at ——, n. 7. But to begin with, another decision taking the *Venner* line—which the majority also cites—involved a general ICC rule, rather than a party-specific license or waiver. See *Lambert Run Coal Co.,* 258 U.S. at 381–382, 42 S.Ct. 349. And anyway, the majority offers neither authority nor reason for treating the two kinds of agency action differently—for varying judicial review based on whether an agency regulates in gross or instead party-by-party. Why, for example, reach a different result in this case because the FCC, instead of licensing a particular company to transmit faxes to an online fax service, created a regulatory safe-harbor for any entity to do so? The idea is, at a minimum, in tension with usual administrative law principles. See, *e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 291–294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (leaving to agency discretion the choice between general rules and individualized proceedings).

4   See, *e.g., CE Design, Ltd. v. Prism Bus. Media, Inc.,* 606 F.3d 443, 447–448 (CA7 2010) (suit between private parties); *Nack v. Walburg,* 715 F.3d 680, 686–687 (CA8 2013) (same); *Mais v. Gulf Coast Collection Bureau, Inc.,* 768 F.3d 1110, 1119–1121 (CA11 2014) (same); *Daniels v. Union Pac. R. Co.,* 530 F.3d 936, 940–941 (CADC 2008) (same); *United States v. Any & All Radio Station Transmission Equip.,* 207 F.3d 458, 463 (CA8 2000) (agency enforcement action in district court); *United States v. Dunifer,* 219 F.3d 1004, 1007 (CA9 2000) (same).

5   The majority's allegedly contrary authorities, see *ante,* at ——, n. 4, do not say otherwise: None applies the presumption of judicial review to a statute that merely channels review to one court rather than another. The "limits" the Court spoke of in *Cuozzo Speed Technologies, LLC v. Lee,* 579 U.S. 261, 273, 136 S.Ct. 2131, 195 L.Ed.2d 423 (2016), operated to cut off *all* judicial review of particular issues, rather than to place that review in a single court; hence, the presumption kicked in (although it was there overcome). And in both *Thunder Basin,* 510 U.S. 200, 114 S.Ct. 771, 127 L.Ed.2d 29, and *Elgin v. Department of Treasury,* 567 U.S. 1, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012)—which did involve channeling—no presumption operated. The Court did ordinary statutory interpretation to figure out what Congress wanted. See *Thunder Basin,* 510 U.S. at 207, 216, 114 S.Ct. 771 (counseling an inquiry into "language," "structure," "purpose," and "legislative history"); *Elgin,* 567 U.S. at 10, 132 S.Ct. 2126 (similar).

---

End of Document                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.