**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE MOORE, on behalf of himself and others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:19-CV-02504 |
| v. | ) ) | Judge Edmond E. Chang |
| CLUB EXPLORIA, LLC, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

George Moore brings this class-action suit against Club Exploria, LLC, alleging violations of the Telephone Consumer Protection Act (usually called the TCPA), 47 U.S.C. §§ 227 *et seq.* R. 55, Am. Compl.[1] Moore now moves for summary judgment on behalf of himself and the class under Section 227(b). R. 319, Pl.'s Mot. Even viewing the evidence in Exploria's favor, no reasonable jury could find that Exploria's pre-recorded calls to the class were permissible under the TCPA. So Moore's motion is granted in full.

## I. Background

In deciding a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party (here, Exploria) and draws all

---

[1]Federal district courts have federal-question jurisdiction, 28 U.S.C. § 1331, for suits brought under the TCPA's private right of action. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). Exploria is a vacation company that owns and operates several resort properties throughout the United States. R. 320, PSOF ¶ 1; R. 320-1, Exh. 1, Rogers Dep. at 10:18–11:8. One of those properties is the Summer Bay resort in Orlando, Florida, which was the subject of a marketing campaign run by Exploria in 2018. PSOF ¶¶ 1–3; Rogers Dep. at 11:11–12:10. To assist with the Summer Bay campaign, Exploria contracted with two telemarketing vendors—Yodel and Ga Investments, LLC (the parties call the latter "GaI")—in the spring of 2018 to place outbound calls on its behalf. PSOF ¶¶ 2–3, 14; R. 320-3, Exh. 3, Yodel Agreement; R. 320-4, Exh. 4, Yodel Insertion Order; R. 320-15, Exh. 15, GaI Insertion Order; R. 320-24, Exh. 24, GaI Agreement.

Before GaI began working on the Summer Bay campaign, it subcontracted with Acquis, LLC, to perform GaI's responsibilities under the Exploria contract. PSOF ¶ 20; R. 320-19, Exh. 19, Connolly Decl. ¶ 3. Exploria was aware of this subcontract and even entered into its own additional marketing contract with Acquis around this time; the Exploria-Acquis contract bore identical terms to the Exploria-GaI contract. PSOF ¶ 21; R. 320-20, Exh. 20, Acquis Agreement. Acquis then appointed a call center—Prospects DM—to perform its work under the Exploria contract. PSOF ¶ 28; Connolly Decl., Exh. B, Prospects Insertion Order at 1; R. 320-22, Exh. 22, Acquis Insertion Order. Exploria was aware of this arrangement; the insertion order between Exploria and Acquis explicitly references Prospects as the call center that would be performing the calls to generate the live transfers to Exploria's agents. *See*

2

Acquis Insertion Order at 1 (referring to the campaign as "Exploria Resorts Call Transfer at ProspectsDM call center"). The Prospects call center agents were to use the "approved telemarketing script" that was part of the contract between Exploria and Acquis. *See id.* (referencing the "script read ad message verbatim" which was approved by Exploria as the "Advertiser").

The calls placed by Yodel and Prospects for the Summer Bay campaign were the result of "leads"—phone numbers—that Yodel had purchased from third-party website operators. PSOF ¶ 40; R. 320-2, Exh. 2, Wood Dep. at 13:20–14:5, 22:19–24, 27:20–28:8; R. 320-31, Exh. 31, Grant Dep. at 70:11–71:4, 74:7–14, 75:22–76:12. The leads were generated through "opt-in sites" that allowed people to authorize certain organizations to call them with sales offers. *See* Rogers Dep. at 71:14–25. For the Summer Bay campaign, the authorization form on the opt-in sites did *not* list Club Exploria as the seller that may call, and instead listed alternative names that the vendors did business as. Rogers Dep. at 77:20–78:8; *see also* R. 320-5, Exh. 5 at 1 (Exploria requesting Yodel's telemarketers use a script that introduced themselves as a "Trip Advisor" from the "Helping Hands association"). The opt-in sites were not owned or operated by any entity that was involved in the campaign itself, and Exploria did not investigate whether the opt-in data that the vendors were using was potentially fabricated or deficient. PSOF ¶¶ 41, 43; Rogers Dep. at 72:1–75:8; 80:19–81:5; Wood Dep. at 70:10–71:7; Grant Dep. at 69:2–5.

As part of the agreements, the vendors were supposed to generate "live transfers," which meant that the vendors' agents would place calls to the phone numbers

obtained through leads and then play prerecorded prompts before transferring the call to Exploria. R. 335, Def.'s Resp. to PSOF ¶ 6; Yodel Insertion Order at 1; GaI Order at 1. Exploria gave scripts to the vendors to use during the calls, and the script offered a vacation package at a special rate in exchange for a cash payment. *See* Exh. 5 at 1; GaI Agreement at 1. Exploria hoped that once at the resort, customers would purchase a timeshare interest. R. 320-8, Exh. 8, Lizotte Dep. at 83:15–20. And as hoped, the Summer Bay calling campaign resulted in nearly $2 million in sales for Exploria. PSOF ¶¶ 54–55; Rogers Dep. at 65:16–66:14; R. 320-66, Exh. 66.

Moore received two calls from telemarketers on Exploria's behalf regarding the Summer Bay campaign. *See* PSOF ¶¶ 58–59; R. 320-67, Exh. 67, Woolfson Decl. ¶ 35. Moore later complained to Exploria by sending the company a demand letter in which he alleged a TCPA violation. *See* R. 320-44, Exh. 44 at 3. He then filed this class-action suit against Exploria, alleging that the two calls violated the TCPA and requesting certification for a nationwide class of individuals that received prerecorded calls on their cell phones as part of the Summer Bay campaign. *See generally* Am. Compl.

In August 2023, the previously assigned judge certified a class of "[a]ll persons in the United States subscribing to a cellular telephone number that received a pre-recorded soundboard call promoting Club Exploria's Summer Bay Resort between March 1, 2018, and August 15, 2019, where the soundboard operator initiated a transfer of the call to Club Exploria." R. 225, Certification Order at 19. Moore—on behalf of himself and the class—now moves for summary judgment on his claim that

4

Exploria violated the TCPA when its vendors used prerecorded technology to make sales calls to cellular numbers without prior consent. *See generally* Pl.'s Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

## A. Arbitration

Before considering the merits of Moore's summary judgment motion, the Court must first decide Exploria's motion for leave to file a motion to compel arbitration. *See* R. 339, Def.'s Mot. Exploria asserts that 1,026 class members visited a website where they opted-in to receive messages with promotional offers and agreed to mandatory arbitration for any claims relating to telemarketing messages that they received as a result of their opt-in. *Id.* at 4–5. According to Exploria, these 1,026 class members are thus bound by a valid arbitration agreement that governs the current dispute. *Id.* at 1–2. Exploria's motion for leave to file an arbitration motion is denied because this issue has already been decided by the previously assigned judge and, even if it had not, the motion comes much too late in this litigation.

### 1. Law of the Case

Moore first argues that the previously assigned judge already held that Exploria waived its arbitration defense and the holding is thus law of the case. Indeed, Exploria had already requested leave to file a third amended answer raising an arbitration defense, and that request was denied. *See* R. 248, Def.'s Mot. (requesting leave to add an arbitration defense to Exploria's answer); R. 272 at 11:14–17 (hearing transcript denying Exploria's motion for leave). According to Moore, the prior decision constitutes law of the case as to Exploria's waiver of any arbitration defense, and so this Court should deny Exploria's request to file an arbitration motion. *See* R. 350, Pl.'s Resp. at 6–7.

6

The law-of-the-case doctrine applies where—as here—a "different member of the same court re-examines a prior ruling." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). In those cases, the subsequent judge should not alter a previous ruling "merely because he has a different view of the law or the facts from the first judge." *Id.* (cleaned up).[2] Thus, courts apply a presumption that "earlier rulings will stand" when they touch on the same issue, absent new controlling law or clear error in the prior decision. *Id.* (cleaned up).

Exploria argues that the doctrine is inapplicable because Judge Leinenweber's statement was supposedly *dicta*. R. 352, Def.'s Reply at 6–7. It is true that statements touching on issues "not formally before the Court do not constitute binding determinations." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 533 (7th Cir. 1982) (citing *Quern v. Jordan,* 440 U.S. 332, 347 n.18 (1979)). But Exploria's earlier motion for leave to file a third amended answer asserting an arbitration defense and its current motion for leave to file a motion to compel arbitration are centered on precisely the same issue: whether the arbitration defense was waived. The prior judge's denial of Exploria's earlier motion explicitly relied on a determination that Exploria had waived any arbitration defense. *See* R. 272 at 11:14–17 ("It seems to me that, … it's too late, in my judgment, to raise arbitration. That was *clearly waived* by not bringing it up before now." (emphasis added)). And Exploria makes no showing of clear error or new

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

controlling law warranting departure from the prior holding—it does not even attempt to address that standard in the briefing. So the law-of-the-case doctrine applies, and this Court presumes that the prior ruling on waiver will stand.

### 2. Waiver

Even if the law-of-the-case doctrine did not apply at all—and this Court was to consider the waiver argument afresh—Exploria's request to file an arbitration motion would fail because it did, in fact, waive the defense. Waiver of the right to arbitrate may be express or inferred, and inferred waiver is a fact-dependent inquiry. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., Inc.*, 969 F.2d 585, 587–588 (7th Cir. 1992). Exploria has not expressly waived its arbitration defense in this case, so the question is whether waiver may be inferred. A party implicitly waives its right to compel arbitration when, considering the totality of the circumstances, it "has acted inconsistently with the right to arbitrate." *Id.* at 588. Relevant facts to consider include whether the movant did "all it could reasonably have been expected to do" to detect the defense early, whether it participated in the litigation, whether there has been a substantial delay in its request, whether it participated in discovery, and whether the nonmovant was prejudiced by the delay. *See Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731, 737 (N.D. Ill. 2023) (cleaned up). As an example, the Seventh Circuit has affirmed a waiver of the right to arbitrate where the defendant filed a motion for summary judgment, because that type of merits presentation meant that the defendant was "submitting the case to the district court for decision," which is inconsistent with the desire to arbitrate. *St. Mary's,* 969 F.2d at 589 (explaining

8

that summary judgment motions "preclude any arbitration ... by virtue of waiver" (cleaned up)).

Just so here. This case was first filed in April 2019, R. 1, Compl., and the parties underwent two years of discovery before Exploria first moved for summary judgment in September 2021. R. 146, Def.'s Mot. for Summary Judgment. In that motion, Exploria advanced only an argument on vicarious liability; it did not mention an arbitration agreement. *See generally* Def.'s Mot. for Summary Judgment. The Court then denied Exploria's motion and certified the class in August 2023. *See* Certification Order. So Exploria, having submitted this case for a decision on the merits before ever raising arbitration and participating in years of discovery (including hiring its own expert witnesses), has acted inconsistently with the intent to arbitrate and thus waived the argument.[3]

Exploria argues that there was "no existing right" to arbitrate until after the class was certified and the notice period ended. Def.'s Reply at 12–14. But after the class was certified in August 2023, Exploria filed a flurry of motions the next month— including a motion to dismiss for lack of standing, R. 239, a motion to reopen

---

[3]Exploria argues that under Ninth Circuit precedent, Exploria's actions evidence only a lack of awareness of the right to arbitrate, and waiver requires knowledge. Def.'s Reply at 11 (citing *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023)). But this Court is bound by Seventh Circuit precedent instructing that it should "weigh heavily" whether a party did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). And although Exploria includes this precise language in its motion for leave, Def.'s Mot. at 17, it provides no information allowing this Court to determine that it did all it could do to detect a potential arbitration defense before its first mention of arbitration some four years after Moore's initial class-action complaint was filed.

discovery, R. 243, a motion to file a second amended answer, R. 241, and a motion to amend the Court's decision, R. 242. Despite all of those merits-related filings, Exploria still did not mention arbitration, and all of this was after the certification of the class. Exploria did not file its motion for leave to file an amended answer (with an arbitration defense) until October 2023. *See generally* Def.'s Mot. (filed Oct. 9, 2023). Both Exploria's pre-certification and *post*-certification litigation conduct thus are inconsistent with an intent to arbitrate. For these reasons, Exploria's motion for leave to file a motion to compel arbitration is denied.

## B. Evidence of Phone Calls

Moving on to Moore's summary judgment motion, the Court must first resolve a preliminary issue on the phone-call logs of Prospects and Yodel. Exploria argues that because Moore has not provided the call logs as evidence in the record, he has no proof that any of the calls actually occurred. R. 333, Def.'s Resp. at 9–11. Moore responds that multiple pieces of record evidence incorporated the call logs and, as a practical matter, he did not submit the actual call logs into the record because the files were too voluminous to be uploaded to the electronic-filing system and also could not be reviewed by this Court without specialized software. R. 358, Pl.'s Reply at 5–6. In particular, Moore argues that the call logs are admissible because they were authenticated through deposition testimony and are incorporated into Moore's expert report by Aaron Woolfson. *Id.* at 2–7; Woolfson Decl ¶ 22. Though Moore should have included the call logs directly in the record for simplicity's sake, this Court agrees

that the expert reports' incorporation of them and the deposition testimony authentication are sufficient foundations to consider the facts reflected in the call logs.

First, the expert reports from *both* parties' experts incorporated the call logs into their respective analyses. Federal Rule of Evidence 703 "allows experts to rely on inadmissible facts or data in forming an opinion so long as 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *Sansone v. Brennan*, 917 F.3d 975, 982 (7th Cir. 2019) (quoting Fed. R. Evid. 703). Here, plaintiff's expert Aaron Woolfson explicitly relied on the call logs from both vendors to support his opinion that 76,255 calls were placed to 66,682 unique cell-phone numbers by Prospects and Yodel on Exploria's behalf. Woolfson Decl. ¶¶ 3, 22 (naming the "*exploria_dialing*" file and "*travel exploria call logs*" file as the materials used to identify the calls at issue in this case); *see also id.* ¶¶ 30–56 (explaining how he identified the relevant calls from the two files); ¶ 56 (describing Woolfson's conclusions); R. 320-68, Exh. 68, Woolfson Rebuttal Report ¶ 7 (explaining that the "*exploria_dialing*" file was produced by Yodel and the "*travel exploria call logs*" file was produced by Prospects). Not surprisingly, Exploria's own expert, Jennifer Smith, testified that these logs are of the type reasonably relied on by experts in her field. *See* R. 195-23, Exh. EE, Smith Rep. ¶ 13 ("I have considered data and information from various sources, all of which are reasonably relied upon by experts in my field."), PDF p. 24 (listing the call logs she relied on by file name, which are the same listed in Woolfson's report). And Exploria does not argue that the call records do not meet the Rule 703 threshold for expert reliance—only that Moore has not

11

shown that the data sets reviewed by Woolfson "have anything to do with this case at all." Def.'s Resp. at 10. Given the experts' reliance on them—the experts of *both* sides—there is some artfulness in saying that the call records have nothing to do with this case. Based on the expert-report reliance on the call logs, there is more than sufficient foundation to consider the logs.[4]

On top of that, the deposition testimony from the Yodel and Prospects representatives also adequately laid a foundation for the call logs as business records. The Seventh Circuit—in other TCPA cases—has explained that call logs may be authenticated by a custodian as business records. *See Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 F. App'x 214, 216 (7th Cir. 2015) (non-precedential disposition). The custodian need only be "familiar with the company's record keeping practices," and need not "have personally made the calls to [the recipient] to testify about the meaning of the records." *Id.* (first citing *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir. 2015); and then citing *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 775–77 (7th Cir. 2006)). Indeed, "[w]hen it comes to testifying about business records, the

---

[4]Exploria also takes issue with Woolfson's methodology for identifying the calls that were transferred to Exploria's agents, arguing that Woolfson did not adequately explain his process. *See* Def.'s Resp. at 10. Rather than developing that argument in its 25-page response brief, Exploria filed a separate Rule 702 motion on the subject, which this Court declined to consider. R. 337, Def.'s Rule 702 Mot.; *see also* R. 349, Minute Entry (explaining the Court's decision to disregard the motion). In any case, Woolfson's same report was relied upon in the Court's class-certification decision in 2023, and Exploria did not attack his methods then. *See* Certification Order at 14 (relying on Woolfson's identification of the 66,682 cell-phone numbers to assess numerosity). So any Rule 702 challenge to Woolfson's methodology is forfeited at the summary judgment stage.

custodian need not be the individual who personally gathered" them. *Cocroft,* 796 F.3d at 686 (cleaned up).

Yodel's CEO, Kyle Wood, testified that he "overs[aw] the management teams that run [outbound telephone campaigns]," and that Yodel produced the logs containing around 20 million call records for the calls that Yodel made on behalf of Exploria. Wood Dep. at 9:7–15; 12:17–24; 55:20–56:7. He confirmed that the data—a dialer record table—came from Yodel's data center in Florida and is "an actual log [of calls] that comes from [the] dialer table." *Id.* at 56:8–10, 57:12–13. He walked through each column to confirm which data they contained and explain which parts of the call were captured by the table. *Id.* at 56:8–69:1. Similarly, Prospect's president and CEO, Joshua Grant Kidd, testified that he personally searched for the call records in the database, and that they were "a record of all the transfers on the Exploria campaign." Grant Dep. at 12:9–17:6, 22:14–17, 41:13–18. He confirmed that the logs reflected *only* the calls for the Exploria campaign, *id.* at 63:16–22, that they were "typical" for what he would see in the business, *id.* at 64:23–65:3, and that he retrieved the records either from a dialer or an Excel database, *id.* at 64:5–7.

As the above testimony clearly shows, Wood and Grant are familiar with their employers' record-keeping practices and laid a sufficient foundation to authenticate the logs as business records. And although Exploria blanketly argues that the call logs have not been authenticated as business records, Def.'s Resp. at 9, the company goes no further to challenge either of the custodians' ability to lay a foundation for the logs or the accuracy of the logs themselves. *See Ira Holtzman, C.P.A. v. Turza,*

728 F.3d 682, 685 (7th Cir. 2013) (explaining that there was no material dispute in a TCPA case where the company's representative detailed how the records were compiled and no competing evidence suggested that the records were inaccurate). Having established that Woolfson's expert testimony—or, alternatively, the records-custodian testimony—laid sufficient foundation for the call logs at issue in this case, this Court may consider them in determining whether Moore is entitled to summary judgment on the TCPA claim.

### C. TCPA

The TCPA bans prerecorded telemarketing and advertising phone calls to cellular numbers unless the recipient has given prior express written consent. 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(2). The statute offers a private cause of action for aggrieved individuals to sue the alleged violator and "receive $500 in damages for each such violation." § 227(b)(3). Thus, to win summary judgment on his TCPA claim, Moore must show that Exploria initiated (1) a telemarketing or advertising call; (2) using a prerecorded voice; (3) to a cellular number. *See* § 64.1200(a)(2). Prior express consent is an affirmative defense; as such, the party raising the consent defense—here, Exploria—bears the burden of proof. *Blow v. Bijora, Inc.*. 855 F.3d 793, 803 (7th Cir. 2017). Moore argues that he has met each element of the Section 227(b) claim and is entitled to judgment as a matter of law; by contrast, Exploria argues that Moore fails on each element. *See* Pl.'s Mot. at 4; Def.'s Resp. at 3. As explained next, Moore has demonstrated—even giving Exploria the benefit of reasonable

14

inferences—that there is no genuine dispute as to any material fact on the elements of the class's TCPA claim, and no reasonable jury could find otherwise.

### 1. Telemarketing

To constitute a TCPA violation, the calls placed on Exploria's behalf must have "include[d] or introduce[d] an advertisement or constitute[d] telemarketing." § 64.1200(a)(2). Telemarketing is "the initiation of a telephone call … for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(13) (emphasis added). Thus, whether a call constitutes telemarketing depends on the call's "context or purpose." *Legg v. PTZ Ins. Agency, Ltd.*, 2018 WL 3869970, at *2 (N.D. Ill. Aug. 15, 2018) (quoting *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015)). Moore points to Exploria-provided scripts that advertise the Summer Bay resort, deposition testimony from Exploria's Vice President of Marketing, and the contracts with the vendors as proof that the calls were telemarketing. Pl.'s Mot. at 4–5. Exploria counters that the scripts were not necessarily used by the vendors, and even if they were, they do not actually offer a good or service for money. Def.'s Resp. at 11–12. Based on the record evidence, Moore has met his burden of showing that any reasonable jury must conclude that the calls made by Yodel and Exploria constituted telemarketing under the TCPA.

First, the contracts with Yodel and Prospects evidence the parties' understanding that the purpose of the call campaign was telemarketing. The relevant calls in this case are those placed by Yodel and Prospects on Exploria's behalf. *See* DSOF ¶¶ 3–4, 22 (explaining that Yodel and GaI/Acquis, which contracted with Prospects,

were retained by Exploria to provide live transfers); PSOF ¶¶ 3, 14, 20, 28 (same). The Yodel Services Agreement and the Insertion Order identify Exploria as the "Advertiser" and state that the Advertiser is in the business of selling products. *See* Yodel Agreement at 2; Yodel Insertion Order at 4. It further states that the Advertiser desires to engage Yodel—referred to as the "Call Center"—to "generate certain sales leads." Yodel Agreement at 2. Similarly, the Acquis Services Agreement states that Exploria is retaining Acquis to provide leads in the form of Live Transfer Calls. *See* Acquis Agreement at 2.[5] The Acquis Insertion Order includes an "Approved Telemarketing Script" that offers the recipients of Prospects' calls a stay at the Exploria resort in exchange for a $99 refundable room deposit which will be returned to the customer as a $100 resort gift card "which can be used in [Exploria's] restaurants, bars, snack and gift shops." Acquis Insertion Order, Exh. 1 at 3–4. The agreements and the script are all aimed at executing one thing: telemarketing.

Second, Ranice Rogers, Exploria's director of national call centers at the time of the campaign, testified that Exploria engaged Yodel and GaI/Acquis to "place outbound telemarketing calls regarding the Summer Bay property." Rogers Dep. at 9:19–23; 12:4–10. Exploria's corporate counsel further confirmed that Exploria is "a real estate timeshare developer" that "sell[s] real estate," and sends potential buyers to the resorts while "hoping to sell them a timeshare interest." Lizotte Dep. at 8:11–

---

[5]Remember that Acquis appointed Prospects as the call center to perform its work under the Exploria contract. *See infra* at 2; Acquis Insertion Order at 1 (titling the campaign "Exploria Resorts Call Transfer at ProspectsDM call center").

9:13; 83:15–20. And to leave no room for doubt, Exploria's response to Moore's Rule 56.1 Statement explicitly states that it is "[u]ndisputed that Club Exploria retained vendors to place outbound telemarketing calls." R. 335, Def.'s Resp. to PSOF ¶ 2.

Thus, Moore has presented evidence that Exploria contracted with Yodel and Prospects to make the calls for the purpose of telemarketing—and with an absence of competing evidence to the contrary, no reasonable jury could find otherwise.

### 2. Prerecorded Technology

Next, Moore must show that every call to the class "us[ed] an artificial or pre-recorded voice." § 64.1200(a)(2). Moore argues that Exploria's contracts with the tel-emarketing vendors expressly required the use of prerecorded scripts using a sound-board system, and so "every single call began with a prerecorded voice via the sound-board process." Pl.'s Mot. at 5–6. Exploria seemingly concedes that the calls did utilize soundboard technology but argues that the issue of whether soundboard technology qualifies as a "prerecorded call" under the TCPA is a "hotly-contested legal issue." Def.'s Resp. at 12–13.

The TCPA and its implementing regulations do not define "prerecorded." Stat-utory interpretation begins with the plain language of the statute. The Court must "assume that the legislative purpose of the statute is expressed by the ordinary mean-ing of the words used." *United States. v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (internal quotation marks and alterations omitted) (quoting *United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006)). The plain language of the statute should be con-clusive unless there is clearly expressed congressional intent to the contrary. *Id*. The

17

statute's text merely prohibits any calls "using any … prerecorded voice." § 227(b)(1)(A). As another court in this District observed in a similar TCPA suit, "prerecorded" simply means "recorded in advance." *Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188, at *3 (N.D. Ill. Dec. 9, 2019) (quoting *Prerecorded,* Merriam-Webster's Dictionary (2019)). And there is nothing within the statute itself to imply that Congress did not intend this meaning.

On the record evidence, the vendor testimony and Woolfson's expert report support the contention that every call from Prospects and Yodel used a "prerecorded voice." Wood testified that the calls placed by Yodel for Exploria were soundboard calls, which means an agent pressed buttons to play prerecorded messages. Wood Dep. at 14:24–15:5, 16:19–21. He explained that Yodel creates the prerecorded clips "[u]sing voice talents that [Yodel] hire[s]," and then Yodel agents press buttons to "progress through the script." *Id.* at 46:9–47:2. Similarly, Grant testified that he "definitely know[s] … that sound board was used and prerecorded messages were used" by Prospects for the Exploria campaign. Grant Dep. at 117:2–4. In his words, soundboard technology uses "prerecorded voice clips" that the live Prospects agents "press[ed] a recording through one way or another," in lieu of using their own voice in real time. *Id.* at 62:8–13. And the expert report bolsters this testimony with the call data. According to Woolfson, he could discern which call records used prerecorded messages; the Yodel call logs listed a "call disposition" reflecting which calls conveyed prerecorded messages, and the Prospects call logs only reflected calls that were transferred to Exploria after the soundboard process that Grant described. Woolfson Decl.

¶¶ 33–35. Woolfson's process to identify the calls to the class now at issue in this case thus only includes calls that contained prerecorded messages. *Id.* ¶ 36 (explaining that he identified 16,566,899 calls from the Yodel and Prospects call logs to 8,359,019 unique phone numbers), ¶ 38 (explaining that he compiled the list of 8,359,019 unique phone numbers to then identify which ones were cellular).

Exploria does not present competing evidence to suggest that any of the calls at issue actually did not feature a prerecorded voice. Given this, Moore has met his burden that the calls to the class placed by Yodel and Prospects were prerecorded; again, no reasonable jury could find otherwise.

### 3. Cellular Numbers

On the final element of his prima facie case, Moore must show that each of the 76,255 calls at issue in this case went to a cell-phone number. Moore presents Woolfson's data analysis of the call logs as evidence that each of the 66,682 numbers that received the 76,255 calls were assigned to a cell service. *See* Pl.'s Mot. at 6–7. Exploria responds by arguing that its expert, Ken Sponsler, "hotly contests" Woolfson's methodology on this point and the question is ultimately one for the jury. Def.'s Resp. at 13–14.

Woolfson's report explains that he identified the wireless status of the numbers from the call logs, which specifically allowed him to discern which wireless carrier the numbers were tied to. *See* Woolfson Decl. ¶ 32. He did so by sending the list of numbers to TelLingua, which "tagged each telephone number … with a label to indicate (a) whether the number isWireless, and (b) the host Operating Company

19

Number that the number was associated with on the date of the call record." *Id.* ¶ 38. Woolfson's call log analysis led him to conclude that "there were 76,255 calls to cellular numbers … The 76,255 telephone calls consisted of 66,682 unique cellular numbers that received one or more calls." *Id.* ¶ 51. And although Exploria's expert disputes the reliability of identifying the *assignees* of wireless phone numbers for the purpose of identifying a class, he does not dispute that Woolfson could have reliably identified whether a number was *wireless* or not. *See* R. 334-14, Exh. 14, Sponsler Rep. ¶¶ 148–168. In fact, Sponsler testified that he "can identify any point in time back to 2003 whether a number was wireless at any particular point in history," and that "a lot of companies do that, including [his] own." R. 320-69, Exh. 69, Sponsler Dep. at 109:12–16. So there is no genuine dispute that any of the calls went to a non-cellular number, and Moore has met his burden.

### 4. Consent

Exploria argues that each class member consented to be contacted because the vendors only called numbers collected from an online opt-in web form. *See* Def.'s Resp. at 14–15. Telemarketing calls using prerecorded voices to cellular numbers do not fall within the TCPA's prohibition if they were made with the consent of the called party. 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2). Consent requires a written agreement clearly authorizing an identified seller to deliver telemarketing communications using a prerecorded voice. § 64.1200(f)(9). Express consent is an affirmative defense, so Exploria bears the burden of proving that it had prior express written consent for the calls at issue. *See Blow*, 855 F.3d at 803.

20

It is undisputed that Exploria's vendors did not own or operate the opt-in sites from which they purchased the leads. Def.'s Resp. to PSOF ¶¶ 40–43. Exploria concedes that the online opt-in forms did not list Exploria's name on them—instead, it argues that it did not need to. Def.'s Resp. at 15. According to Exploria, Yodel and Prospects were the "sellers," and the opt-in sites identified alternative business names for Yodel and Prospects, so the form sufficiently identified a seller. *Id.* But the implementing regulation makes clear that *Exploria* itself—not its telemarketing vendors—is the seller.[6]

The FCC's regulation defines "seller" as the entity "on whose behalf a telephone call … is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(10). By contrast, "telemarketer" is defined as the "entity that initiates a telephone call" for the purpose of sales or

---

[6]In connection with this point, Exploria filed a notice of supplemental authority on a decision from the Eleventh Circuit, which vacated the one-to-one consent rule promulgated by the FCC in 2023. *See* R. 361, Def.'s Suppl. Auth.; *Ins. Mktg. Coalition Ltd. v. FCC*, 127 F.4th 303 (11th Cir. 2025). According to Exploria, the court's holding that consent under the TCPA need only be "'clearly and unmistakably' stated" means that the FCC's consent rule exceeds its authority to implement the TCPA. Def.'s Suppl. Auth. at 1 (quoting *Ins. Mktg. Coalition,* 127 F.4th at 314).

But the Eleventh Circuit's decision does not affect the more general rule that prior express written consent is required for prerecorded telemarketing calls, and consent must "clearly and unmistakably" state that the consumer is willing to receive calls from specific entities. *Id.* at 314 (listing cases finding consent where multiple entities were named in the form). In its holding, the court opined only on the one-to-one requirement and the logically-and-topically-related restrictions, both promulgated in 2023. *See id.* at 311–17. The one-to-one rule is not where Exploria's consent argument falters—it is the fact that there has been no showing that any class members consented to receive marketing calls on behalf of Exploria *specifically*.

investment. *Id*. § 64.1200(f)(12). If Exploria is correct that Yodel and Prospects are sellers making calls on (supposedly) their own behalf, then there would never be a telemarketer—and the definition would be meaningless. *See Berkos*, 543 F.3d at 396 ("We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless.").

Exploria has not offered evidence that would allow a reasonable jury to find that even a single class member opted in to a consent form that identified *Exploria* as the seller. The company argues that "it is not possible for Club Exploria to answer Plaintiff's motion without the specific consent records supporting each call," Def.'s Resp. at 14, but it was Exploria's—not Moore's—responsibility to identify and present the evidence needed to support its affirmative defense. That argument is more of a concession than it is a contention. Given the absence of testimony or documentary evidence to show that any class member actually agreed to be contacted by Exploria itself, no reasonable factfinder could conclude that the calls were made with consent.[7]

The same is true even in light of the Supreme Court's recent decision, *McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation,* 606 U.S. 146 (2025), that courts are not bound by the FCC's interpretation of the TCPA. *Id*. at 155.

---

[7]Exploria also seems to argue that it is enough that its contracts with the vendors required them to comply with the TCPA and use opt-in data. Def.'s Resp. at 14. But as Judge Leinenweber explained in an earlier decision in this case, "Exploria negotiated a contract that requir[ed] the telemarketer to obey the TCPA, but also required the telemarketer to use a prerecorded voice for the telephone calls obtained from an opt-in registry that did not mention itself." Certification Order at 12. So the contracts' general prohibition against TCPA violations does not suffice as evidence of consent.

Exploria argues that *McLaughlin* "throw[s] out" the FCC's interpretation of "prior express written consent," which includes identification of the seller that may contact the call recipient. R. 370, Def.'s Second Suppl. Auth. at 2. But Exploria's reading of *McLaughlin* goes too far—the Supreme Court still instructed that district courts must "afford[] appropriate respect to the agency's interpretation." 606 U.S. at 155 (citing *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402 (2024)). If this Court "independently determine[s]" that the FCC's interpretation of the consent requirement is "correct," then the interpretation is not thrown out at all. *Id.* at 157.

Section 227(b)(1)(B) clearly requires the "prior express consent of the called party." Exploria has already conceded that consent—at a minimum—must be "clearly and unmistakably stated." Def.'s Suppl. Auth. at 1; *see also* Def.'s Second Suppl. Auth. at 2 (reciting the Eleventh Circuit's case law holding that consent minimally must be clear and unmistakable). So the Court need not engage in any more statutory interpretation to determine whether the FCC's consent requirements run afoul of the TCPA's text—Exploria fails to provide any evidence that any class member "clearly and unmistakably" opted in to receive sales calls pertaining to *Exploria. See* Def.'s Resp. at 15 (arguing only that the forms naming the doing-business-as monikers of Yodel and Prospects sufficiently obtained consent even without mentioning Exploria).

### D. Vicarious Liability

Neither party disputes the fact that Exploria itself did not actually make the calls in question. Moore argues that Exploria is vicariously liable through the federal common law of agency for its vendors' violations of the TCPA. *See* Pl.'s Mot. at 8–15.

23

Before addressing the merits of Moore's vicarious-liability arguments, there is a preliminary issue: is vicarious liability permitted under Section 227(b)? The Supreme Court recently held, in *McLaughlin,* that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. at 168The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself "initiate" the call. *See, e.g.*, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) (citing *Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013)). But under the Supreme Court's recent teaching in *McLaughlin,* this Court is not bound to apply *Dish Network* and must instead engage in its own analysis—taking the FCC's interpretation into consideration—to determine whether a seller may be vicariously liable for its telemarketers' Section 227(b) violations. *McLaughlin*, 606 U.S. at 168.

The Court starts "with the text of the statute to ascertain its plain meaning." *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020) (cleaned up). The design of the statute may also assist with the determination of the law's plain meaning. *Berkos*, 543 F.3d at 396 (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Section 227(b) itself has no mention of vicarious liability. Faced with this silence, the Court "assume[s] that, when Congress creates a tort action, it legislates against a legal

24

background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285 (2003) (collecting cases). Indeed, to "abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *United States v. Texas,* 507 U.S. 529, 534 (1993) (cleaned up). And "[n]othing in the language of Section 227(b) itself indicates that common-law agency principles are inapplicable." *Smith,* 30 F. Supp. 3d at 773–74. So this Court applies the assumption that Congress enacted Section 227(b) with the intention of incorporating longstanding vicarious liability principles.

This assumption squares with the purpose of the TCPA itself. "Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent," and "sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA." *Smith,* 30 F. Supp. 3d at 774. Allowing sellers like Exploria to avoid liability for—and even profit from—the TCPA violations of their hired telemarketers would run afoul of this purpose. And Congress' grant of a private cause of action for statutory damages under Section 227(b)—that is, a minimum amount of damages for every violation—is yet more evidence that the TCPA was designed to deter offenders. *See* § 227(b)(3). These same principles are what led the FCC to hold that sellers may be vicariously liable under Section 227(b). *See Dish Network*, 28 FCC Rcd. at 6587–89. For this reason, "the vast majority of courts that have addressed the issue since the FCC's ruling" have similarly found that the FCC's determination squares with

25

the TCPA's text and purpose. *Smith,* 30 F. Supp. 3d at 774–75 (collecting cases addressing the issue).

Having determined that Exploria could be vicariously liable for Yodel's and Prospects' violations of Section 227(b), the Court turns next to Moore's agency arguments. Moore advances two theories: actual authority and ratification. Moore has presented conclusive evidence establishing that Yodel and Prospects acted with actual authority to make the calls violating the TCPA, and no reasonable jury could conclude otherwise.

### 1. Actual Authority

First, Moore argues that Exploria is liable for its vendors' actions under a theory of actual authority. Pl.'s Mot. at 9–12. Exploria responds that its contracts with the vendors "specifically forbade actions that would violate the law,"[8] and that in any case, the vendors did not have actual authority to violate the TCPA. *See* Def.'s Resp. at 16–22. But under federal common law,[9] actual authority may be either express or *implied. Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 866 (7th Cir. 1998).

---

[8]Exploria already filed for summary judgment on this point, and the previously assigned judge rejected its argument that it cannot be held vicariously liable for a vendor's TCPA violation merely because its contracts with vendors required them, on their face, to comply with the TCPA. *See* Certification Order at 8–12. Exploria does not argue that the decision was clearly wrong or that new controlling authority has come to light to strengthen its case that it cannot be liable where its contracts required compliance with the TCPA. *See Mendenhall,* 419 F.3d at 691. So this Court declines to re-examine the prior decision, particularly where Exploria does not argue that it should.

[9]Because this case arises under the TCPA, the Court applies the federal common law of agency, which generally comports with the Restatement of Agency. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 n.15 (7th Cir. 1998).

To establish actual-authority liability, Moore must show that (1) Exploria and its vendors had a principal-agent relationship; (2) Exploria controlled or had the right to control the vendors; and (3) the vendors' conduct fell within the scope of its agency. *See Bilek*, 8 F.4th at 587. Moore has presented plentiful evidence to show that any reasonable jury would have to find that Yodel and Prospects had actual authority to conduct the telemarketing calls in this case.

First, Exploria and its vendors had an agency relationship. Agency arises when a principal manifests assent to an agent that the agent will act on the principal's behalf, subject to the principal's control. *Smith*, 30 F. Supp. 3d at 775 (citing Restatement (Third) of Agency § 1.01 (2006)). Moore presents dispositive evidence in the form of contracts and deposition testimony to establish that an agency relationship existed with both Yodel and Prospects.

Yodel and Exploria entered into a contract wherein "Yodel was hired to generate live transfers" for Exploria. Def.'s Resp. to PSOF ¶ 3; *see also* Yodel Insertion Order at 1–2. Exploria had the right to conduct performance reviews of Yodel's work, which Exploria tries to brush off by saying that the performance reviews were just an opportunity for them to "connect." Def.'s Resp. to PSOF ¶ 4; *see also* Yodel Agreement at 5. But Exploria—throughout the telemarketing campaign—asked for changes to the states that Yodel called into on its behalf and altered the day-to-day volume of calls; it expected the Yodel to "comply" with those changes. Rogers Dep. at 98:12–99:19, 100:23–101:1. Yodel's agents were given a script that offered a vacation package from Exploria, and Exploria said that it was the script it would "like to have

used." Def.'s Resp. to PSOF ¶ 8; R. 320-7, Exh. 7 at 1. And Exploria "would make changes to the script throughout the campaign," with the expectation that Yodel would implement them. Rogers Dep. at 83:24–84:11. Thus, Moore has provided evidence showing that Yodel and Exploria had a principal-agent relationship in which Yodel conducted telemarketing calls on Exploria's behalf per the parties' contract, and Exploria regularly controlled Yodel's performance.

With regard to Prospects, Exploria and Acquis entered into an agreement under which Acquis was to provide live transfers, providing daily counts and invoices to Exploria at the end of every week. Acquis Agreement at 2. Under that agreement, Acquis was to use the Prospects Call Center to place calls with "the script read ad message verbatim as approved in writing by" Exploria. Acquis Insertion Order at 2. It is undisputed that Exploria knew that Prospects would be the entity actually placing the calls, and Exploria and Prospects' president, Joshua Grant, were looped into the same communications about the Summer Bay campaign. *See* Def.'s Resp. to PSOF ¶¶ 29, 31; Acquis Insertion Order at 1; R. 320-27, Exh. 27. So Exploria approved of Prospects' role as a subagent to perform Acquis' duties under its contract with Exploria. *See* Restatement (Third) of Agency § 3.15 ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform … An agent may appoint a subagent only if the agent has actual or apparent authority to do so."). Under the terms of that agency relationship, Exploria controlled the script that Prospects used and Exploria set the targeted demographics and regions that Prospects

28

could call. *See* Acquis Insertion Order. Moore has thus conclusively proved that there was a principal-agent relationship between Exploria and Prospects.

Exploria asserts that the vendors operated outside of Exploria's normal business and that they performed their duties using their own workforce, tools, and facilities. *See* DSOF ¶¶ 13, 14, 29, 36; Rogers Dep. at 10:18–19; Wood Dep. at 126:18–127:1; Grant Dep. at 23:23–25:15, 189:2–10. They were paid based on "success"—Exploria only paid for calls that were 60 seconds or more—rather than an hourly wage by Exploria. DSOF ¶¶ 20, 35; Yodel Insertion Order at 1–2; Acquis Insertion Order at 1. And the contracts themselves disclaim an agency relationship. Yodel Agreement at 9; Acquis Agreement at 2. These facts are more relevant to whether the telemarketers were *employees*—which no one contends—and they do not rise to the level of creating a genuine dispute over Exploria's agency relationships with Yodel and Prospects given the overwhelming strength of Moore's evidence of the principal-agent relationship. No reasonable jury could rely on the sparse facts offered by Exploria to undermine the evidence that Exploria was in a principal-agent relationship with Yodel and Prospects.

Next, Exploria exercised control over Yodel and Prospects during the campaign. "A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent." *Wisc. Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 858 (7th Cir. 2018); *see also Smith*, 30 F. Supp. 3d at 776 (describing "the power to give interim instructions" as "the hallmark of an agency relationship"). In similar TCPA cases, other judges in this District have held that the principal exercised a significant

level of control where a seller required the telemarketer to use an approved script, exercised control over the call volume, and generally controlled how the calls would be placed. *See, e.g.*, *Thompson v. Sutherland Global Servs., Inc.*, 2019 WL 1470238, at *6–7 (N.D. Ill. Apr. 3, 2019).

In support of this point, Moore points to Rogers' testimony stating that Exploria expected all of its telemarketing vendors to comply with its directives throughout the campaign. Pl.'s Mot. at 11; Rogers Dep. at 83:24–84:11, 98:13–99:19, 100:23–101:1, 139:8–11. Indeed, as discussed above, Exploria controlled the script, volume, and the target demographics and states for both Yodel and Prospects during the campaign. Exploria also required weekly reports from the vendors and had the contractual right to conduct performance reviews. *See* Yodel Agreement at 5; Acquis Agreement at 2. Given the evidence, no reasonable jury could find that Exploria did not control Yodel and Prospects.

Exploria seems to argue that it could not have controlled Prospects because it did not have a contract with the company itself. Def.'s Resp. at 21–22. But the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent "to perform functions assigned to the agent by the principal." *See Griffin v. Safeguard Props. Mgmt., LLC*, 2020 WL 6118572, at *3 (N.D. Ill. Oct. 16, 2020) (cleaned up). As discussed already, the agreement between Acquis and Exploria directly referenced Prospects. Acquis Insertion Order at 2. Exploria has also admitted that it knew Prospects was going to be the call center placing the calls. *See* Def.'s Resp. to PSOF ¶¶ 29, 31. Prospects

30

relied on Exploria's directions on when to make calls, which states to call into, and whom to target. R. 320-37, Exh. 37 (showing emails between Prospects and Acquis discussing the schedule of calls to run by Exploria), R. 320-38, Exh. 38 (showing emails from Exploria to Acquis about Exploria's holiday hours); Rogers Dep. at 37:17–38:23 (explaining that Exploria chose the locations and demographics to call with the "approved script"). Even when viewed in Exploria's favor, this is definitive evidence that Exploria controlled Prospects, even without a contractual provision explicitly establishing the control.

Exploria also asserts that Prospects impermissibly employed Teleskills, a call center in the Philippines, to conduct the calls. DSOF ¶ 23; Grant Dep. 145:12–15, 147:24–148:5, 187:19–188:9, 209:1–18. The sole basis for this assertion appears to be the testimony from Grant, the Prospects CEO, stating that Prospects outsourced its calls to Teleskills for the Exploria campaign. Grant Dep. at 54:2-57:1; 209:1–18 (agreeing that the parties are "relying on [Grant's] memory in order to support the position" that Teleskills was involved). Despite participating in years of discovery in this case, Exploria has offered no further evidence that Teleskills was involved, aside from this best-that-I-can-remember, speculative testimony. So this, weighed against the evidence provided by Moore to support that *Prospects*' agents placed the calls, is not enough to create a genuine issue of material fact.

Finally, the calls that Yodel and Prospects placed for the Summer Bay campaign were within the scope of their agency with Exploria. The agreements required the use of prerecorded technology, Exploria requested that the vendors use scripts

that marketed their property, and Exploria contracted with the vendors to buy leads from sites that did not list its name for consent (after having an opportunity to review the consent form for TCPA compliance). *See* Yodel Insertion Order at 1–3; Exh. 7; Acquis Insertion Order; Rogers Dep. at 71:14–73:15, 76:14–78:8. The previously assigned judge's prior decision on vicarious liability concluded the same. *See* Certification Order at 12. No reasonable jury could find that Yodel and Prospects acted outside the scope of their agency when they placed the calls for Exploria in violation of the TCPA.

In sum, Moore has presented ample evidence to establish that Yodel and Prospects had actual authority to place calls on Exploria's behalf, and that those calls violated Section 227(b) of the TCPA. Exploria has not created a genuine issue of fact to allow a reasonable jury to conclude that the vendors' actions were not authorized by Exploria. And because Moore need only show that Exploria was vicariously liable under just one common law theory of agency, the Court need not consider the separate ratification argument.

### E. Motion to Decertify the Class

Lastly, Exploria requests to decertify the class because Moore's allegations pertaining to Yodel and Prospects are supposedly "two entirely different cases." Def.'s Resp. at 25–26. Exploria asserts that the two cases would require separate trials for juries to evaluate different bodies of evidence pertaining to each telemarketing vendor. *Id.* at 25. But there is no genuine issue of fact on the TCPA violations or Exploria's vicarious liability, and Moore is seeking only statutory damages, so no trial is

needed. *See* Pl.'s Mot. at 15 (requesting $500 for each of the 71,538 prerecorded calls placed to the class members); § 227(b)(3)(B). So the basis of Exploria's decertification request is non-existent, and the request is denied.

## IV. Conclusion

Exploria's motion for leave to file a motion to compel arbitration, R. 339, is denied. Moore's motion for summary judgment on behalf of himself and the class, R. 319, is granted. The parties shall confer and file a status report proposing how to proceed with the entry of judgment of statutory damages for Moore and the class, and how to litigate attorneys' fees, expenses, and any incentive award. The parties also shall restart settlement negotiations given the entry of this decision. The parties shall file a joint status report by October 15, 2025.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 26, 2025