**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GEORGE MOORE,<br><br>Plaintiff,<br><br>v.<br><br>CLUB EXPLORIA, LLC,<br><br>Defendant. | Case No. 1:19-cv-02504<br><br>Hon. Edmond E. Chang |

**DECLARATION OF DOUGLAS KIDDER IN SUPPORT OF DEFENDANT CLUB EXPLORIA, LLC'S RESPONSE TO PLAINTIFF'S MOTION FOR ENTRY OF PARTIAL JUDGMENT**

I, Douglas Kidder, being duly sworn, hereby declare as follows:

1. My name is Douglas Kidder. I am over 18 years of age and competent to testify to the matters set forth herein

2. I am a Managing Partner with OSKR, LLC, a firm that provides expert services primarily in the area of damages calculations with a particular focus on intellectual property. Many of my cases involve joining and analyzing large and complex data sets—including datasets used in class actions. I was also an adjunct professor at Golden Gate University, where I taught a graduate course on damages in the school of accounting. I am also a member of the Licensing Executives Society, a former Director of i-cap Partners—a venture capital fund investing in technology companies—and a former member of the Trade New Zealand advisory board—a group formed to review New Zealand-based startups for support entering the U.S. market.

3. I hold a B. A. in Mathematics and English with honors from Amherst College (1983) and a Master of Science from the University of California at Berkeley (1986). While at Berkeley, I was a lecturer in the Computer Science Department.

4. I have been performing business analyses and valuations for over thirty-five years, as a consultant, business owner, board member, and manager. I have been retained by companies to render expert opinions in the context of litigation, to assist in licensing and evaluation of intellectual property that is not subject to litigation, and to develop and refine business strategies.

5. I have published and spoken on business and valuation issues, mostly related to intellectual property. I have co-authored seven published articles relating to intellectual property damages. A copy of my resume is attached as Appendix A.

6. I am being compensated at an hourly rate of $800 per hour, plus reimbursement of expenses. I have been assisted in this matter by OSKR staff, working under my supervision and control. I have no financial interest in the outcome of this matter.

7. I have been asked by counsel for Club Exploria, LLC ("Club Exploria") to evaluate the process by which identification of class members for purposes of notice occurred and to conduct an independent review of findings of Plaintiff's expert, Aaron Woolfson, as laid out in his expert report in support of Plaintiff's Motion for Summary Judgment, *see* Dkt. 186-21 ("Woolfson Decl."), including a review of the data underlying Mr. Woolfson's findings in support of the accompanying Opposition to Motion for Entry of Partial Judgment and filings related to the notice process. The list of documents relied upon in connection with this matter is attached as Appendix B.

8. Specifically, I have been asked to determine whether Mr. Woolfson's analysis, together with the data provided by the subpoenaed carriers and the other means by which Plaintiff

has attempted to identify class members can reliably identify class member names and addresses without further inquiry.

## I. Background

### A. Class definition

9. The Certified Class is defined to include: (1) All persons in the United States subscribing to a cellular telephone number that (2) received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort (3) between March 1, 2018, and August 15, 2019, (4) where the soundboard operator initiated a transfer of the call to Club Exploria.[1] I also understand that to recover damages, a class member must have Article III standing (i.e., suffered an injury in fact that is redressable).

10. Thus, to be members of the Certified Class eligible to receive a damages award, individuals must satisfy four criteria:

a. The class member must be a subscriber of a cellular telephone number;

b. The class member must have received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort;

c. The prerecorded soundboard call must have occurred between March 1, 2018 and August 15, 2019; and

d. The soundboard operator must then have initiated a transfer of the call to Club Exploria.

11. The Court granted summary judgment in Plaintiff's favor by order entered on September 26, 2025 (Dkt. 376). Plaintiff then filed a motion for entry of partial judgment (Dkt. 428) to which Club Exploria responds.

---

[1] Dkt. 225 ("Class Cert. Order"), August 17, 2023, at 19.

### B. Plaintiff's attempts to identify class members

12. Plaintiff's attempts to identify class members proceeded in two phases: class certification and class notice.

13. **Class certification.** The class certification phase concluded by identifying 71,538 calls placed to 66,682 phone numbers.

14. When Plaintiff moved for class certification, he introduced a declaration by Aaron Woolfson. In the declaration, Mr. Woolfson examined the call logs produced by Yodel and Prospects DM, the two companies charged with engaging leads for the campaign at issue in this matter. In his original declaration, Mr. Woolfson identified 76,255 calls to wireless numbers associated with 66,682 unique phone numbers that were transferred to Club Exploria.[2] Mr. Woolfson's initial analysis erroneously included duplicate records of calls in his tally of 76,255 calls. After correcting this error in a rebuttal declaration, Mr. Woolfson identified 71,538 phone calls associated with 66,682 unique telephone numbers.[3]

15. **Class notice.** After the Court certified the class, Plaintiff served subpoenas on ten telephone carriers requesting the name, address, and email address of telephone subscribers for the purpose of providing notice to the class. Dkt. 250 ("Motion to Approve Class Notice Plan").

16. Near the end of the notice period, Plaintiff ultimately intimated that his counsel obtained some amount of subscriber address or email information from the carrier responses for 37,651 of the 66,682 phone numbers (56.5%), but this was never expressly confirmed.[4]

---

[2] Woolfson Decl., September 10, 2021, ¶ 51.
[3] Dkts. 186-22; 322-68, Report of Aaron Woolfson in Rebuttal to Jennifer Smith and Ken Sponsler ("Woolfson Rebuttal"), December 2, 2021, ¶ 11.
[4] This number is calculated based on Plaintiff's representation that the notice administrator performed a reverse look-up for 29,031 numbers out of the total 66,682. *See* Dkt. 306 at 1 ("August 14, 2024 Joint Status Report"). I assume that he used information from carrier responses for the remainder of the unique phone numbers.

17. After realizing the carrier subpoenas were incomplete, Plaintiff asked the court to allow him to perform a reverse look-up process to match phone numbers to individuals for the phone numbers for which the carrier responses were insufficient or missing.[5] Reverse phone look-up is done by entering a mobile or landline phone number into a search engine or specialized platform to identify the individual or organization associated with it using information available at the time of look-up.[6] Unlike traditional directories, where you search for a number based on a name, reverse look-up works the other way around, starting with the phone number and identifying a name. Using some form of reverse look-up performed by notice administrator (Kroll), by the end of the notice period, Plaintiff told the court that he had obtained information for 27,971 out of the 66,682 phone numbers (41.9%).[7] A reverse look-up process involves entering a mobile number into a database, and thus, would not necessarily return historical subscriber information, so the information retrieved for these 27,971 phone numbers would not necessarily return information on the individual who received the calls at issue in this matter.

18. The class notice phase concluded by delivering notice to 52,471 email addresses and 13,982 physical addresses.[8] The address information used to deliver notice came from the two sources described above: carrier subpoenas and a reverse look-up process. Notably, the address information available in the call logs was not used to deliver notice.

---

[5] Dkt. 289 ¶ 6 ("Motion to Approve Supplementation of Notice Plan").

[6] I note that the notice administrator purports to have targeted its reverse look-ups, performed in late 2024, for the "date range of the calls" (Dkt. 306), but I see no evidence of that in the search results it produced.

[7] Dkt. 306 at 1. Plaintiff told the Court that "Kroll did a historical reverse look up for 29,031 phone numbers (out of 66,682 in the class)." He also told the Court that 1,060 were "blank phone numbers that did not return a result." 27,971 is the total after 1,060 is subtracted from 29,031.

[8] Dkt. 308("August 30, 2024 Joint Status Report").

19. My understanding is that Plaintiff also relied on the Woolfson report at the summary judgment stage and has not provided any updated information to the Court or Club Exploria about the identities of class members or their contact information.

20. It is my understanding that, for the current phase of the case, class members need to be identified by name and physical address.

## II. Review of Plaintiff's Attempts to Identify Class Members

21. As described above, the analysis performed at the class certification phase identified phone numbers that were called but neither Mr. Woolfson nor the Plaintiff used the call logs as a source for names and contact information for the phone numbers. Instead, Plaintiff relied solely on the carrier responses and the results of the reverse look-ups to try to identify and contact class members.

22. The information used in the class notification process is not generally reliable for this phase. Between the class period of March 1, 2018-August 15, 2019 and today, 45% of the phone numbers identified in the class have been reassigned. Thus, contacting class members requires identifying and locating the individual who was using the phone during the class period as opposed to queries run years after the fact. Neither the carrier responses nor the reverse look-ups provide reliable information on the actual class member based on the definition of the certified class.

23. Furthermore, my review of the call logs indicates that a majority of class members demonstrated a prolonged engagement with Club Exploria or otherwise demonstrated interest in Club Exploria's offering.

**A. Reassigned Numbers**

24. The list of 66,682 unique phone numbers does not account for instances where the phone number has been disconnected and potentially reassigned since the class period ended (i.e., after August 15, 2019).

25. The Federal Communication Commission's Reassigned Number Database (RND) was established in 2021.[9] The FCC created the RND, and a way for companies to query the RND, to determine whether a US telephone number has been disconnected/reassigned since a given date.[10]

26. A large number of phone numbers are disconnected and reassigned on a regular basis. For example, the FCC points to statistics indicating that approximately 35 million phone numbers were disconnected during a four-year period from January 2013 to December 2016, and 100,000 numbers are reassigned on a daily basis.[11] The frequency of disconnections and reassignments indicates that, as time passes, it is less and less likely that the person using a phone number in 2019 is using that phone number today.

27. Phone numbers can be "given up" or disconnected for a variety of reasons. For instance, the subscriber may want to prevent contact from unwanted parties, may switch to a new carrier, cancel service altogether, or switch to a different number.[12] It might also be the case that the phone number is disconnected due to non-voluntary reasons such as subscriber death, nonpayment, violation of terms, or inactivity.

28. I queried the FCC's Reassigned Number Database with the list of 66,682 numbers identified by Plaintiffs. For each number, I queried whether the number had been disconnected at

[9] *See* https://www.fcc.gov/reassigned-numbers-database.
[10] https://www.reassigned.us/about.
[11] https://docs.fcc.gov/public/attachments/FCC-17-90A1.pdf, p.3.
[12] https://recyclednumbers.cs.princeton.edu/assets/recycled-numbers-latest.pdf, p.2.

any point since the date of the last allegedly violative call. Of those 66,682 numbers, 30,024 (45.0%), or nearly half, have since been disconnected and/or reassigned.

29. This indicates that, while the class members were identified using mobile phone numbers, a substantial portion of class members are no longer using those phone numbers.

30. For the 45% of class member phone numbers that have been reassigned, it might still be possible to use name and address information contemporaneous to the Club Exploria campaign to determine a class member's identity.[13] The call log produced by Prospects DM contains 28,396 records of calls made on behalf of Club Exploria.[14] While these call logs provide information on the date and duration of the call, there is no information on the name or address of the person contacted. The call logs produced by Yodel consist of over 20 million calls made on behalf of Club Exploria.[15] The Yodel call logs include fields indicating name (first and last), street address (address, city, state, and postal code), and email address. In other words, there was contemporaneous name and contact information provided with the phone numbers used to contact some of the class members. Unfortunately, the name and physical address information is incomplete or missing for many of the reassigned class member phone numbers.

31. I reviewed the call logs for the 30,024 class member phone numbers that were reassigned and counted the number where street address and name information was present in the Yodel call logs. I found that 3,564 had both a first/last name and a full street address (i.e., street,

---

[13] There are separate issues concerning whether these addresses continue to be valid which I discuss later in this declaration.
[14] Produced as "travel exploria call logs".
[15] Produced as "exploria_dialing".

city, state, and zip code).[16] This leaves 26,460 of the 66,682 numbers (39.7%) where the number has been reassigned and the call logs provide no alternative means of contact via mail.

**B. Inaccurate Addresses**

32. There are specific reasons each of the sources of class member contact information—call logs, carrier responses, and reverse look-up—are unreliable, as I discuss in the following sections.

**1. Addresses in Call Logs**

33. Even among those class members where the name and street address locations can be identified in the call logs, there are likely to be many class members who have since relocated. According to data from the US Census Bureau, there is a 29.9% chance that a US adult 25 and over will move within five years.[17] The data in the Yodel call logs provides name and address information for 7,771 of the class members (regardless of whether the number was reassigned). Of those 7,771 individuals, 2,324 are likely to have moved since the end of the class period.

34. Applying the same statistic to the full class, 19,938 of the 66,682 class members are likely to have moved since August 15, 2019, the end point of the class period.

**2. Address Information from Carrier Subpoenas**

35. Plaintiff subpoenaed wireless carriers for the name and address information associated with the subscribers to the phone numbers at issue in this matter. To be clear, it is my

[16] For the purposes of this analysis, I have conservatively assumed that any non-null values within these fields are valid. In other words, I have not checked to see whether the information legitimately identifies a location.

[17] See "Geographic Mobility: 2015 to 2020 (Table 1-1. General Mobility, by Race and Hispanic or Latino Origin, Region, Sex, Age, Relationship to Householder, Educational Attainment, Marital Status, Nativity, Tenure, and Poverty Status: 2015 to 2020)", US Census Bureau, available at https://www.census.gov/data/tables/2020/demo/geographic-mobility/cps-2020-5yr.html. I understand that the Club Exploria campaigns at issue in this matter were targeted at adults 25 and over. See Exhibit 5 to Deposition of Ranice Rogers, August 27, 2020, at CE-00154.

understanding that a subscriber for the purposes of the carriers is the person in the carrier records who is responsible for payment on the account. I have examined responses to those subpoenas provided by ten carriers.[18] It appears that the carriers provided names for 36,735 numbers, street addresses for 36,727 numbers, and email addresses for 26,488 numbers (some of which overlap, i.e., the carrier provided both a physical address and email address). In total, the carriers were only able to provide subscriber name and street address for 36,727 numbers, or 55% of the class.[19]

36. While the Plaintiff requested name and contact information relevant to the times of the class period phone calls (the period of March 1, 2018-August 15, 2019), it is unclear whether that is what was provided by all carriers. Two carriers did not include the Plaintiff's requested start and end search dates in the subpoena response. Six of the carriers did not provide information on the subscriber's activation or deactivation dates, making it unclear whether the subscriber information provided is relevant to the calls at issue. For instance, subscriber information for an account whose activation date was after 2019 or whose deactivation date was before 2018 would not be relevant to the calls at issue in this matter, but a lack of activation and deactivation dates makes it impossible to know that the provided subscriber information is relevant to the class. For example, in situations where a subscriber activation date is available, there are instances where that activation date is later than the Plaintiff's requested time period, or only covers a portion of the date range. For instance, AT&T provided information for a phone number, 786-290-xxxx, for

---

[18] The carriers are Carolina West, Cellular South, East Kentucky Network, GCI, Nex Tech, Smith Bagley, US Cellular, T-Mobile, AT&T, and Verizon.

[19] I note that some of these names and addresses do not identify the subscriber, but rather the reseller to whom the carrier has provided the phone number. I further note that the notice administrator implies that sufficient data were obtained for 37,651 phone numbers (66,682 less the 29,031 for which a reverse look-up was performed, see Dkt. 306). I do not have the contact information used by the notice administrator for these 37,651 phone numbers, and therefore cannot compare that information to what I have examined from the carrier responses that I've reviewed.

a subscriber who appears to have initiated service in 2022.[20] Verizon provided information for a phone number, 910-515-xxxx, where the "effective" date for the information is the last date of the range identified by Plaintiff (March 28, 2019), yet the call at issue in this matter occurred before that date—specifically, on March 27, 2019.[21] Thus, the information provided by Verizon post-dates when the call was made.

37. Furthermore, subscriber information does not necessarily pertain to the individual who actually received one of the calls. For instance, the phone number may be part of a family or group plan where the subscriber is a different person/entity from the phone's user. One survey found that 73% of respondents were on a shared plan.[22] Verizon, which Mr. Woolfson identifies as the most common carrier among class members,[23] reports that there were 2.95 lines per account on average among its wireless subscribers in 2025.[24] This suggests that it is more likely than not that a particular phone number is used by an individual who is not the subscriber.

38. To further examine this issue, I compared the name and address information produced by the carriers with the information that is available in the Yodel call logs. Of the 4,333 phone numbers with a name and a street address in the Yodel call logs and in the carrier data, 1,553 (36%) are associated with the same name and address in the carrier records (64% are associated with a different name and/or address). Of the 26,506 phone numbers with a first and last name in the Yodel records and a name in the carrier data, 8,347 (31%) are associated with a different name than that which was provided in the carrier subpoena responses.

---

[20] See "ATT 3046314 copy.xlsx".
[21] See "Verizon Case 23468649 Moore vs club Exploria.xlsx".
[22] Griffith, Eric. "Far Too Many 'Adults' Still Using Parents' Phone Plan," PC Magazine, Aug 3, 2019, at <https://www.pcmag.com/news/far-too-many-adults-still-using-parents-phone-plan>.
[23] Woolfson Decl., at 16.
[24] Verizon Communications Inc. Form 10-K for year ended December 21, 2025, p.29.

39. Collectively, this evidence shows that the carrier subpoena responses to identify and contact class members will wrongly contact between 31% and 64% of class members.

**3. Asynchronous Reverse Address Look-ups**

40. I understand that the notice administrator in this case (Kroll) performed a reverse address look-up for certain phone numbers in 2024. My understanding is that the administrator adopted the name, address, and email information supplied through carrier subpoenas for a portion of the class, and ultimately used reverse look-ups for the 29,031 phone numbers where the notice administrator determined the carrier subpoena responses did not identify a valid email or mailing address. [25] Given the large number of class member phone numbers that have been disconnected/reassigned, reverse look-ups performed four+ years after the class period are likely to include information that is not accurate for the class members.

41. Based on my review of the reverse look-up data produced by the notice administrator,[26] I identified the 29,031 phone numbers that the notice administrator describes as having invalid email or street addresses in the carrier responses and compared that list to those numbers appearing in the Reassigned Number Database. I found that 16,281 (56.1%) have been disconnected and potentially reassigned since the class period. In other words, the reverse look-up for these 16,281 numbers was likely to identify individuals other than the ones who received the calls in this matter.[27]

---

[25] August 14, 2024 Joint Status Report. Of those 29,031 numbers, it was unable to find any information for 1,060 numbers.

[26] See "Exploria_Round 1 Search Results.xlsx" and "Exploria_Round 2 Search Results.xlsx".

[27] It is possible that some of these numbers were disconnected/reassigned at some point after Aug. 23, 2024 (the date on which the class administrator sent notice). To examine the extent of this issue, I tested whether the 16,281 reassigned numbers within the 29,031 with insufficient carrier information had been disconnected/reassigned since Aug. 23, 2024, and found that 8,249 numbers met this criterion. This indicates that 8,032 of the "reverse look-up" numbers were disconnected/reassigned between the last class period contact and August 23, 2024, almost (Continued…)

42. I also reviewed the information obtained by the notice administrator in its reverse look-up process and compared that information to what is available in the Yodel call logs. In particular, I examined the email addresses since this was the primary means of notifying the class members.[28] For the 6,460 phone numbers where an email address is present in both the Yodel call logs and the reverse look-ups, 3,649 of them (56.5%) are different. Unsurprisingly, there are also mismatches between the class member names in the Yodel call logs and what the reverse look-ups provide. Of the 19,470 phone numbers with first and last name in both the Yodel call logs and the reverse look-ups, 7,628 (39.2%) names are different. In total, 775 or 24% of name and physical addresses matched between the Yodel call logs and the reverse look-up information.

43. The Lead Plaintiff in this case (George Moore) provides an example of the errors that result from this reverse look-up process. I reviewed the carrier subpoena responses and identified the plaintiff's number in the data provided by AT&T.[29] As the Plaintiff explained in his deposition testimony, the wireless service for his number is provided by PureTalk.[30] PureTalk is a Mobile Virtual Network Operator. Mobile Virtual Network Operators are companies that resell network services purchased from the major carriers. AT&T is typically unaware of the subscriber details for these resellers, and consequently its subpoena response lists PureTalk as the entity associated with the Lead Plaintiff's number.

44. The notice administrator correctly realized that the information provided by AT&T did not identify the phone number subscriber and therefore included the number in its reverse look-

---

certainly muddying the reverse look-up results. For the 8,249 numbers that were reassigned after August 23, 2024, it is still possible that the number was disconnected both before and after the reverse look-up. In other words, it's still possible that the reverse look-up did not accurately identify the class member.

[28] August 14, 2024, Joint Status Report.

[29] "ATT 3046314 copy.xlsx".

[30] Deposition of George Moore, December 9, 2020, at 20.

up process (i.e., this is an example of where the carrier subpoenas returned subscriber information, but that information did not identify a class member). That process did not return the name, address, and email for George Moore. Instead, it returned information for a Donald Jorgensen in Oswego, Illinois, along with two associated emails—jorgensenm10@gmail.com and djorgensen@worldnet.att.net. In deposition, the Lead Plaintiff identified his place of residence as Carol Stream, Illinois, and identified eleven email addresses he uses, none of which match these two email addresses.[31] This strongly suggests that the notice administrator sent notice to the wrong party, even when attempting to notify the Lead Plaintiff in the matter. This further indicates that other information returned from the reverse look-up process—whether or not it cross-checked partial information from the carrier subpoenas—may be inaccurate and thus, alone, is unreliable.

### C. Call Disposition

45. Third parties Yodel and Prospects DM produced call logs providing details of the contact made in relation to Defendant's campaign. Among several fields provided by Yodel, one indicates the "call disposition." In fact, Plaintiff used the values in this field to identify calls that were transferred to a Club Exploria representative based on testimony by Yodel's CEO, Kyle Wood.[32]

46. One relevant entry among those dispositions is "Interested." As Mr. Wood explains, these are calls where "…at the onset of the phone call the individual is interested…"[33] Examining the call logs associated with the allegedly violative calls, I found that 9,278 (14%) of

[31] Deposition of George Moore, December 9, 2020, pp. 74–45. The email addresses identified are GMoore3@att.net, Shinytop@att.net, GMoore03@att.net, GMoore3@sbcglobal.net, potatopancakes3@gmail.com, shinytop3@gmail.com, GMoore3@outlook.com, shinytop@outlook.com, anykey3@att.net, anykey03@gmail.com, and manneken30@yahoo.com. Furthermore, George Moore himself does not identify Donald Jorgensen as one of the aliases he's used (pp. 13-13).

[32] Woolfson Decl., at ¶33.

[33] Dkt. 322-2, Deposition of Kyle Wood (Wood Dep.), November 5, 2020, at 66.

the class member phone numbers indicated being "Interested" in the offering based on call logs recorded during the class period.

47. Other call logs are characterized with a "Call Back" or "Delayed Call Back" disposition. These represent instances where "…the individual asked to be called back..." or "…they wanted to be called back but not immediately that day."[34] 19,782 (30%) of the class members indicated such interest.

**D. Call Duration**

48. Included in both Yodel and Prospects DM's call log data is a field indicating the total duration of the call. The values in this field range from as short as one second to nearly 8 hours. While the call durations logged by Prospects DM are limited to the time after the call is transferred to Club Exploria, call durations logged by Yodel begin upon connection.[35] As the distribution shows below, a large proportion of calls lasted longer than five minutes. In fact, the median time of the calls identified by Plaintiffs is almost five minutes, with an average call length of 7.45 minutes.

[34] Wood Dep. at 62, 64.

[35] *See* Dkt. 322-31, Deposition of Joshua Grant Kidd ("Kidd Dep."), June 10, 2021, at 65 (Prospects DM) and Wood Dep. at 58 (Yodel).




49. In total, there are 53,866 calls from Yodel and Prospects DM that lasted longer than three minutes. These longer calls were placed to 52,509 Class member phone numbers (78.7% of 66,682). Given the long duration, it seems unlikely that the recipient of the call was averse to receiving information from Defendant.[36]

50. Consistent with the fact that at least some of these calls were welcomed by class members is that Defendant reported nearly $2 million in sales from the campaign.[37] Data from the Defendant indicates that over 1,600 people toured the timeshare property, and over 150 purchased

[36] I note that the soundboard script lasts about ninety seconds (see CE-00175.mp3, for example). Since the call durations for Prospects DM begin at the time of transfer, this analysis underestimates those who spent more than three minutes total on the phone if they were contacted by Prospects DM.
[37] Dkt. 376, Memorandum Opinion and Order Granting Summary Judgment ("Summary Judgment Order"), September 26, 2025, at 4.

timeshare property with Club Exploria.[38] Among those 1,600+ people, 423 phone numbers correspond to those identified by Plaintiffs as class members. Other data indicates that over 4,000 of the class member phone numbers have engaged with a Club Exploria program at some point in time.[39] At a minimum, this raises questions as to whether the phone numbers associated with these sales are for subscribers who welcomed the outreach.

**E. Large Recoveries**

51. It is my understanding that the class members must submit a W-9 if they received four or more calls (i.e., $2,000 or more in recovery). I have identified 182 phone numbers that meet this criterion. For these class members, it will not just be necessary to mail the individual a check, but the person will need to provide their name, address, and social security number in order to receive the proposed recovery amount.

**F. Summary**

52. The evidence available in this case is not sufficient to contact even a majority of class members. It is my understanding that, for this phase of the case, class members need to be contacted by name and physical address. Table 1 below summarizes the reliability of the name and contact information used in the notification phase. Reliability is assessed by comparing the information from the carrier responses and the reverse look-ups to the information provided by the class member in the Yodel call logs.

53. It appears that there is reliable information for approximately 30% of class members in the aggregate. However, there is no way of knowing which of the names and addresses

---

[38] See "Sales Statistics and Efficiency - 2026-09-21T173044.571 dc.xlsx", to be produced to Plaintiff via email. I understand that those who toured the property are counted under the "Tours" section of the "Sales Statistics and Efficiency" worksheet within the document. Those who purchased are counted under the "Sales" section of the same worksheet.

[39] See "Phone Numbers and relationship.xlsx", to be produced to Plaintiff via email. Specifically, see "Unique" worksheet.

are reliable for which phone numbers. In other words, an attempt to contact a class member via their name and address would work 30% of the time—but there is no way of knowing in advance which ones will succeed and which ones will fail. And, as discussed above, there are likely class members among this 30% who welcomed the call and engaged with Club Exploria.

54. A further complexity is that the class member might have moved or given up the phone number called by Club Exploria. Thus, there is a probability that even for class members for whom the data was correct as of the class period, there may be no way to contact that class member today.

**Table 1: Reliability of Name and Contact Information Available**

| **MOBILE NUMBER DATA** | **Via Carrier Responses** | **Via Reverse Lookup** | **No Data at all** | **Total** | **Pct of Total** |
|---|---|---|---|---|---|
| Total Mobile Phone Numbers Targeted by Kroll | 37,651 | 27,971 | 1,060 | 66,682 | 100% |
| *OF THESE:* | | | | | |
| Mobile Phone Numbers Associated with Name and Street Address | 36,727 | 27,879 | N/A | 64,606 | 97% |
| *OF THESE:* | | | | | |
| Name and Address Agree with Yodel Call Logs (%) | 36% | 24% | N/A | | |
| *THUS:* | | | | | |
| Phone Numbers with Potentially Reliable Name/Address Information (*based on Yodel Call Logs matching the Mobile Phone Number information provided by carrier or via reverse look up*) | 13,222 | 6,691 | 0 | 19,913 | 30% |
| *THUS:* | | | | | |
| **Mobile Phone Numbers with Potentially *Unreliable* Information** | **24,429** | **21,280** | **1,060** | **46,769** | **70%** |
| **Mobile Phone Numbers where the Subscriber *May be* Reliable** | **13,222** | **6,691** | **0** | **19,913** | **30%** |
| **Mobile Phone Numbers where it is known that the Subscriber Actually Received an Unwelcome Call**[40] | **0** | **0** | **0** | **0** | **0** |

[40] The only subscriber for whom it is known that the calls were received is Plaintiff George Moore himself, but only because he testified as such. This is because: (1) his wife was the primary user of the phone; (2) The carrier subpoena provided incorrect information for PureTalk because Moore uses a mobile virtual network operator (MVNO); (2) the reverse lookup process (after his wife's death) showed the subscriber as a person named Donald Jorgensen. Thus, even as to Moore himself, there would be no way to connect him as a member of the class without his testimony.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed on September 28, 2026, in Berkeley, CA.

Douglas Kidder